# EXHIBIT 1

## TRANSCRIPT FROM JULY 14, 2026, HEARING IN ADVERSARY PROC. 26-9006-MXM

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In Re:<br><br>INSPIRED HEALTHCARE CAPITAL HOLDINGS, LLC,<br><br>Debtors. | ) | **Case No. 25-90004-mxm-11**<br><br>Fort Worth, Texas<br>July 14, 2026<br>9:30 a.m. Docket |
| INSPIRED HEALTHCARE CAPITAL HOLDINGS, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EMERSON EQUITY, LLC, et al.,<br><br>Defendants. | ) | **Adversary Proc. 26-9006-mxm**<br><br>MOTION TO FILED REDACTED VERSION OF COMPLAINT SCHEDULE 1 UNDER SEAL [2]<br><br>EMERGENCY MOTION FOR INJUNCTIVE RELIEF [3]<br><br>MOTION TO FILE DOCUMENT UNDER SEAL [45] |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARK X. MULLIN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Plaintiffs/ Debtors:

Marcus A. Helt
Jack G. Haake
Debbie E. Green
DECHERT, LLP
2651 N. Harwood Street, Suite 120
Dallas, TX 75201-1574
(214) 453-4900s:

For the Plaintiffs/ Debtors:

Jerry L. Hall
DECHERT, LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500

APPEARANCES, cont'd.:

| | |
|---|---|
| For Certain FINRA Arbitration Claimants: | Robert A. Simon<br>John T. Behan<br>WHITAKER CHALK SWINDLE & SCHWARTZ, PLLC<br>301 Commerce Street, Suite 3500<br>Fort Worth, TX 76102<br>(817) 878-0543 |
| For Certain FINRA Arbitration Claimants: | Kalju Nekvasil<br>Stephen Krosschell<br>GOODMAN & NEKVASIL, P.A.<br>624 1st Avenue S.<br>St. Petersburg, FL 33701<br>(800) 500-4442 |
| For the Official Committee of Unsecured Creditors: | David B. Kurzweil<br>GREENBERG TRAURIG<br>3333 Piedmont Road NE, Suite 2500<br>Atlanta, GA 30305<br>(678) 553-2680 |
| For UMB Bank: | Jason Patrick Kathman<br>SPENCER FANE, LLP<br>5700 Granite Parkway, Suite 650<br>Plano, TX 75024<br>(972) 324-0300 |
| For the Ad Hoc Group of Broker-Dealers of Inspired Healthcare Capital, LLC: | Tristan Axelrod<br>Matthew Sawyer<br>BROWN RUDNICK, LLP<br>One Financial Center<br>Boston, MA 02111<br>(617) 856-8300 |
| For the Ad Hoc Group of Broker-Dealers of Inspired Healthcare Capital, LLC: | Keith M. Aurzada<br>REED SMITH, LLP<br>2850 N. Harwood Street, Suite 1500<br>Dallas, TX 75201<br>(469) 680-4211 |
| For the Ad Hoc Group of Broker-Dealers of Inspired Healthcare Capital, LLC: | Tristan M. Sierra<br>REED SMITH, LLP<br>1221 McKinney Street, Suite 2100<br>Houston, TX 77010<br>(713) 469-3622 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Ad Hoc Committee of DST Investors: | Joseph M. Coleman<br>KANE RUSSELL COLEMAN LOGAN, P.C.<br>901 Main Street, Suite 5200<br>Dallas, TX 75202<br>(214) 777-4200 |
| For the Ad Hoc Committee of DST Investors: | Mark Taylor<br>KANE RUSSELL COLEMAN LOGAN, P.C.<br>Frost Bank Tower<br>401 Congress Avenue, Suite 2100<br>Austin, TX 78701<br>(512) 487-6560 |
| For Concorde Investment Services, LLC: | Christopher R. Kaup<br>TIFFANY & BOSCO, P.A.<br>1850 North Central Avenue, 24th Floor<br>Phoenix, AZ 85004<br>(602) 255-6000 |
| For Certain FINRA Claimants: | Erin E. Jones<br>JONES MURRAY, LLP<br>602 Sawyer Street, Suite 400<br>Houston, TX 77007<br>(832) 529-1999 |
| For Certain FINRA Claimants: | Samuel B. Edwards<br>SHEPHERD SMITH EDWARDS & KANTAS, LLP<br>900 Jackson Street<br>Dallas, TX 75202<br>(214) 613-5306 |
| For Certain FINRA Claimants: | D. Daxton White<br>THE WHITE LAW GROUP<br>125 South Wacker Drive, Suite 300<br>Chicago, IL 60606<br>(888) 637-5510 |
| For Certain FINRA Arbitration Claimants: | Adam Gana<br>GANA WEINSTEIN, LLP<br>295 Madison Avenue, Suite 705<br>New York, NY 10017<br>(516) 672-3072 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For Certain FINRA Arbitration Defendants: | Sean A. Gordon<br>THOMPSON HINE, LLP<br>Two Alliance Center<br>3560 Lenox Road NE, Suite 1600<br>Atlanta, GA 30326<br>(404) 407-3678 |
| Recorded by: | Shelly Warren<br>UNITED STATES BANKRUPTCY COURT<br>501 W. 10th Street<br>Fort Worth, TX 76102<br>(817) 333-6005 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX 76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

FORT WORTH, TEXAS - JULY 14, 2026 - 9:36 A.M.

THE CLERK: All rise.

THE COURT: Good morning. Please be seated.

All right. We're here this morning for the Court's 9:30 docket, and this morning we have the Inspired-related matters. We'll go ahead and take appearances here in the courtroom, and then after that we'll venture out to the videos.

So who'd like to start? Mr. Hall, how are you?

MR. HALL: I'm well, thank you, Your Honor. Jerry Hall, Dechert, for the Debtors. With me in the courtroom is Debbie Green, and I believe on the monitors will be Marcus Helt.

THE COURT: All right. Thank you very much.

MR. HALL: Thank you, Your Honor.

THE COURT: Mr. Simon, good morning, sir.

MR. SIMON: Good morning, Your Honor. Robert Simon, Your Honor, for 23 FINRA Arbitration Claimants in 11 pending FINRA arbitration proceedings, and they're listed in our objection to the motion.

I have with me John Behan, who is my associate, and Kalju Nekvasil, who is an attorney --

THE COURT: Yes.

MR. SIMON: -- and who represents the Claimants in FINRA arbitration actions and who will testify.

THE COURT: All right. Thank you. Welcome to Fort Worth.

MR. NEKVASIL: Thank you.

THE COURT: All right. Yes, Mr. Coleman?

MR. COLEMAN: Good morning, Your Honor. Joseph Coleman; Kane Russell Coleman & Logan; along with my partner, Mark Taylor, on behalf of the DST Committee.

THE COURT: Thank you. Good morning.

MR. KURZWEIL: Good morning, Your Honor. David Kurzweil with Greenberg Traurig on behalf of the Committee of Unsecured Creditors.

THE COURT: Thank you very much.

MR. KURZWEIL: Thank you.

MR. AXELROD: Good morning, Your Honor. Tristan Axelrod; Brown Rudnick, LLP; for the Ad Hoc Committee of Broker-Dealers. On the Zoom -- WebEx, excuse me -- is my colleague Matthew Sawyer, and I believe my co-counsel Tristan Sierra and Keith Aurzada of the Reed Smith firm.

THE COURT: All right. Thank you very much.

Good morning.

MS. JONES: Good morning, Your Honor. Erin Jones on behalf of six law firms representing FINRA Claimants in 66 of the proceedings at issue here today. And I'm here today with Mr. Edwards, Sam Edwards, of Shepard Smith Edwards & Kantas, and Dax Smith --

MR. WHITE: White.

MS. JONES: White, sorry, of The White Law Group.

THE COURT: No worries. Thank you.

MS. JONES: Thank you. And they'll both be testifying today.

THE COURT: Thank you very much.

Anyone else in the courtroom?

All right. We'll venture off to the video. If your video is turned on, I'll recognize you. And once I do, if you'd simply restate your name and the party you represent for the record, that would be very much appreciated.

Mr. Gordon, good morning, sir.

MR. GORDON: Good morning, Your Honor. I'm here today on behalf of three Defendants in FINRA arbitrations: Arkadios Capital, MSCBD, and Kingswood Capital.

THE COURT: All right. Thank you, sir.

Mr. Krosschell, good morning, sir.

MR. KROSSCHELL: Good morning. I'm with the Law Firm of Goodman & Nekvasil. We represent some of the Defendants in the underlying arbitrations. We are being represented in this matter today by Mr. Simon.

THE COURT: All right. Thank you.

All right. Mr. Kaup, good morning, sir. You're on mute on your end, sir. No worries.

MR. KAUP: I apologize, Your Honor. Christopher R.

Kaup, counsel for Concorde. Concorde is a Broker-Dealer. And Mr. Ryan Shacklette, who is an officer of Concorde, is also present on the video feed.

THE COURT: All right. Thank you, sir.

Mr. Kathman, good morning.

MR. KATHMAN: Good morning, Your Honor. Jason Kathman on behalf of UMB Bank. I think I'm just observing this morning, so I'll turn my camera off.

THE COURT: All right. Thank you, sir.

Any other counsel that I have not previously recognized wishing to make an appearance on the video?

All right. We have --

MR. GANA: This is Adam Gana, Gana Weinstein. I represent a couple of the Claimants.

THE COURT: All right.

MR. GANA: I represent a couple Claimants in FINRA arbitrations. Good morning, Your Honor.

THE COURT: Good morning, Mr. Gana. Thank you very much.

Any other counsel on the video wish to make an appearance?

All right. We have a couple of matters on the docket this morning. How would the parties like to proceed? Ms. Green?

MS. GREEN: Good morning, Your Honor. Debbie Green

for the Debtors, our Plaintiffs here. Your Honor, in addition to the Motion to Seal, we have a couple of evidentiary matters we want to take up prior to starting our presentation on the preliminary injunction, if Your Honor will allow.

Okay. Your Honor, following the TRO hearing, we served discovery. Expedited discovery. Very limited. We served eight interrogatories and ten requests for production via email to the counsel for each Defendant. They were very limited in scope to the issues that are material to the preliminary injunction hearing today.

The eight interrogatories sought identification and status of each pending FINRA arbitration, damages claimed in each arbitration, a description of the claims asserted, identification of any allegations implicating IHC's conduct, identification of each applicable insurance policy and the current status of coverage, the nature and basis of any anticipated indemnification claim against the Debtors, a description of any discovery served in the FINRA arbitrations, and a description of the impact of the TRO on each arbitration.

The ten document requests were for the Broker-Dealer Agreements, all FINRA Statements of Claims, all pleadings and submissions in the FINRA arbitrations, scheduling and hearing notices, all applicable insurance policies and declaration

pages, loss runs and claims registers, all indemnification-related documents, all discovery exchanged in the FINRA arbitrations, any declarations or affidavits intended for use in this proceeding, and contact information for each registered representative who sold IHC investments to a Claimant.

There was a -- given the expediency of the hearing, we had a quick turnaround time on that. And I think the Rules are pretty clear in such circumstances that the parties are supposed to cooperate in such discovery without needing a court order for such. And most of them in this case did actually cooperate. They produced documents. They sent us objections and responses.

There were, however, a few attorneys representing a number of Claimants who objected to this discovery, and the objection that we heard was that the Court didn't order expedited discovery, and so they did not comply, up through -- we waited through, you know, yesterday, and we still got nothing.

And so, Your Honor, we are asking the Court to, under Rule 37(c)(1), to exclude those parties who did not produce any discovery, did not serve objections or responses, did not move this Court for a protective order, that they be precluded from presenting any evidence here today, your honor. So that's Evidentiary Issue #1.

MR. SIMON: Objection, Your Honor. Is this a motion that she's now making? Is this some kind of motion for which we have no writing? She just stands up and says, oh, we'd like to exclude all your evidence, even though we sent you discovery you had no obligation to respond to, and now we want to exclude all your evidence because you didn't comply with it?

THE COURT: I believe that's an oral motion that I'm hearing. Is that?

MS. GREEN: Yes, Your Honor.

THE COURT: All right.

MS. GREEN: We gave them up until yesterday. And that's why we didn't file something. We were waiting to see -- we would have, you know, reviewed any documents they produced yesterday as we prepared for this hearing. And as of today, there are some parties that still did not respond.

THE COURT: All right. Is that it, or did --

MS. GREEN: Yes, so that's our first evidentiary issue, Your Honor.

THE COURT: Okay. And you want me to rule on that?

MS. GREEN: If Your Honor wants me to go through the second, or if you want to rule on this first one first, it's up to you, Your Honor.

THE COURT: Why don't you just tell me what they are and we'll figure out what order we'll take them in.

MS. GREEN: Sure. So the second one pertains to some declarations that were executed by attorneys, and they're going to appear on the exhibit and witness lists of some of the Claimants.

In particular, there is one by Samuel B. Edwards, one by Michael D. Kennedy, and a third by Adam, I think it's pronounced Nativ. And you'll also see on the exhibit and witness lists that they designated two attorney witnesses among the three that I just mentioned. That would be -- actually, one is in addition, so Mr. Edwards and Daxton White.

Your Honor, if you look at these declarations, they reveal that they are not declarations of fact. They are legal briefs in declaration form. Each declarant opines on questions of law that are exclusively within this Court's power to decide.

In particular, those issues are whether the automatic stay can extend to the FINRA arbitrations, what duties brokerage firms owe under FINRA's rules, whether the Broker-Dealer Agreements' indemnification provisions apply to the claims asserted in the arbitrations, whether FINRA has jurisdiction to adjudicate claims against non-FINRA members, and whether a stay would cause irreparable harm.

Those, Your Honor, are clearly not factual observations. They are legal conclusions. And so we ask that they be

excluded.

In addition, the declaration by Mr. Edwards explicitly states that he is basing the statements in this declaration on his 26 years of experience in FINRA arbitrations, opining on FINRA's administrative procedures and the practical consequences of a bankruptcy stay. This, Your Honor, is expert testimony and is subject to Rule 702 of evidence. And yet he was not disclosed as an expert witness, served no expert report, basically did not comply with the disclosure requirements of 26(a)(2). And I think, on that basis, that is another ground to exclude that declaration.

Also, one of the declarations is offered by an attorney not designated as a witness. And so that attorney isn't subject to cross-examination, it's hearsay testimony, and it should be excluded on that basis.

That concludes the evidentiary issues that we wanted to bring before the Court prior to our presentation. We have some stipulations with the parties regarding the Debtors' exhibits, but since some parties object, some consented, we're going to leave those until we get to those. And Mr. Hall will address those at the appropriate time.

THE COURT: All right. Thank you.

All right. Mr. Simon?

MR. SIMON: Your Honor, the Movants seem to think they're you. The Rules say we have 30 days to respond to

discovery. Now, the Court can order expedited discovery in a matter, but the Court hasn't ordered expedited discovery. So we're just under the ordinary rule, which is to say, when you send us discovery requests, we have 30 days to respond.

We received discovery requests out of the blue on Monday, eight days ago, and we still have 22 days to respond. Now, if the Court had entered a discovery order saying you must respond within 14 days, you must respond within 12 days, whatever, if the Court had shortened the deadline, then we would have complied with whatever the shortened deadline was, or we would have tried to comply. But we're not required to comply with a discovery they send us, just interrogatories and requests for production, with nothing that accelerates or otherwise shortens the ordinary 30-day period in which to respond.

Now, we understand, Your Honor, that in some circumstances -- for example, stay motions -- there's a shorter response period. It's 14 days. But this isn't a stay motion. And that 14 days hasn't expired yet. So we still have no obligation to respond.

And now they say, well, we want to exclude all your evidence because you didn't timely respond to discovery requests we still have 22 days to respond to. And they bring that up here as an ambush, not as a motion that we would have been able to respond to like you normally respond to a motion

when someone files something like that.

Next, they seem to have a different understanding of Rule 37 than the United States Supreme Court does. Rule 37 says, 37(c): If a party fails to provide information or identify a witness as required by 26(a) or (e), the party is not allowed to use that information or witness to supply evidence at a motion or hearing. We don't intend to use that evidence. The witness that we intend to present is one that was timely disclosed on our witness and exhibit list last Friday, in compliance with the Complex Case Rules. They had every -- they had notice that this -- timely notice that this witness was going to testify.

Second, as to whatever other evidence they wanted from us in discovery, we're not going to use that evidence. And so there's nothing to exclude.

But the motion, this particular oral motion made to the Court on no notice is improper. And beyond improper, it has no merit, because it assumes things that are not true, which is that the deadline to respond to their discovery has passed, and it has not. And with respect, that's my issue. I'm sure other people have other issues.

THE COURT: All right. Did you have any issue with the three declarations?

MR. SIMON: We don't care, Your Honor.

THE COURT: All right. Anyone else wish to be

heard? Yes, Ms. Jones?

MS. JONES: Thank you, Your Honor.

First, I'd just like to say that I reached out several times asking to confer about discovery, about preparation for the hearing, who's going to testify, determine whether do we want to take depositions before. And absolutely not one bite on that line whatsoever to confer, other than an email yesterday saying, do you object to our exhibits, late in the evening.

So I think when we talk about cooperation and the speed with which we need to move for these hearings, I think it's an issue on the Debtors' side as well.

I would like to say, if somebody would have called to confer with me, I would have said -- well, plus I filed a witness and exhibit list on Friday identifying the two witnesses. I don't plan to introduce the declarations. So, don't need to stand up here and make a motion to exclude them because I haven't moved to put them into evidence. So that's premature. But nonetheless, not necessary because I haven't offered, I haven't offered them into evidence.

Mr. Edwards is here to testify. He is testifying based on his experience, but so is Mr. Jones. And so he's not been designated as an expert, either. And so if we're going to go down that route, then we're going to have the same objection to him making any legal conclusions whatsoever about -- as an

expert, anything beyond facts.

And in addition, my client served 11 requests for production. Not one document was produced. And the objections to the requests were not even timely. So we definitely have issues on the Debtors' side as well with respect to really kind of ambush. The witness and exhibit list, I only got a link to the exhibits at 2:30 yesterday. Then there was an update three hours later when I was driving here, or on the road, and so didn't see them until 9:30 last night. And there were 15 new exhibits. There was a new witness that wasn't designated on Friday, which was unfortunate because we did ask a week prior, the week prior, who are you planning on calling as a witness? They said Mr. Jones. As of right now, Mr. Jones. We'll let you know if there's somebody else.

But I didn't think letting me know there was going to be somebody else would be, you know, 15 hours before or 12 hours before the hearing, less than 12 hours by the time I was able to see it.

So I think the issues here with respect to Rule 37 are just not really appropriate for this proceeding and the Court should deny the oral motion of the Debtors to exclude evidence.

THE COURT: All right. Thank you. Any other counsel wish to make an argument in the courtroom?

All right. How about on the video? Any counsel wishing to be heard on the oral motions raised by the Debtors?

(No response.)

THE COURT: All right. So we had an oral motion raised on behalf of the Debtors, who are the Plaintiffs in this underlying adversary proceeding, to exclude evidence under Rule 37(c)(1).

This, of course, is a preliminary injunction hearing, which the Rules require that it be heard within 14 days. So we all know that we're going to be expedited, which the Rules require.

I tend to agree with Mr. Simon in that there's nothing in the Complex Case Order or in this adversary proceeding which deals with timeliness to respond to discovery requests.

Obviously, everyone knew when we set this preliminary injunction hearing for today that there may be those issues out there. There may be discovery that parties wanted to take. Generally, it's sort of the Court's hope that parties always meet and confer, understanding the situation that everybody's in, to try to cooperate to the extent necessary. But when there's not an agreement, it's left with the Rules. And in this case, it's unfortunate that some of the discovery was not voluntarily provided, but I tend to agree that it was not obligated under the Rules or court order.

And the Court also finds that Mr. Simon's argument on

applicability of 37(c) is questionable, at best.

So the Court will deny the Oral Motion to Exclude Evidence for Failure to Have Responded to Discovery. We will go forward.

In addition, at least there was the Oral Motion to Exclude the Declarations, but as Ms. Jones stated, it doesn't appear that they're going to be offered, the declarations will be offered, and therefore it seems like that motion should be denied as well.

And to the extent Mr. Edwards or any of the other parties that were the subject of those declarations are called as witnesses, of course, it's without prejudice to any objections that any party may have to the testimony that's being provided.

But with respect to the Oral Motion to Exclude the Declarations, it appears that is moot and that there's been no declarations offered. So the Court will deny that motion as moot. But again, it's without prejudice to reasserting that oral motion if and when a party seeks to offer any of those declarations during the proceeding.

We have another matter, which I think -- we had that as a preliminary, but I think there's another matter that's also evidentiary-based, which I think Mr. Simon's firm filed an objection. Is now a good time to take up that motion as well?

MS. GREEN: Yes, Your Honor. So that's the Motion to Seal that we filed when we filed the complaint. It's to seal --

THE COURT: No. No.

MS. GREEN: Oh.

THE COURT: There was an objection filed at Docket No. 48 objecting to the Plaintiffs' amended witness list and I'm assuming second amended list as not being timely.

MR. SIMON: Yes, Your Honor.

THE COURT: So, Mr. Simon?

MR. SIMON: Yes, Your Honor. As Ms. Jones has pointed out, the Debtor seems to have a very flexible idea of what the obligations are under the Complex Case Rules to disclose witnesses and to disclose exhibits in a timely fashion.

Again, we understand this is expedited, but we're still stuck with the Complex Case Rules, and the Complex Case Rules assume a lot of things are going to be expedited in a complex case. And the Complex Case Rules set a deadline of noon Friday, noon last Friday, for witness and exhibit lists.

THE COURT: That's Table 1. Isn't Table 2 the appropriate table, since this is an expedited motion and under Table 2? Technically, the deadline was yesterday at noon.

MR. SIMON: If the deadline was yesterday at noon, I

didn't meet that, either.

THE COURT: I figured that was going to be the response.

MR. SIMON: Yeah.

THE COURT: So you missed it by a couple hours.

MR. SIMON: Yeah. And so we received this new witness and exhibit list at 5:15, I believe.

THE COURT: It was filed earlier than that, so --

MR. SIMON: It was -- let me see. I thought I -- I did write down the time, the time that's set forth in the motion. 5:15. 5:15 p.m., Docket No. 47, is what we seem to have.

THE COURT: It is.

MR. SIMON: And so at 5:15 the Debtors disclosed a new witness we never heard of before, a man named Ryan Shacklette of Concorde Security Investment Services. Again, we have no idea who this person is, other than the explanation that the Debtor gave in its witness list. But the point is, under the most charitable possible reading of Table 1 or Table 2, the deadline was noon yesterday, and we didn't get this until 5:15.

And so Mr. -- we -- the witness and exhibit list should be stricken. And even if the Court doesn't strike the witness and exhibit list, there is no basis to let Mr. Shacklette testify. He clearly was not timely designated,

and the Debtors have known about this for a long time. And why they didn't disclose it previously, I don't know. We didn't previously ask the Debtors who you were going to -- who they were going to present to testify. We were simply willing to rely upon their disclosures in the witness and exhibit list.

Ms. Jones did ask the Debtors who they were going to testify -- allow -- were going to present to testify or attempt to allow to testify. And according to Ms. Jones, and I certainly have no reason to doubt what she's saying, the Debtors didn't tell her, or us, that Mr. Shacklette was going to be a witness. And on that basis, I mean, the witness and exhibit list should be stricken. Mr. Shacklette should not testify.

The other issue, Your Honor, is the Debtors added 15 more exhibits. These would be 188 through 102, and then 104. Again, these are not timely. They had -- again, we think they should have been produced by last Friday, but if they weren't produced by last Friday, then they were certainly due by noon, and we didn't get this until 5:15. And the problem, of course, is obvious. You don't have a chance to prepare when you're getting stuff at the last minute, well after the deadline.

And this is precisely why we have rules, so that the parties have an opportunity to look and see what the

potential exhibits are going to be, who the witnesses are going to be, and to prepare. For example, prepare a cross-examination for a witness, or prepare to meet exhibits, prepare evidentiary objections to the exhibits if the basis for objection is not obvious from the face.

And we were denied that opportunity for no good reason and with no excuse, other than they simply think the Rules don't apply to them. And the Court should strike the last witness and exhibit list. The Court should exclude the testimony of Mr. Shacklette. It should exclude the last -- all the Exhibits after 187.

There's a problem with their original list, Your Honor, in that Item #3 on their list says, well, we may use any documents that are in the court record in this case. That's a problem, too. We don't have a problem with the actual documents which they showed us, 187 exhibits. When I say we don't have a problem, that is, we don't have a problem with timeliness. We might object to some of them when they're presented, but we don't object to timeliness.

But with respect to the Item #3 on their original list, where they just say, well, any other document, any documents that are in the Court's record, that doesn't give us fair notice. There are thousands of documents in the Court's record in this case. The purpose of a witness and exhibit list is to give us notice of what documents the Debtor may

intend to use. And to say, well, you know, look at the docket and look at every document attached to every document on the docket and that's what we may use, that's not a witness and exhibit list. That's like telling us, well, the document is in the Library of Congress, you know, here's the email address. It doesn't perform the function that the Rule provides, which is notice. And on that basis, Item #3 should be stricken from their original list, and the last list should be stricken in its entirety.

THE COURT: All right. Thank you.

Ms. Jones?

MS. JONES: Thank you, Your Honor. I did not have an opportunity to prepare a written response between, you know, the hours of 10:00 and this morning. But I would like to at least echo that the late -- well, first, in fairness, being an out-of-towner, I wasn't sure when the witness and exhibit lists were due under the Rules. I wasn't sure if it was under the regular table or if it was considered an emergency motion because it was filed as an emergency motion and it would have to be within a certain time.

And so, in an effort to make sure I was on the same page, I reached out to Debtors' counsel and said, hey, how do you guys interpret this Rule? When do you think the deadline is? And they said -- and I said: Because I think it's Monday at noon. And they responded: It's Friday at noon. So, anyway,

we filed Friday at noon to be in step with everybody else.

So maybe saying Monday at noon is generous, considering, you know, but the Rules are the Rules. But we would ask for at least Exhibits 188 through 202, which are the newly-designated exhibits yesterday, to be excluded, and the testimony of Mr. Shacklette as well. Or I don't know if I'm saying that right. Thank you.

THE COURT: All right. Thank you.

Anyone else in the courtroom who supports the motion filed to exclude?

How about on the video? Anyone wish to be heard in support of the motion?

(No response.)

THE COURT: All right. Response. Mr. Hall?

MR. HALL: Good morning, Your Honor. Jerry Hall for the Debtors.

Your Honor, this is what Your Honor has already said. This is an expedited matter. We had 14 days. The parties are all scrambling around. I understand from my colleague we are still, while we are sitting in this courtroom (indicating), receiving discovery responses and documents from parties. We have done as much as we could as fast as we could.

Ms. Jones is correct. I'm the person who told her we are treating the deadline as Friday, to be conservative. And we

did. That was when our initial list was filed. And then as we discovered other documents in our preparation, we amended our exhibit list and filed those as well, which is the subject of the complaint that we're talking about right now.

Those exhibits, 188 to 202, those are letters seeking discovery from the FINRA Claimants. So they are within their control. We received them because they were sent to us, obviously, seeking discovery. And then one of the letters is our response back to the lawyer for that collection of FINRA Claimants. I want to say it's approximately 20 requests. Well, 188 to 202, whatever that number works out to be. Those are those documents.

I believe there may also be four insurance policies included in that. Those insurance policies relate to Concorde, a witness who we only discovered yesterday. So they weren't somebody known to us. They are not a defendant. In fact, the point of Concorde in part, Your Honor, is (a) to allow Your Honor to hear directly from a Broker-Dealer about, you know, claims that involve IHC Securities, what is happening within the context of the FINRA arbitrations, what they are doing, and then what rights they believe they have vis-a-vis indemnification, all matters that we believe are at issue and that your Court would be interested in hearing about.

But additionally, for this particular Broker-Dealer,

they're not a defendant. So if Your Honor saw our proposed order filed yesterday, we have this proposed process for adding parties in who are not currently known to us. Obviously, Concorde is now currently known to us, but at the time would not have been currently known to us, you know, when we filed the complaint. This is how it will look. But this is what's happening, is parties are showing up and saying, you know, hey, we understand that there is this process, and how does it impact us?

They, after discussion, agreed that if we called them, they would be willing to testify about those matters that I just described to Your Honor. So we added them in order to attempt to ensure that we have that ability to call them if we decide that that makes sense to do.

So those are the issues that we're talking about. But what we've been doing is as much as possible within the context of the 14 days from the TRO hearing to now. We actually contemplated seeking a continuance to give everybody, including the parties that are subject to discovery -- which, by the way, is not just the FINRA Claimants. We also served discovery on the Broker-Dealers in order to ensure that we get as much information so we can give this Court as much information as possible. So, at the end of the day, we're going to all argue and advocate, but the evidence, the facts that the Court should have in front

of it, that's in everybody's interest for the Court to have a fulsome record.

THE COURT: All right. Thank you. Anyone else wish to be heard? Mr. Axelrod?

MR. AXELROD: Thank you, Your Honor. Very briefly.

I agree with the comments of Mr. Hall. I want to add two very brief points. First of all, just that this is bankruptcy. We have to litigate complex and difficult matters on a very short timeline frequently. And the flurry of evidentiary activity prior to this hearing is not unusual, in my experience, in these situations.

And the second point, just as to the inclusion of docket entries, specifically, again, I believe that's customary to include an exhibit and witness list and also customary that a court would take judicial notice of the entries on its docket. There can be issues, depending on how dockets are introduced and for what purpose, but I've never seen it become problematic to include on an exhibit and witness list entries that are already before the court.

Thank you, Your Honor. That's all.

THE COURT: All right, thank you. Anyone else wish to be heard?

(No response.)

THE COURT: All right. So what the Court has before it is at Docket No. 48, which are the certain Defendants

represented by Mr. Simon's firm, which is the Motion to Exclude the Amended Witness List that was filed at Docket No. 47. And in addition, I assume the second amended witness list, which was filed after the objection filed by the Plaintiff/Debtor, Plaintiffs/Debtors, at Docket No. 49.

Again, this is bankruptcy. Welcome to bankruptcy, everyone. This is an expedited matter. It's a very important matter. A lot of people are impacted, will be, have a keen interest on what the Court's ultimate ruling will be. Similar to the Court's ruling in denying the oral request, the Court is also going to overrule the motion at Docket No. 48. Rules are very important. Litigation by ambush is detested by all courts.

Is this litigation by ambush? I don't think so. I think all the parties have been very diligent in trying to get prepared for a very contested matter involving countless parties. So it's not unusual in cases like this that we have a flurry of witness and exhibit list amendments. The key is going to be whether or not there truly is harm, shock, surprise.

So I think what the Court is going to do, the Court, again, is going to overrule the motion. It's without prejudice to raising any objections as this really is a shock and surprise and should not be considered by the Court. And I'll consider those on an item-by-item basis, whether it's a

specific witness or whether it's a specific exhibit.

I agree that most witness and exhibit lists include a docket for the Court to take judicial notice. I get that. But when you have a thousand-plus docket entries, I understand Mr. Simon's and Ms. Jones' consternation that I can't be prepared, I don't know what it's going to be. If I were a betting person, I would say to the extent there are any of those documents that are offered, there probably won't be much of an objection, but there might be, and there might be a good sound reason why the Court should exclude it.

So I'm going to take that up on an individual document by document if and when one is offered to object and to raise the objection of due process, certainly unfairness, things of that nature. But I do want to have as fulsome of a record that the Plaintiffs/Debtors could put forth as well as those that are opposing the entry of a preliminary injunction or extension of the automatic stay.

And so the Court, again, is going to try to be as fair as possible, giving due deference to the fact that this is an expedited matter, that there are witnesses that are included very late in the process here. It's a 14-day process, and at least one witness and perhaps more have been identified in the last 24 hours. I certainly understand that puts a party at a disadvantage.

But in this case, the Plaintiffs have the burden to

either get the stay extended or for a preliminary injunction to be imposed. I'd like to give them their opportunity to put on whatever evidence they think is appropriate. When a witness is called or when a document is offered, I will consider the argument as to why it really is prejudicial, given the timing of either the inclusion of that witness or that particular document on a witness and exempt list and rule each individual evidentiary point, as opposed to a blanket granting of the motion.

So the motion itself is denied, but it's without prejudice to raising objections as we go forward through the hearing.

So, with that, I think, given the Court's ruling, it's a little bit even-handed, I'm going to let you put on whatever evidence you think is appropriate. The Court will consider arguments and objections based upon surprise and due process, and the Court will make its best effort to rule accordingly on each individual item.

So, with that, the motion is denied without prejudice, as stated on the record.

All right. Next.

MS. GREEN: Debbie Green, again, on behalf of the Plaintiffs. Your Honor, I think the remaining preliminary matter that was set for today is the Plaintiffs' Motion to Seal the Identities of the Individual Defendants.

Your Honor, I'm going to be brief on this. Section 105 of the Bankruptcy Code gives the Court power to issue an order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. And then 107(b) provides bankruptcy courts with the power to issue orders that will protect entities from potential harm that may result from the disclosure of certain confidential information. And we believe that's the case here.

And I'd like to remind Your Honor of the order at Docket No. 92 in the main case. Okay. In that case, the Court restricted the identities of the investors, who are the Claimants in this case, to just the Court, the U.S. Trustee, and the retained professionals of any statutory committee appointed. And as Your Honor may recall, there was a motion in the main case to get access to this information. And the Court denied that motion based on them raising the argument late in the day. Their motion read, or could be read, as applying just to the residents, but they were really seeking the identities of investors for solicitation purposes.

And so, Your Honor, we would respectfully submit that a conflicting order in the adversary proceeding should not be entered in this case because we know exactly what's going to happen, which is, if the Court does not seal this information, that there are Plaintiffs' counsel waiting in the wings, without having brought the motion in the main case

that this Court told them they should bring to seek the names of the investors, they're going to use the adversary proceeding to solicit the Defendants.

And so, Your Honor, we'd ask that Your Honor seal the identities of the individual Defendants who are investors in the Debtors. And based on what this Court decides on that motion, we would ask that the Court either exclude, if we're going to mention those names during the proceeding, exclude parties both in the court and on WebEx who are not parties, who are just listening, you know, who are not necessary to this proceeding, from hearing those names.

Nothing further, Your Honor.

THE COURT: Thank you, Ms. Green.

MR. AXELROD: Your Honor, may I?

THE COURT: Yes, of course, Mr. Axelrod.

MR. AXELROD: Before I go too far, may I ask, there were also motions to seal exhibit and witness exhibit filings that I think were fairly consistent, and my party filed one, so I'd like to -- I think those should be heard together on the same reasons. But if you would rather I speak later, I may.

THE COURT: You tell me. I'm not sure what you're talking about, so I don't have them on my radar right now.

MR. AXELROD: Oh, okay. I think it is -- it might be Docket No. 42. But we filed a motion to seal certain

exhibits presented by the Broker-Dealer Group. I believe the Debtors wanted to seal certain of their exhibits as well. And it's basically Statements of Claim from the arbitrations and responses to those Statements of Claim that go into detail about the investors' finances. So I think it goes to some of the same points raised by Ms. Green, because I believe the Debtors are agreeing here.

THE COURT: Give me one moment.

MR. AXELROD: 45, excuse me, Your Honor.

(Pause.)

MS. GREEN: And, Your Honor, if I could just make one comment.

THE COURT: Yes, please.

MS. GREEN: The reason we sealed temporarily the exhibit and witness list was for this reason, because we already have the pending motion, and it's the same information that's being introduced on the exhibit and witness list.

THE COURT: All right. Give me one moment. I know we can get Docket 45. I had not read that prior to coming out.

(Pause.)

THE COURT: All right. I've very quickly read Docket No. 45. Any party wish to respond? Obviously, this was just filed on the 10th. I don't believe it was set for

hearing for today.

MR. AXELROD: Excuse me, Your Honor. I did understand Mr. Simon is objecting to that motion along with the Debtors' motions, and I'm prepared to speak to it. Thank you.

THE COURT: All right. Because I read Mr. Simon's motions as objecting to 40 and 47. And Mr. Simon did object to 2 and 45. You're exactly right. I did read that, actually. I didn't put two and two together. So, Mr. Simon?

MR. SIMON: Oh, no, yes, absolutely, Your Honor. We've read them both and we oppose them both. Your Honor, Robert Simon for 23 of the Claimants in the FINRA arbitrations. One more time, the moving parties seem not to be particularly concerned with actually what the Rules say. Or in this case, it's really -- it's 107(b) of the Bankruptcy Code.

Both motions rely on -- they mentioned 105, but 105 by itself doesn't do anything. 105(a) just gives the Court to issue an order to otherwise carry out the provision of the Bankruptcy Code. It does not create substantive rights. For substantive rights, you have to look somewhere else. And the substantive rights would be in Bankruptcy Code Section 107(b), which states that, on the request of a party in interest, the Bankruptcy Code -- the bankruptcy court shall seal a document if one of two conditions are met. One, the

sealing will protect an entity with respect to a trade secret or confidential research, development, or commercial information. Two, the sealing will protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title. And the party seeking protection under Rule 107 bears the burden of showing that the information is confidential or scandalous, and therefore that the protections of this Rule should apply.

In this case, neither of the Movants can meet that burden. First, although I said it, you know, basically in a footnote in our response, I will say it now out loud, more forcefully. The Movants are flying a false flag, Your Honor. They unconvincingly state that they seek to protect the privacy interests of the arbitration claimants. That's us. That claim is plainly false. Our clients are the very people whom the Debtors and the Arbitration Defendants, effectively, Broker-Dealers, say they're trying to protect. Our clients did not ask for this protection and we do not want this protection. That should be the end of the debate. They say they're trying to protect us. We don't want to be protected.

THE COURT: What about other like potential plaintiffs?

MR. SIMON: Well, Your Honor, there are other potential plaintiffs who may feel differently, although we don't think so. But we're okay if the Court -- if the Court

carves us out, then that in and of itself is significant. But the truth is obvious, Your Honor. The Debtors are seeking to protect the Broker-Dealers from embarrassment. They are not seeking to protect the Arbitration Claimants. And even -- and to address the Court's point, yeah, what about everybody else?

Second, even if you suspended disbelief and took the Debtors' representations at face value, the desire to protect the identity of claimants in litigation is not sufficient cause to seal documents under Rule 107. Courts have ruled "The exception to public disclosure under Section 107 was never intended to save the debtor or its creditors from embarrassment or to protect their privacy in light of countervailing statutory, constitutional, and policy concerns." We cite that case in our brief, Your Honor, but it is *In re Fibermark, Inc.*, 330 B.R. 480, 508 (coughing). It's the Bankruptcy Court out of the State of Vermont, 2005.

Court filings are public records, and the interest of transparency outweighs the interest in protecting privacy. Now, obviously, there are exceptions to that rule -- Social Security numbers, bank account numbers, the names of minors, sure. We acknowledge that and we totally agree that is appropriate.

But that's not the relief they're seeking. What they're seeking is to conceal the names of the Arbitration Claimants

and the lawyers in the arbitration matters. And there is no basis to do that to protect the privacy of creditors.

Third, to the extent the Motion to Seal may purport to protect commercial information pursuant to Section 107(b), Movants do not allege any factual basis for that assertion. There are no allegations whatever in the motion that there is commercial -- confidential commercial information that needs to be protected, and you did not hear that from Ms. Green or counsel for the B-D Claimants, for the Broker-Dealers.

Bankruptcy courts have defined confidential commercial information as information that would cause "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." That's *In re Faucett*, 438 B.R. 634 [sic], 637, Western District of Texas, 2010.

The listing of FINRA arbitration names, the names of arbitration claimants -- the listing of FINRA arbitration case names, the names of the Arbitration Claimants, and the lawyers for the Claimants are not commercial information and they would not provide an unfair advantage to competitors of the Debtor, nor has the Debtor pleaded what that competitive injury would be if the names of these people and their attorneys and the case captions were disclosed.

That is their burden. They have to prove this is confidential commercial information and they would be harmed

if it were disclosed. They don't even allege it, much less prove it.

To the extent Movants are relying on 107(b)(2), the argument also fails. A party seeking redaction pursuant to 107(b)(2) must establish that the material is, quote, either scandalous because it is grossly offensive, irrelevant to the proceeding and submitted for an improper purpose, or defamatory, because the statements can clearly be shown to be untrue without the need for discovery or in any trial.

The listing of arbitration case numbers, the names of the Claimants, and their attorneys is not scandalous, nor is it irrelevant to the proceedings. That is what the proceedings are all about. Nor is it defamatory. The mere fact that people were involved in litigation is not defamatory.

Next, to get directly to the Broker-Dealer Agreement, because the Broker-Dealers seek something else, they seek to redact not just the names of the people in the arbitration but to redact the Managing Broker-Dealer Agreement.

As evidenced by the document itself, the Managing Broker-Dealer Agreement is a standard agreement with no special provisions that competitors would want to copy or use, and they would have to prove that, and they haven't. There is no confidential commercial information in the Managing Broker-Dealer Agreement, or at least, if there is, no evidence has been presented.

Similarly, there is nothing scandalous or defamatory about the Managing Broker-Dealer Agreement. It's simply a form contract used in the security industry. There's nothing about it that needs to be redacted or sealed in any way.

Finally, Your Honor, and this is really important, the request to seal the Managing Broker-Dealer Agreement asks the Court to ignore reality. This document is the critical document in the adversary proceeding as it contains the indemnification agreement that the Debtors cite in support of enjoining all of the FINRA arbitrations. It's the critical document. In the interest of transparency of the proceeding, the Court should not seal the critical document in the case. It's actually absurd.

And this document has been discussed and quoted extensively in the party's filings. The Debtors attach the agreement to the complaint in the adversary proceeding. It's been readily available on PACER in unredacted form since the adversary proceeding was filed.

Furthermore, the document is already out there. We've cited the webpage in our response. Anybody can simply go click on that link and read the Managing Broker-Dealer Agreement.

Accordingly, even if they could somehow get over all the other things, the genie is already out of the bottle. There's no way to reseal this document. It's out there in

the public.

To the extent that the B-D Ad Hoc Group ever had a legitimate argument to seal the Managing Broker-Dealer Agreement, the Debtor mooted that argument by attaching it to the complaint and putting it out there for the world to see. Both of these motions are frivolous. Neither is supported by evidence. And they ask the Court to do the impossible by requesting that you claw back documents that have already been publicly available for weeks. The Court should deny the motions.

THE COURT: Thank you.

MR. NEKVASIL: Your Honor?

THE COURT: Yes?

MR. NEKVASIL: May I be heard on this motion? I, as a witness in the preliminary injunction, there's no evidentiary hearing on the Motion to Seal. May I also be heard to briefly --

THE COURT: No, I think your counsel has spoken, and we'll leave it at that.

MR. AXELROD: Your Honor, I previously did not intend to cede the podium. I actually wanted to argue my motion. So if I could be heard now, I'd appreciate it.

THE COURT: Of course.

MR. AXELROD: Thank you.

THE COURT: And again, I apologize. I didn't put

two and two together. I did read Docket No. 2 and I did read the objection, which did refer to 45 and 2. I just didn't see 45. And I've now seen it and read it, so --

MR. AXELROD: No harm, I'm sure, Your Honor. Thank you.

I do want to make one preliminary comment. The Master Broker-Dealer Agreement was included in this motion by error. And Mr. Simon is correct. That's been made public already. We withdraw our motion as to that.

This is about the Statements of Claim and the responses from the Broker-Dealers in the arbitrations. The FINRA Plaintiffs -- I'm going to call Mr. Simon and Ms. Jones' clients the FINRA Plaintiffs. They're Defendants in this adversary. So am I.

The FINRA Plaintiffs are the Broker-Dealers' current and former clients. The Broker-Dealers keep their client financial information safe and confidential at all times to the best of their ability, period, end of story. Even if their clients are suing them, as they are. The Statements of Claim and the responses to those contain detailed information about their clients' finances. It's not just redactable names and account informations. It's net worth. It's who they trust. It's how they think about their wealth, how they created their wealth, are they sophisticated and experienced investors. There's a lot of information in there. It is

difficult, if not impossible, to just redact everything in those documents. That's why we requested to seal.

Your Honor, there was some discussion of case law here. There's a lot of case law around this type of thing. It tends to come up in financial fraud cases and personal injury mass tort cases. I've litigated this a number of times, usually against the U.S. Trustee. We could put in a supplemental filing if Your Honor would like to review additional case law. But basically, we thought this was a fairly *pro forma* motion, because what investor, what party here, other than the U.S. Trustee, would want to blow out all of their financial information and identify all that to the public?

In my experience in the cryptocurrency cases, families and the public don't always know what people's net worth is, they don't know where the money is, unless you disclose it in these cases. And I had real-life examples in those cases of people who were blackmailed and injured as a result of this sudden discovery. That was the basis for sealing in those cases.

Similarly, personal injury, mass tort cases, you have sex abuse, opioids. It is embarrassing. It is also scandalous. People have to bring out very difficult elements of their personal history. There's no advantage, really, to any party in making that information public.

And here, I want to be very clear about one issue. If you read the Statements of Claim that we are seeking to seal and you read the responses to it, I don't want to proffer about every one of the hundred-plus Statements of Claim, but I believe in every single one of them, or nearly every single one of them, there is an allegation that the DST or similar investments were not suitable for the investor and the investor should have never signed on to them. And there's also an allegation that the investor signed a document saying that they were an accredited investor and that they had a sophistication in their investment activity and an appetite and capability for risk and an understanding of that risk. That is in all of the responses from the Broker-Dealers, and it's often preempted by statements in the Statement of Claim.

And then you have preemptive statements in the Statement of Claim, some of them saying, well, I know I signed that saying I'm a sophisticated investor, but I didn't really understand it. I was sold something that I didn't fully understand.

That's the allegation. That's the claim that they are making. And of course, there are merits, defenses, all kinds of things. I just want to point this out because we have counsel standing up here saying he wants to waive his clients' confidentiality protection and waive other people's confidentiality protections. And I have to say, knowing what

is at stake here and why in this case, I would be very, very frightened to waive my clients' personally-identifying and sensitive financial information and make it public.

The Broker-Dealers are concerned that the clients in this instance may not fully understand the potential repercussions for blowing out their financial information, and they don't want to be responsible for that. If counsel is fully authorized, they can file whatever they want on the record. They can file these Statements of Claim. I think they have, to some extent. But the Broker-Dealers won't be part of that. As far as we're concerned, everything identifying investors and their financial information in these entire cases should remain confidential.

Thank you, Your Honor.

THE COURT: Mr. Coleman?

MR. COLEMAN: May I be heard, Your Honor?

THE COURT: Yes, of course.

MR. COLEMAN: Very briefly.

THE COURT: Take your time.

MR. COLEMAN: You may regret that.

Your Honor, on behalf of the DST -- Joseph Coleman, counsel for DST Investors. On behalf of the DST Investors, I've got a very narrow point to make. Ms. Jones' and Mr. Simon's DST Investors, who are Plaintiffs, they're represented by counsel. They can -- their counsel can take

care of them.

It's the remaining well over 2,000 DST Investors that I'm concerned about. I want to make sure their identity is protected. I want to make sure -- we had this remarkable hearing, Your Honor, where they wanted -- the Movant wanted a list of the residents, and then it turned into the DST Investors, a list of DST Investors. So I want to keep that pursuit to the motion at Docket 92 to seal the identity of DST Investors, other than those represented by Ms. Jones and Mr. Simon, I want to keep that order in place and not have other DST Investors' identity exposed. That's my only point, Your Honor.

THE COURT: All right. Thank you.

MR. COLEMAN: Thank you.

THE COURT: Mr. Kurzweil?

MR. KURZWEIL: Thank you, Your Honor. David Kurzweil on behalf of the Committee of Unsecured Creditors.

Your Honor will see a common theme today where we turn to DST and a lot of comments that they're making. So not to belabor the point, we do share Mr. Coleman's concerns about this information being shared. On the fund side, we do represent over -- approximately over 2,000 creditors. I don't know the exact amount on that. But we certainly -- they don't want their intimate financial information exposed to the public. And that is something that we seek to protect

and not have it disclosed.

Certainly, any individual creditor who's represented by counsel who wants to make that disclosure, that's specifically up to them. But any general order that allows disclosure of anybody's personal identification information or any intimate financial details, we certainly oppose the disclosure of that information.

THE COURT: So, and I should have asked Mr. Coleman this as well, but I'll ask you both as the Committee counsel for the DSTs and the Unsecured Creditors' Committee: Is it your position that the order in the main case should remain in effect and unchanged?

MR. KURZWEIL: Yes, it is, Your Honor.

THE COURT: And that the motion that was filed by the Debtors at Docket No. 2 is really kind of belts-and--suspenders? The protection is already there and it should be changed in the main case pursuant to that order?

MR. KURZWEIL: I didn't understand the second question.

THE COURT: That if the Court is going to change the order in the main case, that it should do so through a motion that's filed in the main case, noticed to everybody, to determine whether or not that order should be limited in any way?

MR. COLEMAN: Absolutely.

MR. KURZWEIL: We agree, Your Honor.

THE COURT: All right. Ms. Green, what about the Debtor? What's the Debtors' position? I think you said that, but I wanted to make sure.

MS. GREEN: Yes, Your Honor. So, Your Honor, here's the issue. Currently in this adversary proceeding, there are a hundred and something or so investors. However, if Your Honor will look at the proposed order, what we're hoping, if Your Honor grants the preliminary injunction, is to capture all the other claims that are out there. And this is why we're still getting, you know, reach-outs from Broker-Dealers saying, hey, we've got some additional claims.

And so if Your Honor enters a preliminary injunction, there are going to be other investor names and information that come out, and we want to protect all of the investors. As it stands in the -- under Order 92 in the main case, that information is sealed. It's protected from, you know, from the public information. And so we think it should remain that way. This shouldn't be some sort of escape because there's an adversary proceeding, that there's a different order entered and their information gets out there just because there's an adversary proceeding.

THE COURT: All right. Another question for you while you're at the podium, to make sure I understand. So the request in Docket 2 is to maintain the confidentiality

order that is in the main case?

MS. GREEN: Essentially, Your Honor.

THE COURT: Essentially? And so in this case we have -- at least some of the investors have said we think -- we have no problem with our investors being disclosed. Is there any way that we can have this hearing and parse out some investors and not the others? Is that even a practical solution?

MS. GREEN: I don't know if Your Honor can do -- I mean, practically, I don't know how that would work.

THE COURT: Okay. Mr. Simon, that's a question I have, as I understand that your clients, and Ms. Jones, your clients, may wish to have that information made public.

I tend to agree that that probably should be papers filed in the main case, so that parties, all creditors and parties in interest can have a say in whether or not the Court should modify what's already an order in the main case.

Ms. Jones, go ahead.

MS. JONES: Yes. May I speak from --

THE COURT: Yes. Go right ahead.

MS. JONES: I just didn't want to -- so, just to be clear, my clients haven't taken a position on this motion.

THE COURT: Okay.

MS. JONES: But there has been raised an issue that I do want to deal with at some point, which is this, like,

just extreme lack of notice problem that we have and the fact that we're here today on a preliminary injunction for parties that are yet to be named even. Not to mention the fact that absolutely none of these individual FINRA Claimants are actually named as defendants, nor have summons been sought, nor has it been served, which is so easy to do in a bankruptcy case.

So, I mean, we've got some serious procedural problems here. Or, really, substantive problems, you know, jurisdictional problems. The idea that there's now a new proposed order filed this morning that expands the scope of our preliminary injunction against parties that have no notice --

THE COURT: I haven't seen it, by the way.

MS. JONES: Okay.

THE COURT: I've not seen that portion of the order.

MS. JONES: No, that's what I'm hearing.

THE COURT: But let's focus on --

MS. JONES: I'm going to leave that, but I just -- I just -- it's been raised, and so I just want to signal to the Court that I want to talk about that when we get to the point.

THE COURT: Understood.

MS. JONES: Okay.

THE COURT: But as far as the Motion to Seal, do

your clients take any position?

MS. JONES: Not taking a position.

THE COURT: All right. So, Mr. Simon, I'll give you the last word.

MR. SIMON: A couple of points, Your Honor.

THE COURT: And you can take a minute and chat with your --

MR. SIMON: Sure.

A VOICE: May I consult with --

THE COURT: Of course. Yes. Of course.

(Pause.)

A VOICE: Thank you, Your Honor.

THE COURT: Of course.

MR. SIMON: Your Honor, we are, as we have -- as we frequently are in this case, we are the victim of, shall we say, lack of notice from the get-go. Docket No. 92 -- the docket -- the order entered in Docket No. 92 was an *ex parte*, as a result of an *ex parte* motion. None of them had the opportunity to come in and tell the Court, hey, please don't protect us. This is not the protection that we want. It was done without notice.

THE COURT: It was done in February.

MR. SIMON: Yeah.

THE COURT: Clearly, since February, --

MR. SIMON: Sure.

THE COURT: -- any party who wished to have relief from that order certainly had the opportunity to file something.

MR. SIMON: Sure. But I don't think anyone hugely cared, Your Honor, until the Debtor filed this adversary proceeding. The adversary proceeding seeking to enjoin the continuation of the FINRA arbitrations is why we're here, and that's the precipitating event.

But the counsel for the B-D Investors makes one point that is absolutely valid, which is there may be financial information in these complaints that probably should be redacted. And that information can be redacted. And so I think the best resolution for this is why don't we not rule on the motion right now and let us work with the Debtor and the Committee and see if we can reach agreement on the information that should be redacted? And then we can come back. If we can't reach any agreement, then it would make sense for the Court to rule on the motion.

What we do object to, Your Honor, is not the redaction of financial information. It's the redaction of the names of the parties and the actions -- and the action themselves and their attorneys. We think that's public information and it should remain public information.

Frankly, Your Honor, the Debtor -- Ms. Green actually said the quiet part out loud the first time, which was what

they're really trying to prevent is Plaintiffs' lawyers from finding these Arbitration Claimants, which I do understand, except the Arbitration Claimants already have lawyers. They've already filed arbitrations. So I don't think that's really a concern.

Where the parties do have a community of interest, both the Debtors and our clients and the Broker-Dealers, is in the redaction of personal financial information that's separate from who are the names of the parties, you know, what is the caption of the arbitration proceeding, and who the attorneys are. And if the Court is agreeable, I would suggest that the Court order us to go meet and confer and see if we can reach an agreement.

THE COURT: When would you meet and confer? I mean, how would we proceed with the --

MR. SIMON: I think we would just tell the Court, if we need to, we're unable to reach an agreement, please rule.

THE COURT: I know, but you mean now?

MR. SIMON: No, not at this moment.

THE COURT: Which then begs the question, how do we proceed unless the Court rules, given at least the request from the Plaintiffs-Debtors that this proceeding needs to be sealed from nonparties and from other potential parties who may be sitting in the courtroom?

MR. SIMON: Your Honor, we think the Court should

deny that, simply based upon 107, the actual ruling, the actual language of 107. If the Court needs to rule today on that, it should deny it, because they do not meet these standards and they have presented no evidence. And although counsel for the B-D Ad Hoc Claimants came up here and spoke, that's not evidence. That's just a lawyer talking. There is no actual evidence that supports this motion.

And so the motion -- on that basis, the motion should be denied. And then the document, the order that is at Docket No. 92 is still there, and we can talk to the Debtors about whether we think it should be modified.

THE COURT: All right. Thank you.

Ms. Green?

MS. GREEN: Your Honor, I just want to make one final point. These FINRA Statements of Claims were intended to be confidential until we got to this Court. And so just because there's an adversary proceeding should not mean that all of a sudden, you know, they've lost protection.

But in any event, Your Honor, we would like to get going with our preliminary injunction hearing, and so we'd ask Your Honor to just go ahead and rule on the motions.

THE COURT: All right. So the Court has before it the Debtors' motion, which is at Docket No. 2. In support of that motion is Docket No. 45, filed on behalf of the Ad Hoc Group of Broker-Dealers.

The Court has also reviewed the objection filed at Docket No. 46, which are the various clients that Mr. Simon represents in this whole litany of those parties.

These issues are very, very important. And I think the points that both Committee counsel made, and as Mr. Simon has even now acknowledged, that some of this information probably should be protected, unless or until those parties that could be affected want to come in and say, go ahead and release the information.

We have had an order. It's at Docket 92. It's been the Court's order since February 6th of 2026. I think that the order and the intent of that order should continue to control, unless or until a party, a creditor party in interest can come in and ask for relief from that order. I think carrying on the intent of that order in this adversary proceeding makes abundant sense.

And I certainly understand that at least Mr. Simon's clients would like to have the names of parties of the currently-filed FINRA be made public. I think the Court is going to grant the motion to overrule the objection in this adversary proceeding, and the proper forum for the Court to fully consider whether or not the protections that are afforded in the order in the main case at Docket 92 should be modified.

So the Court, again, will grant the motion as requested,

and the Court will be happy to sign that order overruling the objection.

Which now begs the question, how do we proceed now? I'm not sure how we're going to be able to police what's on the video. You can certainly police, if there's any parties that are in the courtroom that you believe should be excluded, I guess now is a good time to chat about that. I don't know if any parties -- go ahead.

MR. AXELROD: Your Honor, if I might ask a clarification. Does the Court intend to grant the order sealing exhibits as well?

THE COURT: Yes.

MR. AXELROD: Okay.

THE COURT: Yes. Unless and until we have a fully-vetted hearing on whether or not they should be released. And I think just to maintain the status quo without prejudice is probably the best route, because I think this is a very important issue on the preliminary injunction request. That needs to be heard. There needs to be a ruling one way or the other. And I don't want to have a knee-jerk reaction to go ahead and allow information to get in the public that perhaps shouldn't have been.

So I'm going to grant the motion. Again, it's without prejudice, and the Court may, of course, grant further relief to --

Yes, Mr. Simon?

MR. SIMON: Your Honor, one thing that we need to clarify. The B-D Ad Hoc -- counsel for the B-D Ad Hoc Party, well, Parties has said they are withdrawing the motion with respect to the --

THE COURT: The Broker-Dealer Agreement?

MR. SIMON: -- the Broker-Dealer Agreement.

THE COURT: And I took them at --

MR. AXELROD: Yeah.

THE COURT: So I guess with respect to that, that's now public and that can be unsealed. I guess we can unseal that one document.

MR. AXELROD: I --

THE COURT: But for purposes of this hearing, I want to make sure we don't get too unwieldy and we're able to --

MR. AXELROD: And Your Honor, for purposes of this hearing, the document has been introduced by other parties. I think it's a moot point. I don't intend to speak about it today, I don't think.

As to how we proceed, since I'm standing at the podium, I'd be comfortable proceeding, with the understanding that speaking parties refrain from introducing into the oral record any identifying information, and we would exercise caution before putting anything on the screen. Beyond that, I'd defer to the Debtors.

THE COURT: All right.

MS. GREEN: Your Honor, that was going to be my recommendation as well. Because Your Honor has kept the exhibit and witness list sealed, I think the contents of those documents are protected. So that if the parties here today just refer to the number of the exhibit, without going into detail, naming any names, you know, going into the financial information on those documents, I think we should be okay.

THE COURT: All right. Then that's how we'll proceed.

And I'll just remind everyone who is participating on the video, of course, welcome, but just a reminder, and I think all of you should see the notice when you log in: There is to be no recording of this proceeding on the video by anyone, and we will attempt to keep that information from the public unless or until there is a further order of the Court.

All right. So how would you like to proceed? Mr. Hall?

MR. HALL: Good morning, Your Honor. Jerry Hall for the Debtors.

I have, I guess, two primary proposals. One is a short recess, maybe for restroom breaks and also maybe I can pull up a couple of our documents that we know we're going to use, maybe become a little more organized before we get into it.

Then I'm assuming that all the parties would be

interested in making brief opening statements to the Court. And then we would anticipate calling one or two witnesses. I'd like to caucus with the Committees about that before we proceed. But I would suggest perhaps 10 or 15 minutes, just to allow us to organize ourselves and use the restroom and whatnot.

THE COURT: Of course. Makes perfect sense. Just let us know when you'd like for us to come back.

All right. Court will be in brief recess, 10, 15, 20 minutes.

MR. AXELROD: Thank you, Your Honor.

THE COURT: All right. Thank you.

(A recess ensued from 10:55 a.m. until 11:42 a.m.)

THE CLERK: All rise.

THE COURT: Thank you. Please be seated.

All right. This is Judge Mullin. We're back on the record. Let me go ahead and just make clear on the record the matter we've already taken up, which is Motion to Seal. There are really two different motions, so I think we probably ought to have two orders.

Ms. Green, you could do one, and Mr. Axelrod could do the other one. But then you'll have to modify yours pursuant to the agreement that that one -- that one document is already out in public so it doesn't apply to that.

MR. AXELROD: Yes, Your Honor.

THE COURT: All right.

MR. AXELROD: Understood. Thank you.

THE COURT: All right. So, with that, Mr. Hall, are you ready?

MR. HALL: Yes, Your Honor. My understanding is we'll go through opening statements by all the parties, then we'll break for lunch, and then we'll pick up with witnesses and the Defendants' rebuttal cases.

THE COURT: Of course.

OPENING STATEMENT ON BEHALF OF THE DEBTORS

MR. HALL: So, Your Honor, we're here -- Jerry Hall for the Debtors again.

We're here today on behalf of the Debtors to request a preliminary injunction staying the Listed Actions in the complaint filed at Docket 1 of the adversary proceeding, which are more than 100 pending FINRA arbitrations and related proceedings against nondebtor defendants through the effective date of the confirmed Chapter 11 plan.

At its core, this adversary proceeding is about protecting the integrity of a Chapter 11 reorganization that directly affects the lives of approximately 2,600 elderly residents. Sorry, do we have --

THE COURT: We'll take care of that. Thank you. You may proceed.

MR. HALL: Thank you, Your Honor.

As I was saying, the foundation of this adversary proceeding is to protect the integrity of the Chapter 11 process and a reorganization that will affect the lives of approximately 2,600 elderly residents living in 33 senior living communities across 14 states, the nearly 2,000 employees who care for them, and the families of those residents and employees.

If the arbitrations that we're seeking to stay are permitted to continue, they will drain the estates' insurance resources, they will divert management's attention away from the Debtors' reorganization process.

This diversion of attention began when the Debtors filed their Chapter 11 cases. Your Honor, we'll see evidence of and certainly we'll hear testimony of several dozen requests for discovery that were made almost as soon as the bankruptcy cases were filed from various FINRA Claimants.

This is, as I mentioned earlier in our arguments about evidence, this is the basis of, a substantial part of the basis of our amended exhibit list filed yesterday. As I said, the Debtors have received maybe two dozen of these requests thus far, and they continue.

If the arbitrations continue, it will also cause a race to the courthouse that undermines the Bankruptcy Code's fundamental promise of orderly, equitable distribution. We would anticipate, Your Honor, that in addition to those

claims that have already been filed, we would see more as people strive to keep pace with those who have already filed their claims.

The relief that we are seeking is temporary and it is targeted. We are asking only that the Listed Actions be paused while the Debtors complete their sale process and move toward plan confirmation. The brokers, which are some of the parties who are Defendants in this action, support this relief. Mr. Lee, whom we have made a Defendant in this action, supports this relief. Both of the statutory committees who are present here today and Your Honor will hear from, the Official Committee of Unsecured Creditors and the Official Committee of DST Investors, supported the TRO that this Court entered on July 2 and support continuing the stay for a period of time. And as I said, you'll hear from them. The only opposition to the requested relief comes from certain FINRA Claimants.

In terms of the legal framework, the Debtors seek the relief on two independent statutory grounds, each of which justifies the preliminary injunction and each of which will be supported by the evidence Your Honor will hear.

First, we will present evidence to support the Court declaring the automatic stay under Section 362 extends to the Listed Actions against the Nondebtor Defendants because there's an identity of interest between the Debtors and the

Nondebtor Defendants and because the Listed Actions constitute acts to obtain or exercise control over property of the estate -- namely, the insurance coverage that the Debtors have.

Second, and alternatively, the Debtor may exercise its broad equitable powers under Section 105 to issue a discretionary injunction because the claims against the Nondebtors are interwoven with the claims against the Debtors, and permitting those actions to proceed would interfere with the Debtors' reorganization.

Under either theory, the traditional four-factor preliminary injunction test is satisfied. And Your Honor is familiar with those four factors: Substantial likelihood of success on the merits, substantial threat of irreparable harm, balance of the equities, and public interest.

In terms of identity of the interest, the identity of interest here is supported by the indemnification agreements which exist within the Master, sorry, the Managing Broker Agreement and the Soliciting Broker Agreements. Those documents, it's Section 8 of that document, and of course it's one of the exhibits, and Your Honor will have reference to that in the testimony. This document provides the indemnity obligation for which the Debtor is responsible for any liability that might be awarded against the Broker-Dealers in these arbitrations.

The indemnification covers, among other things, untrue statements or alleged untrue statements in the offering memorandum or sales materials, the Debtors' failures to comply with the Securities Act, the Exchange Act, or applicable regulations, any unauthorized representations made by the Debtors or their agents. Sorry. And any breach by the Debtors of any representation, warranty, or covenant in the broker agreement themselves.

Many of the FINRA arbitration claims allege that private placement offering materials were incomplete, misleading, or inadequately disclosed risks. These claims go directly to the content of the offering memoranda and the sales materials that the Debtors prepared and provided to the Broker-Dealers. If an arbitration panel finds that the offering materials contained untrue statements of material fact or omitted material information, that is precisely the kind of claim that the Debtors are concerned would give rise to an indemnification claim.

In addition to the contract, there are also common law grounds for indemnification here. There is a joint tort-feasor doctrine and agency, which the Managing Broker-Dealer Agreement designates the managing dealer as an agent of Inspired Healthcare for purposes of the offerings. So we would anticipate agency arguments.

There's also, of course, *respondeat superior* and similar

agency-related grounds.

And here, you know, Mr. Lee served as the CEO of the Debtors' Sponsor. We anticipate that Mr. Lee would argue that he was authorized to act as an agent of the Debtor in connection with the private placements. If any Claimant were to prevail on the theory that the Broker-Dealers were acting as Debtors' agent, the resulting judgment or award would effectively be a judgment against the Debtors. Thus, this would be an independent basis for finding identity of interest separate and apart from the contractual indemnification.

In terms of property of the estate, Your Honor, Section 362(a)(3) automatically stays acts to obtain possession of property of the estate or to control -- sorry, or to exercise control over property of the estate. The Debtors maintain a $10 million tower of D&O liability insurance through four policies. These are wasting policies, as I think Your Honor heard during the TRO hearing. The aggregate limit of liability is reduced by every dollar that's paid for defense costs, settlements, or judgments. One of the policies expressly provides that defense costs are part of and not in addition to the applicable limit of liability, and the payment by the insurer of defense costs reduces and may even exhaust such applicable limit of liability.

The D&O policies cover the Debtors under Sides B and C.

The Debtors' interest in these policies is thus concrete and make these policies and their proceeds proper property of the estate.

As Your Honor knows from the TRO hearing, the policies are already being consumed, and it will only continue if the arbitrations are not stayed.

There is, of course, one aspect of the insurance coverage consumption that is not subject to the stay, that's the SEC investigation, and the Debtors have been working closely with the SEC to ensure that the negative effects of the SEC's investigation on the reorganization are minimal, and currently we have had some success and have received cooperation from the SEC. Your Honor will hear testimony about that.

We expect that to continue, but, of course, we simply are resigned to doing our best on that point because we can't stay the matter. But the point would be that eliminating the second layer of use of that coverage is all the more important given that there is a potential risk that we can't subject to a stay.

So that's the 362 side of what Your Honor will hear. As to the discretionary stay under 105, Your Honor is aware of what 105 provides. The Listed Actions overwhelmingly arise from the same factual predicates that the private placement sales of IHC securities to IHC investors were improper for

one or another reasons. I think Your Honor may recall Mr. Axelrod made the point that there's sort of this core series of allegations that exists in all of these or many of -- most of these Listed Actions.

So they involve the same offering documents. They involve similar communications from the Broker-Dealers to the investors, similar conduct from the Broker-Dealers to the investors. Also, similar conduct from the Debtors and the Debtors' CEO in coordination with or in response to whatever might be happening with the Broker-Dealers and the investors. And, of course, the same financial products.

We would anticipate that the FINRA actions would create a substantial amount of risk to the Debtors' estates for purposes of potential adverse factual record development, which would cause the Debtors to need or want to monitor the FINRA actions to the extent possible. Given that those are confidential and private, that would require the Debtors to make efforts to intervene where they felt was appropriate or necessary.

So, Your Honor, the three concrete ways that Your Honor will hear the arbitrations pose irreparable harm and threats to the Debtors are, one, the depletion of wasting D&O policy, which can't be restored. And as I said, that policy, you'll hear, is already under pressure. Adding a hundred-plus FINRA arbitrations, and then more if the arbitrations are not

stayed, will only accelerate that.

There's also the issue of the brokers' policies themselves. Once consumed, those policies will be unavailable to the estate.

And the second way that Your Honor will hear is that these arbitrations will generate adverse factual records through testimony, potential expert reports, and findings that the Debtors will not be able to easily contest, particularly since these are private arbitrations and the Debtors' rights to intervene are not assured.

Your Honor will hear from the Statements of Claim and testimony about the Statements of Claim that there are allegations of conflicts and coordination that involve the Debtors and the brokers already in the records.

And then third, Your Honor will hear about the broader risk that these actions will impede a successful reorganization, which itself is a basis for irreparable harm. The Debtors are in the middle of a substantial process to sell or reorganize the Debtors. To date, that process has been very successful. I think Your Honor has seen from the docket notices continuing the designation of stalking horses. More recently, Your Honor has seen notices designating stalking horses.

I don't -- because of this hearing, I have not been following the most recent filings, but I believe there are

still a few yet to come. Mr. Jones will be able to testify about the current state of that.

But the point is this is a process that has been robust, has been successful, and the Debtors want to assure that it continues to be successful and ends successfully, which is one of the primary reasons why we are here.

Your Honor, that's the sum and substance of what you're going to hear about this. Certainly, you'll hear argument later. But at the end of the Debtors' presentation, we believe the evidence will have demonstrated that the Debtors have met every element of the preliminary injunction standard, that these contracts and the wasting policies are substantial risks to the Debtors, that the Debtors, who have 12 employees at the corporate level, cannot afford to be distracted from an overwhelming and overwhelming and voluminous sale process in order to address potentially substantial indemnification claims that arise from these FINRA actions.

And at the end of the presentation, at the end of all the argument, we will ask the Court to extend the stay through its preliminary injunction, through the confirmation of the Debtors' Chapter 11 plans.

THE COURT: All right. Thank you, sir.

Mr. Simon?

Well, before we get to Mr. Simon, any party in support of

extending the stay and/or issuing a preliminary injunction?

MR. COLEMAN: If I may?

THE COURT: Yes, Mr. Coleman.

OPENING STATEMENT ON BEHALF OF THE DST COMMITTEE

MR. COLEMAN: Excuse me. If I may, Your Honor. Joseph Coleman, along with my co-counsel Mark Taylor, on behalf of the DST Committee.

And Your Honor, I'm going to take your earlier invitation to take my time a little bit, because the DST Committee has spent a lot of time on this issue and they consider it very serious.

Your Honor, at the TRO hearing, I was very clear that we support the TRO but we reserved our right to a temporary injunction. We felt like we had to do due diligence to determine what was the right road to go down. And we have done quite a bit of due diligence, Your Honor. And in your TRO hearing, you acknowledged that the DSTs, the Delaware Statutory Trust Investors, are on both sides of this controversy.

We have our constituency among the Plaintiffs in the arbitration. We have our constituencies that are not Plaintiffs. And so we're on both sides, and we took that very seriously.

Your Honor, our due diligence in these 14 days included reviewing insurance policies, examining production of

documents by Emerson, the Defendant, reviewing the FINRA Plaintiffs' discovery responses, interviewing Emerson's insurance broker in London, obtaining documentation of the amount of insurance remaining, reviewing select FINRA complaints, analyzing indemnity claims by Broker-Dealers, and the Debtors' causes of action against Broker-Dealers. We had numerous conversations with counsel, and we examined the claims register.

So, Your Honor, the DST Committee, after that due diligence, supports the imposition of a temporary restraining order, but we'd ask Your Honor to extend it 120 days. And our rationale for that is, number one, at the end of 120 days, the Debtors' sales process or other transactions should be complete. Forensics will be much further down the road. The plan will be -- the plan will be in process, and we can kind of take a look at it.

The other, to be candid with the Court, the other rationale for 120 days, I want to have as much pressure on the Broker-Dealers as possible. We also think it would be less burdensome on the Plaintiffs to have a certain time.

So some of the key factors that support the DST's conclusion to support a temporary injunction: Your Honor, we have approximately 2,300 DSTs. Through our due diligence, we know there are approximately 105 FINRA actions noted on the Debtors' complaint, and there are some others. We believe

clearly it's less than 200 total actions.

So that is less than 10 percent of the DST community. You add Mr. Kurzweil's community or his constituency, and we have a significantly less. We have a very small subset of the entire investor pool. The DST community strongly prefers an equitable distribution of the insurance and other assets, as opposed to a race to the courthouse.

The bottom line is we don't want to leave over 90 percent of our constituency out in the cold. Our due diligence shows that just the FINRA actions filed will likely exhaust the insurance. So we just think it's not right to leave 90 percent of our constituency out in the cold.

And Your Honor, I want you to know that a lot of DST Investors, they are retired. They are dependent on this, on money coming in from the insurance and other claims against the Broker-Dealers. Nobody knows that better than our constituency, our Committee, because they are themselves primarily retired. So we took that into account and we care about that.

But, again, we believe that a pro rata distribution in bankruptcy is better than a race to the courthouse. And we want to protect the 90 percent that are not part of the FINRA. And we really figure it's too late to join that group, because we think the insurance will be exhausted.

Our due diligence also included looking at the insurance

policy. How much is left? How much is left after the incurred versus paid defense costs? And, you know, we came to the conclusion that there is meaningful insurance currently, but there won't be.

We also looked at the universe of Broker-Dealers. Only some are currently Defendants. And if those Defendants represent a small percentage of the total FINRA claims, then it wouldn't make sense, what we're doing. But our due diligence showed that the current Broker-Dealers represent a substantial majority of all the FINRA claims, and we're aware of and have even interviewed and talked to other Broker-Dealers that would like to join as Defendants.

So I want Your Honor to know that this DST Committee took this extremely seriously. They wanted counsel to do significant due diligence. They deliberated on what was the right thing to do for their constituency, and they unanimously supported a temporary injunction for a period of 120 days.

And if Your Honor has any questions, that's all I have.

THE COURT: Thank you, sir.

Mr. Kurzweil?

OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

MR. KURZWEIL: Thank you, Your Honor. David Kurzweil on behalf of the Official Committee of Unsecured

Creditors.

Your Honor, we also join in support of the preliminary injunction in this case. And after much discussion, also join in the period that the DST has put before the Court of 120 days, so the parties can keep the case moving.

Your Honor, this is a very serious matter before the Court, and it's something that the Committee has not taken lightly. But a determination is made that is consistent with the principles of Chapter 11. And what we do believe is that the evidence will show today that the four prongs that are required for the Court to find are very apparent in this case, that they will -- there is a likelihood that they will prevail on the merits. That it's clear and that there will be irreparable injuries to the estate. That the balance of harms also weigh in favor of granting a preliminary injunction, and the public interest won't be harmed.

Your Honor, what we're trying to avoid here, one, which is very apparent, is a race to the courthouse. As Mr. Coleman just pointed out, you have approximately 120 creditors who are there in line who are also creditors of this case, sitting on both sides of this. And before long, you'll have a plethora of other creditors also proceeding against these policies that are wasting, that they are insufficient to provide for all the claims that are going to be filed against that.

And Your Honor, what's really interesting in this case is there's no one who has been before the Court in any of these hearings that argued that wrongful conduct in the case on behalf of the Debtor didn't take place. The effect of that, how that comes out at the end, needs to be decided by the Court. But even in the additional affidavit of Mr. Jones that was filed on the first day shows that that conduct occurs.

This is also consistent with the principles of Chapter 11 because it will maximize the value available for all creditors and provide the Debtor the resources that it needs to be able to go forward with a plan of reorganization.

We believe that there's evidence to provide that the automatic stay should be extended in this case. There is an identity of interest in this case. All the claims are common. It tests credibility for somebody to come before the Court, and when the evidence comes, to say these are bifurcated claims and they're not inextricably intertwined between the same causal facts affecting the same parties. And it does affect the property of the estate.

Your Honor, in discussing this with the Broker-Dealers and the process of going forward, not only did we suggest 120 days because we want to move this forward, but the Court may remember, which I will come and repeat in a lot of presentations coming before the Court, that this case is one

of transparency. And we need to know at the end of the day what happened, why it happened, and how to rectify the situation the best that we can for all constituents.

In light of that, we have asked the Broker-Dealers to agree to transparency and disclosures. And we are working on what we believe is consensual language in the order that provides them to make full financial disclosures under -- for professional eyes only, so it's not out there in the public for everyone, so we can have full discussions about how to proceed through this process.

And we would request that any Broker-Dealer that wants to be -- take the advantages of the preliminary injunction also agree to provide this information to Committee -- both the DT and Unsecured Creditor Committee professionals in order to sit down and have meaningful discussions during this period that allows the parties to get together and come back before the Court if the stay -- if the injunction should be extended beyond that time period.

We'd like to reserve more presentation for when the evidence is presented, but we wanted to get these issues in front of the Court.

THE COURT: Thank you very much.

All right. Mr. Axelrod?

OPENING STATEMENT ON BEHALF OF AD HOC BROKER-DEAL GROUP

MR. AXELROD: Thank you, Your Honor. I made a

lengthy presentation at the TRO hearing, and Your Honor accurately remarked that certain parties, and I'm sure I was one of them, were arguing the preliminary injunction at that time. So I'll take the liberty to not overdo it today. I think you understand who my clients are and what they'd like. I'm going to repeat a few thing.

First, I don't think I said this, but I should. My clients are adversaries of the Debtors and the Committees. We are seeking this relief together and everyone is pursuing a collaborative approach. I don't agree with absolutely everything that was just said, and there were many adversarial communications over the last couple of weeks. Everyone here, though, on this side of the house is working to be collaborative to reach a Chapter 11 confirmation, to get recoveries to creditors quickly. It's in everyone's interests.

My clients don't enjoy being sued by anyone, but they're in the business of making money for people. And all of these clients or most of these clients of theirs are creditors in this proceeding. They want to get money to them. This is the way to do it.

As Mr. Kurzweil just said, there is a proposed order. We are working through the language right now. There is no dispute. We have agreed to voluntary discovery. If this order is entered, there will be documents produced in very

short order and an agreement on how we proceed through an inclusive and efficient settlement mediation, Chapter 11 design process, however that looks like.

As Mr. Kurzweil and Mr. Coleman also said, the Broker-Dealers are talking, and this process has gotten them talking more. My group currently has six disclosed members. I can say we are signing up new members as we speak. There will be a 2019 filed as soon as this or the next round of the process concludes. And there are other Broker-Dealers Your Honor has seen on the line today. Everybody is talking. We are building consensus to allow for an inclusive and efficient Chapter 11 process to happen.

We cannot do that, at least the Broker-Dealers cannot, and we would argue -- and Debtors are saying -- they cannot do that without this injunction. It's unfair to the Broker-Dealers, it's unfair to all of their clients, their thousands of clients, and it undermines the Chapter 11 process to have everyone here have to contest or participate in a hundred-plus arbitrations outside of this proceeding and then litigate the impact of those arbitrations here. It's inconsistent with Chapter 11, the Bankruptcy Code. It's inconsistent with common sense about how you solve this complex situation.

So we support the injunction today. Thank you, Your Honor.

THE COURT: Thank you.

All right. Mr. Simon?

OPENING STATEMENT ON BEHALF OF CERTAIN FINRA ARBITRATION CLAIMANTS

MR. SIMON: I should say, now, good afternoon, Your Honor. Robert Simon for the 23 FINRA Arbitration Claimants in 11 pending adversary -- 11 pending FINRA arbitration proceedings.

The Plaintiffs, who are the Debtors in these jointly-administered cases, seek to extend the automatic stay to 109 FINRA arbitrations. The Debtors are not parties to any of the FINRA arbitration proceedings that they seek to stay, and the arbitrations do not seek to collect or control any property of the estate. The Plaintiffs do not share an identity of interest with the FINRA Arbitration Respondents. That is the threshold issue in the Fifth Circuit, and the Debtors do not get across it.

The evidence will show that the Plaintiff, Inspired Healthcare Capital Holdings, LLC, which is the lead Debtor in this case, is the parent entity of the other debtors-in-possession. IHC served as the sponsor of the Debtors' investment offerings, which have generated a firestorm of litigation by unhappy investors who suffered large losses, like our clients.

Our clients are numerous individuals and entities to whom

the various Broker-Dealers improperly and negligently sold high-risk investments and securities offered by the Debtor. The evidence will show many of them invested life savings in these risky securities. To be precise, the Plaintiffs, the Debtors, packaged and issued fractional interests in highly-leveraged Delaware Statutory Trusts, DSTs, managed by IHC and its subsidiaries.

DSTs are a real estate ownership structure that allows multiple investors to hold an undivided fractional interest in the holdings of a trust which owns a parcel of real estate. The DST -- the trust is sponsored by a real estate professional, referred to as a DST Sponsor, which goes out, identifies, and acquires the real estate asset. As the individuals invest their funds, their investment displaces the capital used by the DST Sponsor to acquire the property, which is eventually wholly-owned by the investors. That's how we got here.

The structure allows investors to enjoy the tax benefits of direct real estate ownership without having to manage the properties. In particular, if the Court wonders, gee, why are these DSTs so attractive, they're so attractive because they're qualified for Internal Revenue Code 1031 tax-free exchanges. The potential tax benefits are very attractive, but the DST structure exposes the investor to a high risk of loss if the underlying real estate is overleveraged, which

unfortunately it was here.

The evidence will show that the Debtors did not solicit or sell any of the DST interests to retail investors, such as our clients. Rather, IHC entered into an exclusive managing broker agreement, which we call the Managing Broker-Dealer Agreement, with Emerson Equity, a brokerage firm. Emerson then solicited and entered into contracts with various third-party Broker-Dealers to sell these DST fractional interests to retail investors.

Emerson and the third-party brokers are the actual respondents in our clients' FINRA arbitration proceedings and the ones the Debtor is seeking to stay. And the Debtor is not a party to any of these FINRA arbitration proceedings. At least with respect to our clients' claims in the FINRA arbitration proceedings, not only are the Debtors not a party, they are not named by anyone as a responsible third party.

No one has, at least in our proceedings, no one has brought the Debtor in and said, oh, by the way, you're liable for this. Moreover, two of our FINRA arbitration -- in two of our FINRA arbitration proceedings, our clients are also suing the Broker-Dealers as part of the arbitration for selling them risky investments not sponsored by the Debtor, not part of the DSTs in this case. Those Claimants are Henrick, H-E-N-R-I-C-K, and Walzer Greenfield.

MR. HALL: Your Honor?

THE COURT: Yes.

MR. HALL: I thought we had an agreement on names.

MR. SIMON: Ah, sorry.

MR. HALL: Pursuant to Your Honor's order.

MR. SIMON: My apologies. I -- to identify the -- we have two claimants, Your Honor.

THE COURT: Thank you.

MR. SIMON: Thank you. No problem. We have two claimants, and we'll -- we can identify them elsewhere to the Court, who have claims, FINRA Arbitration Claimants against Broker-Dealers for selling them securities other than the Debtors' securities. And the Debtor is telling us those actions should be stayed, too, for reasons that make absolutely no sense and have no basis in the Bankruptcy Code.

The evidence will show that our clients' claims against the various Broker-Dealers have nothing to do with the Debtors' conduct. Our clients allege, in their FINRA arbitration proceedings, that the Broker-Dealers fraudulently or negligently misrepresented the risky nature of the DSTs, resulting in large investment losses. Our clients do not allege the Debtors' misconduct. They simply allege the Broker-Dealers breached their agreements to improperly advise our clients. They don't say the Debtor did anything wrong.

It is not unlawful to sell risky securities. The problem

was, with respect to our clients, we contend the Broker-Dealers improperly advised them to buy these risky securities, which may have been totally appropriate for other investors but not for them. We don't allege the Debtor did anything wrong in the FINRA arbitration proceedings.

The evidence will further show that our clients' claims against the Broker-Dealers do not implicate the Debtors' conduct. It is simply the conduct of the Broker-Dealers.

The evidence will further show that the FINRA arbitration claims do not implicate the Debtors' indemnification obligations. And we'll get into the reasons why that is. One of the obvious reasons is, to the extent the Broker-Dealers breached their own agreements to our clients, they're not entitled to indemnification for that, regardless of the Debtors' conduct. And to the extent the Debtor committed fraud, that's different.

As best we can tell, as best we can tell, no indemnification claims have been made. Maybe we'll learn differently, but to the best of our knowledge no indemnifications claims have been made. And there is a very short timeline in the indemnification agreement that the Court will see. If an indemnification claim is not made within 14 days, it is waived.

We believe that the Broker-Dealers have waived those claims, to the extent that they have them. And to the extent

that Broker-Dealers have postpetition claims -- that is to say, to the extent that Broker-Dealers have indemnity claims that could have arisen after the Debtor filed; I mean, it would be under a prepetition agreement, but I mean postpetition temporally -- they have a remedy. They can file a proof of claim, like any other creditor.

Finally, the evidence will show that the Debtors' insurance policies do not cover the Broker-Dealers, and they're not affected by the FINRA arbitration actions, and we don't seek any recovery from the Debtors under their insurance policies, at least not in the FINRA arbitration actions.

Your Honor, to address one more argument that the Debtors' counsel made that I think is particularly egregious, it is the idea that the Debtor is entitled to enjoin claims against the Broker-Dealers because the Debtor might have claims against the Broker-Dealers' own insurance. That is an absurd argument. That's like saying I can't make a -- I can enjoin other people from making claims against State Farm because I have a claim against State Farm.

One, there's no mechanism, there's nothing in the Bankruptcy Code that extends property of the estate that far -- that is, to insurance policies of nondebtor entities on the basis that the debtor might also have claims against them. That's an extension of the automatic stay that is

unsupported by case law, unsupported by the Bankruptcy Code, and frankly absurd. That makes property of the estate potentially infinite. The Court has no ability to do that.

There's no ability to extend the stay to the Broker-Dealers to protect their insurance policies and their assets, nor is there any evidence of the assets of the Broker-Dealers, which the Debtor, even if you could get over that legal issue, they would also have to present evidence of the financial capacity of the Broker-Dealers, and there's not going to be any evidence of that.

One more point, Your Honor. As to adverse factual records, because the Debtor is not a party to any of our of our FINRA arbitrations, it is not bound by any fact findings. There is no adverse record in the FINRA arbitration, in which the Debtors are not parties, in which they would be bound by any of the fact findings, to the extent there are any. So the concern about an adverse factual record being built up in a case in which the Debtor is not a party, and in which the Debtor would be protected by the automatic stay anyway, is not a valid concern.

THE COURT: Thank you, sir.

Any other? Ms. Jones?

OPENING STATEMENT ON BEHALF OF CERTAIN FINRA CLAIMANTS

MS. JONES: Thank you, Your Honor. I'll avoid repetition. I think I hear people's stomachs growling.

People would like to have lunch. I wanted to raise a couple issues today.

One, we have, honestly, a procedural quagmire in this case. We have a complaint that identifies Plaintiffs under parties, that identifies Defendant Broker-Dealers, and then it just says IHC Investors. But it doesn't say they're a Defendant. It doesn't say they're a Defendant in the preliminary injunction. So this is Docket 1, Docket 3, Docket 4, which is the brief in support of the preliminary injunction, also doesn't identify them as Defendants. Neither do the summons identify them as Defendants. So none of these individual people are even named as Defendants.

We know that the imposition of injunction is an extraordinary and drastic remedy that's not routinely granted. We know that the Fifth Circuit mandates compliance with the notice requirement. This is why, if you ask for injunctive relief under Rule 7001(g), it's got to be in an adversary proceeding. In cases where the courts have extended the stay to nondebtor defendants, we see the courts say you've got to do it in an adversary proceeding, because you're asking effectively for injunctive relief, right? And so the idea is you need to get this into an adversary proceeding where there are more guardrails in terms of due process. People get real notice. And don't take that the wrong way, because I've been doing this for 26 years, too,

but, you know, the rules for notice and what's considered sufficient in a contested matter in a 9014 is really different than what would be required in an adversary proceeding in order to enjoin somebody. That's the whole reason it needs to be in an adversary proceeding. And what we have here is we have a case where none of these people are listed as Defendants.

We also have a new -- or I don't want to say it's a new, I guess it's -- well, I guess it is new -- an entirely new order for the first time today uploaded to the Court's docket saying precisely what relief is actually being requested today -- I still haven't even made it through the entire 16-page order -- that is also seeking to enjoin people yet to be named, except I think I heard someone say there's maybe 200, so I think they have some inkling of who these people are. Yet there's been no attempt whatsoever to let any of those people know that this injunction is going on. So, or maybe we'll hear testimony about that today.

And so, you know, the proposed order that's been uploaded, it has just so many violations of just fundamental, just notions of fairness and due process, that it is truly concerning. And I think under Rule 65 an injunction cannot issue.

Now, there's still a question of whether Your Honor can enter an order extending the stay under 105 and 362. I would

still argue that notice isn't sufficient to all the parties that they intend to sort of bring under that umbrella, who are going to get some kind of negative notice maybe after the fact that they've been enjoined. And then it's incumbent upon them to have the injunction, you know, or to seek some sort of relief from the Court from the injunction that's already been entered against them.

We've also heard today that, come one, come all, Broker-Dealers, right? They're going to be, you know, if you're not under this umbrella yet, come get underneath it. We're inviting you here to get all the protections of this injunction.

So there's also this request to enjoin parties who aren't named as Defendants, we don't have, like, notice as required for a Rule 69 injunction, but we have unknown parties, too, that are going to be enjoined against unknown parties. We don't even know who those people are. So how are people supposed to know who they're being enjoined from suing if those people aren't under the umbrella yet, haven't made themselves known, haven't shown up today and said, We want in, too?

And so the proposed injunction, as it's filed, I mean, just absolutely lacks the specificity that's required for a Rule 65 injunction. Even for an order under 105 and 362. And people have to know. They have to know who they are,

what they're enjoined from pursuing, and against whom they are enjoined, not to just find out after the fact, oh, these guys said we're included, too, and we'll let you know at some point with a supplemental list.

And just that -- I don't understand how you can get a prospective injunction against unknown parties. That's just not something that I think this Court can do today, and definitely not on a record that we're anticipating.

The Debtors are going to have the burden of proof. They've got one witness. There's nobody here to testify for the Broker-Dealers. There's nobody here to testify about the due diligence we heard Mr. Coleman talk about that his clients were allowed to do over the last 14 days but which my clients were told no when they requested the same information.

You know, Mr. Jones' knowledge is going to be limited. Not limited in a general way -- I mean, he has lots of knowledge -- but limited on, I think, what he can testify about today. And so I think there's real issues here. There's specifically an issue concerning the identity of interest. You know, the Debtors are not parties to the FINRA arbitration. They can't be parties.

And so I don't think anybody is seriously standing here today saying that somehow an outcome, an award in this arbitration proceeding against parties that are not the

Debtor, is somehow preclusive against the Debtors. I don't see how it could be.

And so, you know, this idea that, well, a judgment against the Broker-Dealers is effectively a judgment against the Debtors, well, in order to get there, they're going to have to show an indemnity obligation, and I just -- I just don't think we're going to have a record that supports that today.

And then relating to harm, and we'll hear about harm, I suppose, by -- the Debtors are going to claim. But I think you also have to realize that these FINRA proceedings, these sort of Listed Actions, I think what they're calling them in the proposed order, also include IHC -- completely non -- or investments completely not related to IHC for conduct of the Broker-Dealers. It has nothing whatsoever to do with IHC other than the fact that they were pled as one of many claims, or claims under the, you know, FINRA Statements of Action.

So completely enjoining the continuation of those proceedings to include claims for conduct that has nothing whatsoever to do with the Debtors is not something I think this Court can do. I just don't think the Court's jurisdiction reaches that far.

Now, what the Debtors say the harm is, is, well, the Broker-Dealers, they've got limited insurance. I guess we'll

see if there's evidence of that. They've got limited insurance, and, you know, if other people are able to exhaust their insurance, the Broker-Dealers' insurance, before we get our hands on it, then we won't get anything.

Well, I mean, I don't think you get to enjoin people just because you may also have a claim against the same person who has a claims-made policy. I try to imagine, you know, if any debtor suing or asking this Court to enjoin all litigation against somebody they're going after so that they can make sure they get access to their insurance policy and to make sure they stay solvent so that they can, you know, so the debtor can recover, when those people have independent rights, don't have anything to do with the bankruptcy at all.

I think we're also completely overlooking the fact that there are just other claims that aren't part of these Listed Actions, that don't involve IHC, that aren't mixed in together with sort of non-IHC-related investment securities, the people that nobody's talking about today that are suing the Broker-Dealers under those same policies, and they're not being enjoined.

So this idea that the policies are going to be exhausted isn't going to go away just because the Court enters this injunction. There are other -- there's other litigation out there against Broker-Dealers that is not involved, you know, has nothing to do with this Debtor, and they're going to have

access to the same policies. So I think that is not really going to be a harm that the Debtor can prevent or the Debtors can prevent.

And I'm going to reserve the rest of my comments for closing and during the presentation of evidence.

THE COURT: Thank you, Ms. Jones. Any other counsel?

(No response.)

THE COURT: All right. Would the parties would like to take a break and then come back? All right. How much time do y'all need? It's currently 12:30. When would you like to begin?

MR. SIMON: An hour.

THE COURT: 1:30?

MR. HALL: Yes, Your Honor. That's perfectly fine with us.

THE COURT: All right. The Court will be in recess until 1:30. Thank you.

MR. HALL: 1:30?

(A luncheon recess ensued from 12:32 p.m. until 1:36 p.m.)

THE CLERK: All rise.

THE COURT: Thank you. Please be seated.

All right. We're back on the record. Mr. Hall?

MR. HALL: Thank you, Your Honor. Jerry Hall for

the Debtors. The Debtors would call their first witness, Mr. Ben Jones.

THE COURT: All right. Mr. Jones, please come forward, sir. All right, sir. Please raise your right hand.

BENJAMIN JONES, DEBTORS' WITNESS, SWORN

THE COURT: Thank you, sir. You may be seated right there.

DIRECT EXAMINATION

BY MR. HALL:

Q Good afternoon, Mr. Jones. Would state your name for the record?

A Marion Benjamin Jones.

Q And your current position with the Debtors?

A I am the Debtors' chief restructuring officer.

Q And when were you appointed CRO? Can we call it CRO?

A Yes. November the 21st, via an engagement letter with Ankura Consulting that was signed, I think, on November the 3rd.

Q Okay. November 3?

A Yes.

Q Have you served as a CRO before?

A I have.

Q Have you worked in healthcare cases before?

A I have.

Q Are you familiar with the Debtors' books and records?

A I am.
Q Would that include their contracts?
A Yes.
Q Insurance policies?
A Yes.
Q Financial condition?
A Yes.
Q Did you verify the complaint that was filed in this adversary proceeding?
A I did.
Q Okay. How did the Debtors learn about the arbitrations that are the issues being addressed in this adversary proceeding?
A In mid-February, a couple of weeks after the Debtors filed, we began receiving letters that were requests for information related to the FINRA proceedings.
Q Mr. Jones, you have a narrow folder probably at one end or the other. It'll say, Second Amended Debtors' Witness and Exhibit List.
A Here.
Q Can you flip to Exhibit 188?

MR. HALL: Your Honor, it will be the -- it'll probably be the only narrow binder up there.

MR. SIMON: Debtors' Exhibit 188.

MR. HALL: Your Honor, do you have --

THE COURT: Did you say 88? 188?

MR. HALL: 188.

THE COURT: I've got it right here.

MR. HALL: Okay.

MR. SIMON: Hold on. Let me find it.

BY MR. HALL:

Q Do you have 188 in front of you, Mr. Jones?

A I do.

MR. HALL: Your Honor, I'll give a moment to let others get organized.

THE COURT: Of course.

(Pause.)

MR. HALL: Okay. I think everybody in the courtroom now has the relevant exhibits in front of them.

BY MR. HALL:

Q Do you recognize this, Mr. Jones?

A I do.

Q What is it?

A This is a letter which is an authorization and demand for release of documents and information from --

Q No names.

A No, no, I wasn't going to say that.

Q Okay.

A From an investor in a particular DST.

Q Okay. And is it your understanding that this was a

request for information and documents related to a FINRA arbitration?
A It is, yes.
Q And if I could have you just, because I don't want to take up a ton of time, have you flip through 189?
A Okay.
Q Same kind of letter?
A Same kind of letter, yes.
Q 190?
A Same kind of letter involving the same law firm but different DSTs.
Q Same for 191 all the way up to 197?
A (Pause.) That's correct.
MR. HALL: Your Honor, if I could just for a second address a housekeeping matter.
THE COURT: Of course.
MR. HALL: Because we have stipulations, I believe, with almost all parties on the admissibility of at least the Debtors' exhibits, the Debtors are going to stipulate to the admissibility of other parties' exhibits without objection. But Ms. Jones is not able to join in all of the stipulations. So what I would like to do is hold admission of exhibits to the end, --
THE COURT: That’s fine.
MR. HALL: -- rather than doing it piece by piece,

in order to hopefully make the record clean, but also the proceeding more efficient.

THE COURT: Any objection to that?

MS. JONES: Well, yeah, I'm going to object to the witness testifying about documents that aren't in evidence.

THE COURT: All right. Then we'll just go piece by piece.

MR. HALL: Okay, then. Your Honor, I'd like to move into evidence the Exhibits 188 through 197.

THE COURT: Any objection?

MS. JONES: Yes, Your Honor. I'm going to object. This is -- it's hearsay. It's an out-of-court statement. This is not a document written by Mr. Jones. It's not his statement. It's somebody else's statement. And it's hearsay.

THE COURT: Your response?

MR. HALL: Yes, Your Honor. These are, well, for one, to the extent that the FINRA Claimant Defendants are asserting to the Court that the Debtors are unburdened by any requests for discovery, these are those requests that rebut that contention, so they would be admissions by these parties against interest.

They are also correspondence that I don't believe anybody can reasonably doubt the authenticity of. In fact, one of the witnesses who will testify for the FINRA Claimant

Defendants, he is the lawyer, as I understand it, for all of these parties. And as Your Honor will see in Exhibit 198, he is the lawyer to whom we responded in aggregate to address those discovery requests.

MS. JONES: Your Honor, these documents don't discuss the FINRA proceedings. They -- I mean, also, I'd have to look through each and every one, and since these are new, I haven't done that. But like 197, for example, is incomplete. It just cuts off at the end. So I don't -- I don't even -- I don't even know if all these complete, but they are definitively hearsay. I mean, it's their burden to demonstrate they're authentic and bring the right witness to (overspoken) the record.

MR. HALL: So, Your Honor, if I may -- sorry.

MS. JONES: Sorry. So, I mean, I stand on there's a lack of foundation, they're hearsay, and at least as to 197, and I'd have to look at all of them, it's incomplete.

THE COURT: Okay. So, right now, let me go -- we'll just take all the objections at once. Mr. Simon, any additional other than the hearsay --

MR. SIMON: All of --

THE COURT: -- and lack of foundation?

MR. SIMON: All the same objections, but, Your Honor, I really object, these are all untimely. I understand that the Court overruled that motion, you know, without

prejudice to being made when the documents are offered.

THE COURT: Understood.

MR. SIMON: They're all untimely.

THE COURT: All right. The untimely objection will be overruled.

Any further response to the hearsay and the foundation objection? Is there a specific exception to the hearsay rule that this applies to you?

MR. HALL: Just one as to foundation, Your Honor, and it will be a quick *voir dire* question.

THE COURT: Sure.

BY MR. HALL:

Q Mr. Jones, would you look at any one of those letters and tell me if you recognize the address to which the letter was sent?

A The letter was sent to 7047 East Greenway Parkway.

Q And --

A And I do recognize that address as IHC's corporate offices.

Q Okay. So did IHC receive these letters?

A Yes, they did.

MR. HALL: So, Your Honor, they sent them to us. I'm not sure why we're fighting about them, but --

THE COURT: So is that a business record exception, is that what you're arguing?

MR. HALL: Absolutely. This is --

THE COURT: Okay. The hearsay objection will be overruled. The Court does find this is a business record.

And then, the lack of foundation, that's also been cured by the testimony of Mr. Jones.

So Exhibits 188 through 197 -- except for the one, I do want, Ms. Jones, you indicated that one of the exhibits was not complete. Which one was that?

MS. JONES: At least 197. I'm trying to get through the other ones.

THE COURT: How is it --

MS. JONES: Well, I mean, I'm looking at -- I'm looking what I received electronically, and it's just got a -- at the very end, maybe what's in the notebook is different than what we were given, but -- which, again, --

THE COURT: What I'm looking at, if it helps you, in the bottom right there's a stamp and it says, Exhibits 197-001 and it goes through 005.

MS. JONES: 197?

THE COURT: It appears to be a complete exhibit, unless there's a page after 005.

MS. JONES: 197, I have only 197-002, that's where mine ends, --

THE COURT: H.

MS. JONES: -- and then I have blank pages.

THE COURT: Okay. So we can get you a full copy. But that objection to 197 as not being complete is also overruled. Therefore, Debtors' Exhibits 188 to 197 are each admitted.

(Debtors' Exhibits 188 through 197 are admitted into evidence.)

MR. HALL: Your Honor, I'm going to cure the problem with the cutoff electronic right now.

MS. JONES: Oh, okay. Thank you.

BY MR. HALL:

Q Sorry. So, Mr. Jones, if we can look at Exhibit 198.

A Okay.

Q Do you recognize this document?

A I do.

Q What is it?

A This is a letter in response that was sent to the White Law Group related to the request for documents we previously discussed.

Q Is this a letter that you would have authorized the Debtors to send through their counsel?

A Yes.

MR. HALL: Your Honor, I'd move the admission of Exhibit 199.

THE COURT: Any objection?

MR. SIMON: Is it 199 or 198?

MR. HALL: Oh, sorry, 198. I apologize. Apologies, Your Honor. One nine eight. I'm looking at the next tab.

MR. SIMON: No objection.

THE COURT: And just so the record is clear, I'm taking your objection to timeliness as a running objection to all of these, so it's preserved as to all, so you don't have to make that same objection on timeliness.

MR. SIMON: Thank you, Your Honor. Other than that, no.

THE COURT: Okay. Ms. Jones?

MS. JONES: Actually, no objection.

THE COURT: All right. Debtors' 198 is admitted.

MR. HALL: Thank you, Your Honor.

(Debtors' Exhibit 198 is admitted into evidence.)

MR. HALL: And Your Honor, just for the record, so it's clear, the Debtors will not be moving for 199 through 202 to be admitted. That was something that we had discussed with FINRA Claimants Defendants' Counsel. Those are not --

THE COURT: Not being offered? Therefore, they're not being admitted.

MR. HALL: Correct. They will not be offered by Debtors.

BY MR. HALL:

Q Okay, sorry. So we were talking about how you learned about these arbitrations. So you received requests for

discovery. What did Debtors do from there to learn about the magnitude of FINRA arbitrations?

A Well, between the time this letter was received and kind of a few weeks ago, the Debtors engaged in discussions with the Brokers and the Ad Hoc Brokers' Counsel and became aware that the FINRA arbitrations were much higher in number than the Debtors initially thought, that instead of approximately twenty, there was over a hundred.

Q Okay. And are you -- are the Debtors still learning about FINRA arbitrations currently?

A Yes.

Q Not necessarily to this day, but in the past, say, 30 days?

A Yes.

Q Okay. At a high level, what is IHC's business?

A IHC's business was to sponsor the establishment of Delaware Statutory Trust investments in the senior housing space. They served as the sponsor for the investment vehicles.

Q And did IHC operate any of these healthcare communities?

A Well, IHC operated some of these communities through their subsidiary, Volante, up until the middle of last year. Currently, all of the facilities are operated by third parties.

Q Okay. Is IHC responsible for any kind of interaction or

management of those third-party operators?
A Yes. IHC, in effect, manages the managers. Even though there are parties that are responsible for day-to-day operations at the community, someone has to actually monitor those managers and also support those managers. So we're very actively involved in managing the managers.
Q Okay. How many corporate-level employees does IHC have today?
A Fourteen.
Q Fourteen? Earlier in my opening remarks to the Court, I said twelve. You updated this number as of when?
A It's currently 14, yeah.
Q Okay. So I misspoke. Could you describe for the Court how Debtors' community operations are currently doing? I don't mean financially. I mean care of the residents, for example.
A Well, one of the Debtors' goals in this process is to make sure that we maintained and stabilized care at the communities. And since filing, we have had that stability. All the residents are being cared for, vendors are being paid. And so we've been successful at maintaining that stability.
Q The Debtors are engaged in a sale process --
A Yes.
Q -- at the moment?

A That's correct.
Q Can you describe for the Court what the sale process is and what its goals are?
A Sure. The sales process is being led by Raymond James as the Debtors' investment banker. As part of that process, Raymond James prepared confidential memorandums for each one of the communities, established a data room with all the relevant information, and then reached out to parties.
Their process involved over a thousand parties. They conducted well over a hundred site visits, and have now boiled it down to a handful of parties that are competing to be the stalking horse buyers on each one of the facilities. We've filed about five designation notices, with more to come, in anticipation of an auction in August of this year.
So the process has been running since we filed in February. It's involved a large number of interested parties. But we are on track to have a, you know, what we think will be a robust auction in August.
Q Okay. The 14 corporate-level employees that you mentioned a moment ago, what is their regular business function at IHC?
A So the Debtors, prior to our involvement, did a pretty massive reduction in force back in June of last year. They went from over 200 employees down to, at the time, about 20, and we sit today at about 14. And those 14 are really

responsible for management of the managers, operational support, finance, accounting.

Q Okay. Do they have any roles to play within the restructuring process?

A They do. They have a very significant role.

Q What have they been doing with respect to, for example, the sale process?

A So, with respect to the sale process, they have been the primary conduit with Raymond James in order to populate the data room, answer due diligence requests from the potential buyers. And there have literally been thousands of questions that they've had to respond to. Members of the management team accompanied Raymond James on every one of the site visits, given their knowledge of the properties and knowledge of the staff there onsite. And they continue to be actively involved with respect to working with the bankers to fulfill additional diligence requests from parties that intend to participate in the auction.

Q Have they -- well, actually, let me stay on the theme of sales for a second. Will they have a role after the auction occurs and after a sale hearing occurs, assuming that a sale is approved?

A Absolutely. And I assume you're talking about with respect to the sale or transaction process?

Q Correct.

A They will, because, again, the auction is just one step in the process. After the auction, we then have to actually close on transactions involving over 30 facilities. And from a financial, operational, regulatory standpoint, that's a pretty heavy lift.

Q Are they doing anything with respect to the restructuring that is unrelated to the sale process?

A They are.

Q What else are they involved with, with respect to restructuring?

A Well, they were involved with the preparation of schedules and statements. The finance team is still involved with the preparation of monthly operating reports, with my team's assistance. They've also been involved and engaged with the various due diligence efforts on behalf of each one of the Committees. And --

Q The discovery issues?

A Both discovery and due diligence. You know, we have regular I call them due diligence conversations with the financial advisors.

In addition, there is a formal discovery process ongoing with each one of the Committees as well, in addition to the investigative process that the Debtors are conducting with the help of Reid Collins.

Q How would you characterize -- intermittent, part-time,

full-time -- the corporate-level employees' involvement in the restructuring process?
A You know, I'd say they have a full-time day job that has to do with maintaining the business operations, and they have a second full-time day job with respect to the restructuring process, whether it be the sale or the various due diligence and investigative activities.
Q In your view, is a successful reorganization of the Debtors achievable in these cases?
A Absolutely.
Q If the Debtors' management, counsel, and others are required or deem it advisable to concern themselves with the ongoing arbitrations, will that have any impact in the Debtors' reorganization efforts?
A Well, it will be a tremendous drain on the resources the Debtors have, both the management team and the advisors, given the number of arbitrations that are currently being pursued.
Q Again, at a high level, how did IHC raise capital for its business?
A IHC raised capital via private placements. And those private placements were either for investment funds or for specific DSTs. So they work with Broker-Dealers in order to put together the private placement memorandums and go to the market to raise the funds.

Q Are you familiar with the Managing Broker-Dealer Agreement?
A I am.
Q Is it attached to the Debtors' Verified Complaint?
A It is.
Q Can you pull our binder, Volume 1 of 5? And then at Tab 1, tell me if you see the Debtors' Verified Complaint.
A I do.
MR. HALL: Your Honor, are you squared away?
THE COURT: Yes, I am.
MS. JONES: Which number?
MR. HALL: Verified Complaint. Exhibit 1 of our exhibits.
MS. JONES: Exhibit 1?
MR. SIMON: Yes, it's Exhibit 1.
MS. JONES: Exhibit 1?
MR. SIMON: Yes.
BY MR. HALL:
Q Can you flip to, first, just to Exhibit 1-019? That's a page number about halfway through it. Tell me if that's your verification.
A Sorry, which page did you say?
Q It's 19.
A Yes, 19 at the top.
Q Sorry. That's your verification?

A It is.
Q Okay. And then flip back to Page 21. Is this the Managing Broker-Dealer Agreement?
A It is.
Q Does this agreement impose indemnification obligations on Debtors?
A It does.
MS. JONES: Objection.
MR. SIMON: Objection. Asking for a legal conclusion.
THE COURT: Sustained.
MS. JONES: Calls for a legal --
MR. HALL: Does this --
BY MR. HALL:
Q Does this broker agreement contain provisions that address indemnification?
MS. JONES: Your Honor, I'm going to object to -- this document hasn't admitted to evidence yet, and we're talking about what's in it.
MR. HALL: Your Honor, I'll move its admission.
THE COURT: The entirety of Exhibit 1 or --
MR. HALL: The entirety of Exhibit 1. Well, actually, what I really want is just the Managing Broker Agreement.
THE COURT: That's what I assumed.

MR. HALL: The complaint is not really evidence. It's a --

THE COURT: Understood.

MR. HALL: It's an allegation.

THE COURT: Understood. And that goes through -- it looks like it goes through 1-039?

MR. SIMON: We have no objection to the Broker-Dealer Agreement, Your Honor.

THE COURT: All right. Ms. Jones, any objections?

MS. JONES: Yeah, I do object to the Broker-Dealer Agreement. One, there's a lack of foundation that this witness has personal knowledge about its contents. And it's another -- it's hearsay.

THE COURT: Would you like to ask a foundation question?

MR. HALL: Absolutely, Your Honor.

BY MR. HALL:

Q Mr. Jones, would you take a look at this document and tell the Court whether or not it is an agreement that the Debtors have entered into? And I'll direct you to Page 39 as the source of signature on it.

A Yeah. This is a document that was gathered as part of our diligence process. It's one that the Debtors did enter into. It was signed by Luke Lee, who was the CEO of Inspire.

Q You know who Luke Lee is?

A I do.
Q Okay. And you know that he was the CEO?
A I do.
Q Okay.

MS. JONES: Your Honor, that doesn't imbue him with personal knowledge of the document. He's just said it's not his signature. He didn't negotiate this document. It predates him. He does not have personal knowledge of its contents.

If they want to have Mr. Lee come testify about what this document is about, what it means, what's included, I think he could testify about it. But I just, I don't think Mr. Jones has the personal knowledge to testify about it.

THE COURT: The hearsay objection is overruled. The Court finds it is a business record, which is an exception to the hearsay rule. Based on Mr. Jones' testimony, this is a business record of the company.

MS. JONES: And on the personal knowledge -- the company.

THE COURT: Business record. It's a business record, so it's coming in.

MS. JONES: Okay. I understand that it can be admitted, Your Honor.

THE COURT: That's all I'm dealing with right now.

MS. JONES: Okay. Okay.

THE COURT: It is offered. He has offered -- he offered the exhibit --

MS. JONES: Okay. Yes, thank you. I understand.

THE COURT: -- and I've admitted the exhibit.

MS. JONES: Yes. I appreciate it. Thank you.

(Debtors' Exhibit 1 is admitted into evidence.)

BY MR. HALL:

Q So, Mr. Jones, would you turn to Page 31 and over to 32? Sorry, it's -- that's the Bates stamping. The page is 11 over to 12.

A Yes, I see it.

Q Section 8?

A Yes.

MS. JONES: All right.

BY MR. HALL:

Q What's the title of Section 8?

A The title of Section 8 is Indemnification.

MS. JONES: What page are you on? I'm sorry.

THE COURT: Why don't you go with the Bates stamp, just to make it all --

MR. HALL: It's -- will do, Your Honor.

THE COURT: Yes, so the record's --

MR. HALL: That would be 31 over to 32.

MS. JONES: Okay.

BY MR. HALL:

Q I don't want you to give a legal conclusion, but is it your understanding that that's an indemnification provision?
A Yes, it's my understanding that Section 8 of this document outlines the indemnification provisions of the agreement.
Q Did you attend, either in-person or by remote means, the TRO hearing?
A I did.
Q Okay. Are you aware of whether or not any Broker-Dealers have indicated an intent to assert indemnification?
A During the TRO hearing, it was stated by counsel for the Broker-Dealers that they did intend to make indemnification claims.
MR. SIMON: Objection. Hearsay. Statement by a lawyer in hearing. Not under oath.
THE COURT: Sustained. The answer will be struck to the extent it was given.
BY MR. HALL:
Q Have you reviewed any of the FINRA Statements of Claim that have been filed or produced in this adversary?
A I have.
Q Okay. The Defendants contend that the FINRA claims are based solely on Broker-Dealers' independent duties and have nothing to do with the Debtors. Based on your review of those claims, is that your view?

A I don't think that's totally true.

Q Okay. I want to walk you through a couple of exhibits.

MR. HALL: Your Honor, if I could approach the witness, it might make it easier.

THE COURT: Of course.

MR. HALL: So this is -- we had some confusion, so I'm going to probably have to defer to Mr. Simon. But this is a First Amended Statement of Claim. It is identified as GN Defendants' Exhibit 9. I thought it was Exhibit 9 of Mr. Simon's group's exhibits, but I might be wrong about that.

Do you know?

(Pause.)

MR. HALL: Your Honor, if I may, I'm going to approach, just to --

THE COURT: Of course.

BY MR. HALL:

Q Mr. Jones, is Exhibit 9 a Statement of Claim that you have reviewed?

A Yes, it is.

Q Now, can you turn to Paragraph 7 of that statement?

A Okay.

Q And just as a quick reminder, avoid using any names, including the names of, for example, Debtor employees, to the extent that those are ever referenced in this exchange.

Can you find in that paragraph -- well, actually, can you

just read, without names, the paragraph? It's fairly short.
A Paragraph 7?
Q Seven, please.
A (reading) Respondent negligently recommended that Claimants invest in highly-leveraged, high-commission, inflated DST real estate investments managed by NB Private Capital --
THE COURT: Is that what you want said?
BY MR. HALL:
Q Yeah, no names at all.
A Okay, no names at all. (reading) Managed by, blank, and -- I can say Inspired Healthcare --
Q Yes.
A (reading) -- Corporation, collectively referred to as DST Investments. Respondent misrepresented the risk of these DST Investments and failed to conduct a reasonable due diligence on these investments.
Further, Respondent's due diligence was conflicted because, among other things, blank, a financial advisor to Respondent, was a partial owner of, blank, the syndicator of most of the investments purchased by Claimants.
Further, key marketing personnel at Inspired Healthcare Corporation were also licensed with Respondent, blank, and Respondent, blank, was the principal broker-dealer responsible for marketing these investments. Respondent

misrepresented the risk of these DST Investments and failed to conduct a reasonable due diligence on these investments.

Q The language about key marketing personnel, in your view, who are the -- who are the key marketing personnel at Inspired Healthcare Corporation?

MR. SIMON: Objection; form.

MS. JONES: Also, --

THE COURT: What's wrong with the form?

MR. SIMON: Well, objection to form is when; and, second, no -- a lack of partial knowledge. He wasn't there.

MS. JONES: Well, --

THE COURT: Ms. Jones?

MS. JONES: I think he's also asking him to speculate about what -- somebody's Statement of Claim and what they meant when they wrote 'key personnel.'

THE COURT: The speculation objection will be sustained.

MR. HALL: Okay.

THE COURT: And with respect to Mr. Simon's, I guess --

MR. SIMON: It only has to be sustained once, Your Honor.

THE COURT: I understand, so we'll just leave those hanging. Okay. Back to Mr. Hall.

MR. HALL: Yes, Your Honor.

BY MR. HALL:
Q In Paragraph 8, do you see where it says: Respondent failed to disclose, among other things, that these were high-risk, highly-leveraged investments offered by an investment sponsor with financial issues and a checkered history?
A I do.
Q Do you know who the investment sponsor is?
A Well, one of the sponsors they're referring to is Inspired.
Q Was Inspired an investment sponsor of DST offerings for the Debtors' enterprise?
MS. JONES: Objection, Your Honor; it's leading.
THE COURT: I'm sorry?
MS. JONES: Leading.
THE COURT: Sustained.
Which paragraph are you on again?
MR. JONES: That was Paragraph 8, Your Honor.
BY MR. JONES:
Q What entity sponsored the Debtors' investment offerings in the DSTs?
A Inspired Healthcare Capital.
Q Okay. You can put 9 down.
MR. HALL: Your Honor, if I may, I'd like to approach again.
THE COURT: Of course.

MR. HALL: Thank you.

THE WITNESS: Thank you.

MR. HALL: Your Honor, I've handed Mr. Jones what I believe is Simon Exhibit 15.

THE COURT: For the record, that's GN Defendants.

MR. HALL: GN Defendants' Exhibit 15. Yes, Your Honor.

THE COURT: I'm ready.

MR. HALL: Okay.

BY MR. HALL:

Q Mr. Jones, do you recognize this as being a Statement of Claim that you have reviewed?

A I do.

Q Okay. If you would turn to Paragraph 10. Can you just -- I'm sorry. I want to see what I'm asking you to do. Yeah. Can you just read into the record Paragraph 10?

A (reading) Respondents negligently recommended that Claimant invest in a high-commission, inflated DST real estate investment managed by Inspired Healthcare Capital, thereafter referred to as the IHC DST Investment. Respondents misrepresented the risk of this IHC DST Investment and failed to conduct a reasonable due diligence on this investment.

Q Without naming any names, is this the same or a different broker involved in this Statement of Claim than Exhibit 9?

A Different.
Q In Paragraph 11, can you just read the first sentence, but again without names?
A (reading) Further, Respondent's due diligence was conflicted by undisclosed conflicts of interest.
Q Blank? Oh, sorry, second sentence as well.
A Sure. (reading) Blank, hereafter referred to as, blank, was the Managing Broker-Dealer for the IHC DST Investments.
Q And then the third.
A (reading) Blank was an Emerson -- blank was a blank financial advisor, was also IHC's president of capital markets and national sales manager. Apologies.
Q It's okay.

MR. AXELROD: Your Honor, the Broker-Dealers, I believe we had a stipulation on this, but just to be clear, we are objecting to the extent that this is being introduced for the truth of the matter asserted in the allegation in the Statement of Claim, which is what is being read now.

MR. HALL: Correct, Your Honor. The Debtors are not seeking to introduce any of these statements for the truth of the matter, but rather to show to the Court the connection in the allegations between the Debtors and the Brokers.

THE COURT: All right. The exhibits have not been admitted into evidence, at least as of yet.

MR. HALL: Correct.

THE COURT: And as far as the testimony --

MR. HALL: Correct, Your Honor.

THE COURT: As far as the testimony goes, the Court will just limit it as if he just read what the document said.

MR. HALL: Correct.

THE COURT: And at this point, it's not been admitted for the truth of the matter.

MR. HALL: Although Your Honor raises it, it might as well be something we take up right now. I believe all parties stipulate to the admissibility of the Statements of Claim, unless somebody has changed their mind.

MR. SIMON: We have not. At least not our -- I think, no, we don't object to the admissibility of any Statements of Claim.

MR. HALL: Right.

MR. SIMON: Okay.

THE COURT: So, with respect to the GN Defendants' exhibits, which exhibits are those? You just want to have those admitted now?

MR. HALL: 9 to 35.

MR. SIMON: 9 through 35.

THE COURT: 9 through 35? Any objection to GN Exhibits 9 through 35?

MS. JONES: Just that they're not offered for truth and -- okay. And --

THE COURT: It's a limited offer for all of those?

MR. HALL: Correct, Your Honor.

THE COURT: All right. So --

MR. HALL: And --

THE COURT: -- GN 9 through 35 are admitted for the limited purpose for which they've been offered.

(GN Defendants' Exhibits 9 through 35 are admitted into evidence.)

MR. HALL: And actually, Your Honor, it's not just the GN for the Debtors. It would be Exhibits 2 through -- one second, Your Honor -- 2 through 105.

THE COURT: And --

MR. HALL: They are, --

THE COURT: Go ahead.

MR. HALL: -- I believe, all Statements of Claim.

MS. JONES: Um, --

THE COURT: Hold on.

MR. SIMON: We'll need to verify that.

THE COURT: Yes, that's fine. Take your time.

MR. SIMON: Yeah.

MS. JONES: Which list is this?

THE COURT: 2 through -- what did you say? This would be the Debtors' Exhibits.

MR. HALL: 105.

THE COURT: 105.

MR. HALL: Debtors'.

THE COURT: 2 through 105 is being offered, and we'll see if we have any party objecting to any of those.

MR. HALL: And I'll say it's the goal that they all be Statements of Claim. That's -- but I believe, just on a quick review, again, that that's correct.

MR. SIMON: I was told there's one that may not be relevant to this case at all. So let me -- let's look at the list.

MR. HALL: Okay. While Mr. Simon --

THE COURT: Take your time.

MR. HALL: While Mr. Simon does that, I will say we have thus far identified a couple of claims where there does not appear to us to be an IHC product involved. So as we've been gathering this, we've been trying to keep track of that all. But I think it's clear from everybody's comments -- if it's not, I want it to be clear now -- we're not seeking to enjoin non-IHC FINRA arbitrations. And I think the Court is going to get to this point somewhere down the line with respect to argument. The question will be, what about a mixed -- we definitely want the IHC stuff stayed, but non-IHC stuff, it can be severed, amended, whatever. Again, that's -- we're not after that.

THE COURT: All right. Understood. So --

MR. HALL: So if one is irrelevant, it can still be

admitted, but it just won't be part of the stay order, if the Court is inclined to grant the stay.

THE COURT: All right. And again, just so it's clear, all these are sealed. So 2 through 105, to the extent there's a relevance objection, that will be overruled and will go to the weight, if any, that the Court gives it. And, of course, the Court will probably not give any weight to non. But we'll go ahead and give you the opportunity to look.

MR. HALL: Perfect. Thank you, Your Honor. But we may be taking it up anyway.

(Discussion.)

MR. SIMON: Sorry, Your Honor.

THE COURT: Go ahead and talk. That's fine.

MR. HALL: Sorry, Your Honor. Could we just take one minute to --

THE COURT: We'll go off the record, then, until you tell us we're back on.

MR. HALL: Thank you, Your Honor.

(Off the record discussion.)

THE COURT: All right. We're back on the record.

MR. HALL: I think I understand that, Your Honor. The point that was made to me was the complaint that we thought the Debtors filed did not initially seek to include the Statement of Claim that is listed as Exhibit 100. So it

would have to be, assuming that Your Honor enters an order and assuming that that order provides a mechanism -- or, frankly, I guess if it doesn't, we could file a separate complaint -- but that particular Statement of Claim would have to be enjoined pursuant to either the process that the Debtors have laid out in their proposed order or some other process that the Court allows, again, assuming the Court is going to go forward with a stay.

THE COURT: Understood. Understood. So for purposes --

MR. HALL: So I guess I'm a little indifferent. I'm still okay with it being admitted just for the sake of an easy, complete record, but it just wouldn't be the subject of the initial order. It would have to go through the process.

MR. SIMON: Since it's not part of this case, Your Honor, we would object to its admissibility.

MR. HALL: Okay.

THE COURT: You would what? I didn't hear you.

MR. SIMON: Since it's not part of this case, we would object to its admissibility on relevance grounds, among other.

THE COURT: Yes, Ms. Jones?

MS. JONES: I guess the only concern I sort of have right at this moment is, you know, I'm here on behalf of 66 of the proceedings. I don't know how many Mr. Simon has, 22

maybe, something like that. And there's 105. So we've got 15-ish or so. We tried to do the math earlier in the hall, but you know, we're lawyers. So we've got, I don't know, a dozen or more Statements of Claim for people that aren't here, and I would have some concern about admitting those. I just, unfortunately, don't know which ones they are, unless I go through and say which ones, you know, because they're just not in the record.

I just wanted to raise that concern. There's nobody here to be able to talk about them.

THE COURT: All right. Your concern is on the record. Let me ask a question.

MR. HALL: Yes, Your Honor.

THE COURT: Because right now, 2 through 105 are being offered. There's an issue about potentially number 100. My understanding of the request, and maybe I'm thinking it was more broad than what I had anticipated, or less broad, I thought that one of the arguments that the Debtors were making were to enjoin not only these 100, but any others that may be out there. Wouldn't 100 fall into that category?

MR. HALL: Yes, Your Honor.

THE COURT: So for purposes of the hearing, I think it probably would be potentially a relevant document if you're going to request the Court to enjoin that action.

MR. HALL: Correct, Your Honor. I agree. This is

about admissibility of a document. I agree with everything Your Honor just said. What I was sort of jumping ahead to is what Your Honor ultimately does with -- exactly.

THE COURT: And I have to wait for the evidence to come in to make that determination.

MR. HALL: Correct.

THE COURT: So with respect to the relevance objection, as I do, since there's no jury that's going to be impacted, I generally overrule relevance objections, because that'll go to the weight, if any, the Court gives that document in its ultimate decision. But because the way the Court read at least the request, this would seem to fall within the relevance portion of that, so it's based on that is why I'm overruling the relevance objection. It might be relevant.

MR. SIMON: One more question, Your Honor, --

THE COURT: Yes.

MR. SIMON: -- which is authenticity. Obviously, with respect to our claims, we don't object to authenticity as to our claims. That's not one of ours. And the witness has not yet said, oh -- I don't know whether the witness can sponsor it or not. It's not one of ours. That's --

THE COURT: Understood. So, okay, then is there an objection to 1 through 105 based on that?

MR. SIMON: No, Your Honor. We've told the Debtors,

generally speaking, that we would --

THE COURT: All right. I understand the point, but I just want to make sure if there is an objection, I'm going to have to rule on it. So it doesn't appear that there is --

MR. SIMON: Other than 100, no.

THE COURT: All right. So the 100, the Court will overrule the relevance objection. Any other objection other than relevance?

MR. SIMON: No, Your Honor. Oh, authenticity.

THE COURT: Authenticity?

MR. SIMON: Authenticity. On that one. If the witness can identify it, he can identify it.

THE COURT: All right. So you want to do a foundation on 100, or do you want me to rule?

MR. HALL: I want to check the time, Your Honor. (Pause.) Your Honor, if I can, may we push 100 to the back, and I'll either retake it up and attempt to authenticate, or we'll just let it go?

THE COURT: That's fine.

MR. HALL: Sorry, Your Honor, there's -- encouraging that we --

(Pause.)

MR. HALL: Your Honor, may I approach?

THE COURT: Of course.

MR. SIMON: Jerry, what is that?

MR. HALL: That's 100.

MR. SIMON: Oh, okay. Thank you.

MS. JONES: Is that the same 100 we got?

MR. HALL: I believe so.

MR. SIMON: Is it this one? No. Is it in here?

(Pause.)

THE COURT: Are you waiting for the witness, or --

MR. HALL: I'm waiting for everybody to get organized.

MR. SIMON: He's waiting for us, Your Honor, to find it in the binders. Okay.

BY MR. HALL:

Q But, yeah, Mr. Jones, if I actually can direct you to Page 55 of that exhibit, tell the Court who signed that document.

A I'm sorry?

Q Can you tell the Court who signed that document?

A This document was signed by an attorney by the name of -- and I apologize, I'm going to mispronounce it -- Kalju Nekvasil.

MR. NEKVASIL: That's okay. Kalju Nekvasil, but it's all good.

THE WITNESS: Okay.

BY MR. HALL:

Q So do you know whether or not that person is in the

courtroom and a witness for one of the FINRA Claimant Defendants?

A I do. I happen to know that they are in the courtroom.

MR. HALL: So, Your Honor, I would suggest that the document signed by somebody who is going to be testifying and who is an officer of the Court is an authentic document.

THE COURT: The Court will overrule the authenticity objection and the Court will admit Debtors' Exhibits 2 through 105.

MR. HALL: Thank you, Your Honor.

(Debtors' Exhibits 2 through 105 are admitted into evidence.)

BY MR. HALL:

Q So, Mr. Jones, having gone through and reviewed many of the Statements of Claim, did you find a common pattern of core allegations in them?

A Yes. There were very similar allegations across a number of the Statement of Claims.

Q Did those allegations involve the Debtor or the Debtors' personnel?

MS. JONES: Object to leading.

MR. HALL: I'm sorry?

THE COURT: Overruled. You may answer the question.

THE WITNESS: Some of the allegations did involve the Debtors and Debtors' personnel. There were allegations

with respect to conflicts of interest because Debtor personnel also served in a position with the Broker-Dealer. There are also allegations with respect to misrepresentations and the documents and information that was provided.

MR. HALL: So, Your Honor, if I may approach one more time.

THE COURT: Of course.

MR. HALL: I just want to -- okay.

BY MR. HALL:

Q You have to ignore the cover because it's double-sided. So the first page is on the second.

MR. HALL: Your Honor, this is GN Defendants' Exhibit 3. It should be a state court complaint.

THE COURT: It is.

BY MR. HALL:

Q Is that a document that you've reviewed?

A It is.

Q Is it a state court complaint?

A It is.

MR. HALL: Before I do this, I just want to make sure we all agree, especially Your Honor. This is not a FINRA arbitration document. Is there anybody objecting to us just using the names of the parties in this one? This is --

(Discussion.)

MR. HALL: Okay. So unless Your Honor views this as

off-limits, I'm just going to make it easier.

THE COURT: That's fine. Fine with the Court.

MR. HALL: Okay.

BY MR. HALL:

Q This -- well, is this a complaint brought by Emerson Equity Bridge Fund I, LLC?

A It is.

Q And is it brought against Inspired Healthcare Capital, LLC?

A In addition to Inspired Healthcare Capital Holdings, yes.

Q And any individuals?

A Luke Lee.

Q Are you familiar with this complaint?

A I am.

Q Are you familiar with Emerson Equity Bridge Fund I?

A I'm familiar with Emerson Equity. I don't know a lot of specifics about Bridge Fund I except for what's in the document.

Q Okay. Do you know what the subject matter of that complaint is? Is it a loan?

A The subject matter is a loan that was made by Emerson to Inspired and allegations with respect to underlying information.

Q Okay. Can you turn to Paragraph 11?

MR. AXELROD: Your Honor, I'm going to object to the

line of questioning just on the grounds that the Plaintiff in that case is Emerson Equity Bridge Fund I, LLC. There's actually a clarification in the amended complaint that specifies that it is not an affiliate of Emerson Equity, LLC. And so we would object to the use of the word Emerson representing an ambiguous party here.

THE COURT: Any response?

MR. HALL: That's completely fine with us. We're not attempting to cast any sort of aspersions or insinuate that Party A is actually Party B or otherwise.

THE COURT: The objection is sustained. It will be very clear that they may be two different entities that are not related.

MR. AXELROD: Thank you, Your Honor.

MR. HALL: We would stipulate if it were necessary.

BY MR. HALL:

Q Sorry. So, Paragraph 11, have you had a chance to look at that?

A Yes.

Q What's the -- what's the -- well, what is Paragraph 11 saying?

A Paragraph 11 talks about, subsequent to the execution and funding of the note in question, the Plaintiff learned of material misrepresentations and omissions in submissions by IHC in connection with seeking the loan.

Q Okay.
A And then it goes on to talk about some of the misrepresentations that are alleged.
Q Is this a fraud complaint against IHC?

MS. JONES: Your Honor, I'm just going to object. I don't understand the relevance to this case if this is not the party in this case.

THE COURT: Understood.

MR. HALL: So, --

THE COURT: What's the relevance of this particular --

MR. HALL: Two things, Your Honor. One is, again, to the extent that the FINRA Claimant Defendants are asserting that, you know, this -- there's this disconnect between the Brokers and the Debtors and, you know, no conduct of the Debtors is sort of at issue or in play, this is a fraud complaint by an Emerson entity, not necessarily the Broker entity, and the Debtors. And it is, if I'm not mistaken, Defendants' exhibit because it was attached to somebody's Statement of Claim.

MR. SIMON: That doesn't make --

THE COURT: Reply?

MR. SIMON: Objection, Your Honor.

THE COURT: Yes.

MR. SIMON: That doesn't make it relevant. It was

-- it's a different party. It's a different matter. It's not a securities case. It's a case alleging --

THE COURT: It's not a case that the --

MR. SIMON: -- that the Debtor committed fraud trying to get a loan. Has nothing to do with the issuance of securities. Has nothing to do with FINRA arbitrations.

THE COURT: It's not a case that the Debtor is trying to get enjoined?

MR. HALL: No. It's already stayed, Your Honor, actually.

THE COURT: The Court will sustain the objections. Just to make it clear, the Court will not give this any weight.

MR. HALL: Okay.

BY MR. HALL:

Q You can put that aside. Are the Debtors concerned about the allegations in these various Statements of Claim as they relate to the Debtors and its current or former employees?

MS. JONES: Object to the question as leading and also calls for a narrative.

THE COURT: Sustained on the narrative. Go ahead.

MR. HALL: Sustained as to--?

THE COURT: Narrative.

MR. HALL: As to narrative?

THE COURT: Yes.

MR. HALL: Okay.

BY MR. HALL:

Q What concerns does the Debtor have about the allegations in the Statements of Claim as they relate to the Debtors and its current or former employees?

MS. JONES: I'm going to object that it assumes a fact not in evidence.

THE COURT: Overruled. You may answer the question.

THE WITNESS: Okay. I think the question was what concerns do the Debtors have with respect to the allegations in the Statement of Complaints. Well, the allegations in the Statement of Complaints, many of them center around due diligence. Many of them center around the information that was provided with respect to the DST Investments. And those are type -- those are the type of allegations and claims that could give rise to indemnification obligations, which would, again, fall back to the Debtors.

BY MR. HALL:

Q Do you understand that the Managing Broker-Dealer Agreement asserts that the managing dealer is authorized as an agent of Inspired Healthcare?

A That's correct.

MR. HALL: Your Honor, if I may approach. And I think this will be a handout, just a demonstrative.

THE COURT: All right.

MR. HALL: So I'll first approach Your Honor.

THE COURT: Of course. Thank you.

MR. HALL: And the witness's lawyer?

THE COURT: Of course.

BY MR. HALL:

Q Mr. Jones, have you seen this document before?

A I have.

Q What is it?

A This is a table which breaks down, based upon the Statement of Claims, the amount of claims that relate to IHC, the amount that relate to other parties, and then the amount that can't be allocated based on the information provided.

MR. SIMON: Objection, Your Honor. There's no foundation for this at all. He hasn't testified who created it. He hasn't testified why he has partial knowledge of it. All he's saying is I'm looking at a piece of paper.

THE COURT: Sustained. If you want to give a better foundation.

MR. HALL: Actually, if, Your Honor, before -- well, okay, fair, but what I was going to say is that was literally the first question in a series of questions to establish a foundation. But we're on the same page.

THE COURT: All right.

BY MR. HALL:

Q So that document that you just described, how was it

prepared?
A It was prepared by the Dechert team with my supervision.
Q And what was the source information? I think you may have already testified to this. What was the source information for this data table?
A The individual Statements of Claim.
Q And what does this show the Court?
A Based on the table, the information from the Statement of Claims point to $147 million of investment, of which $59.4 million was related to IHC. $54.9 million was not confirmed as related to IHC. And there's another $32.6 million which was unallocated.
Q And the left-hand column under the heading Broker-Dealer, are these the Broker-Dealers whose -- sorry, let me say it differently. Are these the Broker-Dealers that were at issue in the Statement of Claims that caused the values to be populated in the columns to the right?
MS. JONES: Your Honor, again, I'm going to object as leading.
THE COURT: I'm sorry?
MS. JONES: It's leading. It also -- I mean, there's still a lack of foundation. We're still asking questions about it. I mean, if we can carry that to the end of this I think sort of attempt to establish it, then maybe I can ask you to strike the testimony. But I just, I don't

think we've laud a foundation yet to be talking about the meaning of this document as a fact.

THE COURT: The foundation objection is overruled. And as far as the leading, that objection is also overruled. I'm not sure there was a question pending. If there was, if you remember, answer it.

MR. HALL: I'll re-ask it, if it --

THE COURT: Thank you.

BY MR. HALL:

Q Mr. Jones, I was asking you about the Broker-Dealers identified in the left-hand column. Are the values in the right-hand columns, the four right-hand columns, related to those respective Broker-Dealers by row?

A They are, because they were taken from the respective Statement of Claims.

MR. HALL: I think that's all for that one, Your Honor.

Your Honor, I have one more, but I seem to have lost all of my extra copies to hand out to the field. May I approach, Your Honor and the witness? I'll give one over to that side.

THE COURT: Hand them over there first, and then the witness, and then I can be last.

MR. HALL: I only have one to give to you guys. Apologies.

MS. JONES: We have to share? Is this also a new

document?

MR. HALL: It's a demonstrative, yeah.

MS. JONES: Okay.

MR. HALL: It's just a summary.

MS. JONES: Okay. Judge, I'm sorry. I'm going to object to the use of these demonstratives. These are summaries of really a lot of information that we've had no opportunity to review, no opportunity to verify whether the information in them is correct.

They had a chance to put them on their witness and exhibit list. They haven't done it. And now we're being -- the witness is testifying about these documents, these just demonstratives, that summarize voluminous information we've had no opportunity to review them to see if any of it is correct. And we don't even have, really, a proper opportunity to ask him questions, as well as to go out and crunch these numbers.

I mean, we asked for discovery. We got nothing in response. Not one document. This isn't in their witness and exhibit list. I mean, this is absolutely just -- I mean, it's just improper to try to introduce, like, really substantive information at this point that we have had no chance to verify.

THE COURT: I haven't seen it yet, but any response?

MR. HALL: Your Honor, with respect, I disagree.

These are simply summaries of information that is in everybody's witness and exhibit list. This specific one, just for Your Honor's edification, since Your Honor has yet to see it, is a list of cases, Statement of Claim Claimants and the respective Broker-Dealer, and then the date of the arbitration, to the extent that we've been able to get that information from our own discovery. It's maybe 25 of them or so.

So it's really just for sort of table-setting for Your Honor to understand what the landscape looks like with respect to these pending arbitrations. Are they all coming up for hearing tomorrow? No. Are they all five years out? No. This tells, at least for maybe a quarter of the ones that we were able -- a quarter of them that are involved in this case, the ones that we were able to identify, it shows what this looks like.

But again, all of this is in information that we received in discovery. A fair amount of it actually came from the FINRA Claimants themselves. Some of it came from the Broker-Dealers.

MR. SIMON: Your Honor, this has a list of arbitration dates. One, we don't know that these are true. Two, we don't know where this information came from. And we don't have the information from which anyone could have created this chart.

MS. JONES: Same --

THE COURT: Maybe I misunderstood, but it seemed to me they're all in these claims that are in these binders.

MS. JONES: No.

MR. SIMON: They are not.

THE COURT: All right. Are they or are they not?

MS. JONES: It's in this information about the status of the proceedings. And that is based upon information they received in discovery that we did not receive any of that discovery ourselves. We did not get copies of that discovery. We even asked for discovery and received --

THE COURT: All right.

MS. JONES: -- nothing in response. So we just have no way to know whether this is accurate or not. We don't have information.

MR. SIMON: What's in the binders, Your Honor, is the Statements of Claim. That doesn't tell you when they're going to trial.

THE COURT: That's true. All right. So --

MR. HALL: So, Your Honor, I'm going to take it a different way. We won't --

THE COURT: That's fine.

MR. HALL: May I take that back?

MR. SIMON: Yes, you may.

THE COURT: Just so the record is clear, I've never seen it and I still don't know what's in it.

BY MR. HALL:

Q Mr. Jones, have you looked at materials that were produced by various parties to this adversary proceeding in order to understand whether and when arbitration hearings have been scheduled?

MS. JONES: Objection, Your Honor. It's leading.

THE COURT: Overruled. You may answer the question.

THE WITNESS: I have looked at discovery information that's been provided, yes.

BY MR. HALL:

Q Have arbitration dates been scheduled in any of the arbitrations that you reviewed information for?

A Yes.

Q To the best of your ability, --

MR. SIMON: Go ahead and answer the question, then. Go ahead and ask the question.

BY MR. HALL:

Q To the best of your ability, what is the range of scheduled dates for arbitration among those that you were able to discern dates for?

MR. SIMON: Hearsay. Is there any basis for this other than hearsay?

THE COURT: Overruled. You may answer the question.

THE WITNESS: The dates started around September or October of this year and ran through late 2027.

BY MR. HALL:

Q Do the Debtors have D&O insurance?

A Yes.

Q Can you describe, is it an insurance tower?

A It is.

Q Could you describe it for the Court?

A There's $2.5 million of primary coverage, and then there are three layers of excess that take the total to $10 million.

Q Are the Debtors insureds under these policies?

A I'm sorry, I couldn't hear you.

Q Sorry. Are the Debtors insureds under these policies?

A Yes, they are.

Q Are these wasting policies?

A Yes, they are.

Q What is a wasting policy?

A A wasting policy means that defense costs erode the policy limit. So to the extent money is spent on defense and other costs, it reduces the net amount available for any claims or any other items.

MR. HALL: So, Your Honor, Exhibit 110 of the Debtors' exhibits is a motion. I believe we have a stipulation, but again, maybe I'm wrong. The insurance

policies of the Debtors are attached, I believe, as Exhibits B through E to that motion. Again, it's 110.

MS. JONES: Which one?

MR. HALL: It's Binder 4.

THE COURT: I'm there.

BY MR. HALL:

Q So, Mr. Jones, if you would turn to Exhibit 110, and I think it's starting -- sorry -- starting at Bates Page 021 and then continuing to the end. Could you flip through that and then tell the Court whether or not these are the policies that you were referencing?

A Yes, those are the Debtors' D&O policy.

Q Okay.

MR. HALL: Your Honor, I would move Bates 21 to the end of Exhibit 110.

THE COURT: Any objection to Exhibit 110, Pages 021 through 112?

MS. JONES: Only, Your Honor, that I'm still trying to look through it because this is amongst the new exhibits. So I just --

THE COURT: Take your time.

MS. JONES: I don't know what all these documents are, so. I've got them here. I'm just -- I chose to sleep for a couple hours last night, so I just didn't read them yet.

MR. SIMON: And, Your Honor, we don't object to the admissibility of the insurance policies.

THE COURT: Did you say you were going to --

MR. SIMON: We do not object to the admissibility of insurance policies.

(Pause.)

(WebEx interruption.)

THE COURT: Sorry. We'll have to mute that. There you go.

A VOICE: We're all having a good time, Your Honor.

MR. HALL: Just for symmetry's sake, assuming that these come in, Exhibit 6 of what I'm calling the Simon exhibits, but the GN Defendant exhibits, those are the same insurance policies, so they would also be admitted.

MR. SIMON: Yes, Your Honor.

MS. JONES: His exhibits are exactly the same as these?

MR. HALL: They're the same.

MS. JONES: Okay. Well, Your Honor, I mean, these are just the Debtors' policies that I'm not -- I don't have an objection. I don't have an objection, but -- I don't have an objection to admission of the document.

THE COURT: All right. So then, again, Debtors' Exhibit 110-021 through 112 is admitted.

And I take it that that's also GN Exhibit #6?

MR. SIMON: Yes, Your Honor.

THE COURT: So that will also be admitted.

(Debtors' Exhibit 110-021 through 110-112 is admitted into evidence. GN Defendants' Exhibit 6 is admitted into evidence.)

MS. JONES: Just one question, though, Your Honor. Like, I'm looking on Page -- it's Exhibit 110-99 is the Bates on the bottom. And there's redactions.

THE COURT: I don't see any redactions.

MR. HALL: Yes, Your Honor, for premiums.

THE COURT: On --?

MR. HALL: On 099. Toward the bottom.

THE COURT: Ah, there we go. You bet. Okay, I do see it.

MS. JONES: Okay. Well, I don't know if there's any more redactions, but I guess if they come up I'll try to fill it in. But, I mean, they're not complete, but --

THE COURT: All right. The exhibits are admitted.

MR. HALL: Thank you, Your Honor.

BY MR. HALL:

Q Do the Debtors believe that they have potential claims against Mr. Lee?

A Yes, we do.

Q Are the Debtors investigating Mr. Lee?

A Yes, we are.

Q Are Debtors investigating any other former officers or directors of the Debtors?
A Yes, we are.
Q Do you understand whether or not the Broker-Dealers maintain their own insurance in any instances?
A It's my understanding that they do.
Q Have you seen any of the insurance policies of the Broker-Dealers?
A I've seen information on a handful, not all.
Q Have you seen any -- well, never mind that. Do the Debtors believe that they may have potential claims against Broker-Dealers?
A Yes, we do.
Q Are Debtors investigating those claims?
A Yes, we are.
Q The Debtors are seeking a stay of certain cases through this adversary proceeding, correct?
A Correct.
Q How long are the Debtors seeking a stay to last?
A Through the effective date of a confirmed plan of reorganization.
Q Have the Debtors filed a plan?
A Not yet.
Q Have the Debtors started formulating a plan?
A The Debtors and their advisors have started thinking

about and formulating plans. Yes.
Q Do the Debtors intend to file a plan?
A Yes.
Q Do they intend to confirm a plan?
A Absolutely.
Q Or maybe it's multiple plans, given the cases?
A Correct.

MR. HALL: Your Honor, can I have two minutes to consult?

THE COURT: Of course.

MR. HALL: Thank you.

(Pause.)

MR. HALL: Just a couple more questions, Your Honor. And also, Your Honor, --

BY MR. HALL:
Q Mr. Jones, if I can have you look at Exhibit 106, which is also in Binder 4. Do you recognize this document?
A I do.
Q What is it?
A It's information regarding the Broker-Dealer professional liability insurance policy for --
Q A Broker-Dealer?
A Correct.
Q Okay. Thank you.

MR. HALL: Your Honor, I'd like to --

BY MR. HALL:
Q How did you receive it?
A It was part of the discovery information we received based on a request.
Q So before I try to introduce this, did the Debtors participate in any diligence calls with the DST Committee and the UCC?
A Yes.
Q And did those diligence calls involve Brokers, speaking to Brokers?
A It did.
Q Did those diligence calls involve speaking to insurers of those Brokers?
A Yes. I want to make sure I understand what you meant when -- Brokers. You didn't mean insurance brokers, you meant the Broker-Dealers?
Q Insurers of the Broker-Dealers.
A Of the Broker-Dealers? Yes.
Q Yes.
A Yes.
Q Okay. And did Debtors provide documents to the UCC and DST Committee to facilitate their diligence for this adversary proceeding?
A Yes.
Q Did that document production include Broker-Dealer

insurance policies?
A It did.
Q Just to round it out, did it also include things like Statements of Claim?

MR. SIMON: I'm sorry, what did you say?

BY MR. HALL:
Q I said, to round it out, did it also include things like Statements of Claim?
A Yes.

MR. HALL: Your Honor, the Debtors would move Exhibit 106 into evidence.

THE COURT: Any objection?

MS. JONES: Yes. Hearsay. It's -- no exception to the hearsay rule here. It's not authenticated. It is a document we asked for and did not receive. And the fact that it was shared with some people but not others doesn't make it authentic. So, yeah, those are the objections.

THE COURT: To hearsay and lack of -- what was the second? Lack of foundation?

MS. JONES: Well, lack of foundation, lack of personal knowledge. Yeah, so all of them, really. The document can't be authenticated.

THE COURT: Lack of authentication and hearsay are both sustained.

MS. JONES: Thank you.

MR. HALL: Okay.
BY MR. HALL:
Q Okay. At least one group of Defendants asserted that the Debtors claims-made insurance policies expired in 2025. Have the Debtors extended their insurance policies without interruption?
A Yes.
MR. HALL: Your Honor, one moment?
THE COURT: Of course.
(Pause.)
BY MR. HALL:
Q Mr. Jones, do you believe that if the arbitration matters are allowed to proceed and result in awards against Broker-Dealers, that that will result in indemnification claims against the Debtors?
MR. SIMON: Objection.
MS. JONES: Objection, Your Honor. Calls for speculation, and leading.
MR. SIMON: And legal conclusion.
MS. JONES: And legal conclusion.
THE COURT: Legal conclusion is overruled. It's just his understanding.
MR. HALL: Your Honor?
THE COURT: Go ahead.
MR. HALL: If I may, it's --

THE COURT: Yes.

MR. HALL: He's the CRO of a Debtor, and among other things is responsible for its business and legal affairs. It's impossible for him to not have a view that -- it's no different than he's going to have a view of whether this adversary proceeding might succeed or fail. He's not giving a legal conclusion; he's simply giving his opinion and concerns, which are why we're all here today.

THE COURT: So the speculation objection is also overruled. I meant to overrule it. Didn't I overrule, Mr. Simon, your objection? I thought I did.

MR. HALL: I believe you did.

THE COURT: And then you had speculation, which I've overruled. And then what was the other one?

MS. JONES: Leading.

THE COURT: Leading is overruled as well. So you may answer.

MS. JONES: Your Honor, I'm also going to object to the witness testifying -- making -- testifying to this, because the question was asked in interrogatories and we were told it was privileged information so we couldn't have the answer.

THE COURT: That objection on it I'll take as part of the timeliness. That's overruled as well. So you may answer the question.

THE WITNESS: Do you want to ask the question again?
BY MR. HALL:
Q The question was whether or not you are concerned, expect that if arbitration awards are entered against the Broker-Dealers, that will result in indemnification claims being asserted against the Debtors.
A I'm very concerned, because, again, the nature of the allegations involve due diligence. It involved information provided by the Debtors. And so if there are arbitration awards, I would expect that indemnification claims would be filed against the Debtors. And in this case, those indemnification claims would materially impact distributions that would otherwise go to the investors here, whether they be creditors or equity holders from the DSTs. So it is a -- it is a concern.
Q How could those claims affect the recoveries of others in the Debtors' cases?
MS. JONES: Your Honor, this question, I object. It assumes facts not in evidence about what the claims are, the extent of the claims, what the potential distributions are. We don't have any of that information to reach the conclusion question.
THE COURT: That objection is overruled.
Mr. Simon?
MR. SIMON: Yeah. That's it. None of the

information, other than the fact the witness may have an opinion, none of --

THE COURT: I'm sorry, I can't hear you.

MR. SIMON: Other than the fact the witness might have an opinion, none of the information that would be necessary to make that judgment is in evidence.

THE COURT: I'm not sure I understood that objection.

MR. SIMON: Sure. The witness is being asked to give opinion testimony --

THE COURT: No, he's not. It's just his understanding as the CRO of the Debtor.

MR. SIMON: Well, he's also being asked -- actually, that wasn't the question, what is his understanding. The question was whether, in his opinion, if these lawsuits went forward, that it would affect the Debtors' distribution.

THE COURT: I think concern was the term.

I'll tell you what. To make sure everything's clear, because I thought it was concern or understanding, you're saying he asked for an opinion. I frankly don't remember. So I'll go ahead and sustain the objections just to get rid of -- ask the question again.

BY MR. HALL:

Q So the question is, do you have a concern or understanding about how, if those claims, indemnification

claims, were asserted in the Debtors' cases they would potentially affect recoveries for other claim holders or other creditors?

MR. SIMON: Objection. Form. Concern and understanding are different things.

MR. HALL: Okay.

BY MR. HALL:

Q Just your understanding.

MS. JONES: And I'm going to object that it's leading.

THE COURT: Overruled on the leading. Go ahead.

MR. HALL: I've amended my question to just be his understanding.

THE COURT: I understand. You're addressing the form objection.

MR. HALL: Yes, Your Honor.

THE WITNESS: Okay. If there are indemnification claims, those become unsecured claims in these cases. Those claims would get paid out ahead of equity holders here. We are running a sale process to maximize value and return value to not only creditors, but also the equity holders in each one of these DSTs who are the subject of these complaints. Any additional claims, unsecured claims, would rank ahead of those and would dilute not only unsecured creditors but maybe even reduce recoveries to equity holders here. And it in

effect moves these parties to the top of the line and spreads that impact over other creditors.

MR. HALL: No further questions, Your Honor.

THE COURT: All right. Thank you, sir.

All right. Mr. Coleman, any questions?

MR. COLEMAN: No, Your Honor.

THE COURT: How about for the Committee, Mr. --

MR. KURZWEIL: No, Your Honor.

THE COURT: Mr. Axelrod, any questions on behalf of your clients?

MR. AXELROD: No, Your Honor.

THE COURT: All right. Mr. Simon or Ms. Jones, you can arm-wrestle as to who goes first.

MS. JONES: I'm going to defer to the local person.

A VOICE: May we have just one minute?

THE COURT: Of course.

A VOICE: I don't want to violate your forms.

THE COURT: You're not violating anything. You can take your time.

Let me ask Mr. Jones. Do you need about five-minute break, or --?

THE WITNESS: Sure.

THE COURT: Why don't we just take a five-minute break? That way you can chat and I can stretch my legs.

THE WITNESS: Thank you, Your Honor.

(A recess ensued from 3:05 p.m. until 3:14 p.m.)

THE CLERK: All rise.

THE COURT: Thank you. Please be seated.

All right. We're back on the record. And, Mr. Jones, I do this with every witness when we take a break. Just to remind you, you're under oath, sir.

THE WITNESS: Yes, sir.

THE COURT: With that, the podium is yours, Mr. Simon.

MR. SIMON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SIMON:

Q And good afternoon, Mr. Jones. How are you?

A Good afternoon.

Q Mr. Jones, my name is Robert Simon, and I represent 23 FINRA Claimants against Broker-Dealers in 11 different FINRA arbitrations.

All right. Do you have in front of you or can you get your hands on Debtors' Exhibit #198? It's Volume 8 of 9, and it's the first -- it's not the first document you talked about, but --

A So you said 198?

Q 1-9-8.

A That's in the first binder?

Q Yeah.

A Okay.
Q And I'm flipping back myself. All right. Do you see Debtors' Exhibit #198?
A I do.
Q Okay. Now, this is a letter that was written by what was at that time the Debtors' counsel, McDermott Will & Schulte. Is that correct?
A That's correct.
Q And the date is February the 19th, 2026?
A That is correct.
Q And it's written to D. Dax White of The White Law Group, correct?
A Correct.
Q Now you previously testified that this letter was given in response to the requests for information that are in Debtors' Exhibits 187 through 197. Is that correct?
A That's correct.
Q Okay. And if you look at the --
MR. SIMON: I'll wait until the Court finds it.
THE COURT: No, I'm fine. I'm hearing every word, so you may proceed.
MR. SIMON: Okay.
THE COURT: If you look at, I'm hearing and I've got it right here.
MR. SIMON: We all double-task, multi-task.

BY MR. SIMON:
Q Okay. All right. Would you turn to the second page of Debtors' Exhibit 198?
A Okay.
Q All right. And look at the second-to-last paragraph, the one that begins: Given the nature and breadth of the information and the documents you seek via authorization. Do you see that?
A I do.
Q All right. And then it goes on to say, the last sentence says: Thus, it would be unduly burdensome for IHC and the other Debtors in this matter, although the authorizations are addressed only to IHC, to provide the requested documents at this time. Do you see that?
A I do.
Q Okay. So when the Debtor received these document requests from the Claimants in the -- in some of these FINRA arbitration actions, the Debtor refused to comply, correct?
A The Debtors indicated that the production of information would be burdensome and that they would not be sending information.
Q Okay. So the Debtor, in fact, didn't send any information, correct?
A That's correct.
Q All right. Now, the Debtor didn't really incur much cost

in not complying with these document requests, did it?
A Correct.
Q Okay. And in fact, the Debtor goes on to say: We plan to file a motion in this Chapter 11 case asking the Court to stay or enjoin your FINRA arbitrations. Correct?
A That's correct.
Q All right. And that was February. It took the Debtor until late June. But the Debtor, as good as its word, filed this adversary proceeding in this motion, correct?
A Correct.
Q All right. So the Debtor is not currently incurring any costs complying with document requests because the Debtor is not complying with document requests, correct?
A Currently, we are not expending any dollars related to the document requests in question here, yes.
Q Okay. And that's been true since at least February of 2026, correct?
A Correct.
Q All right. Now, the Debtor has been in bankruptcy since February of 2026, correct?
A That is correct.
Q What was the petition date? Was it February the 2nd?
A February 2nd.
Q Okay. And you testified that the Debtor is engaged in a sale process to sell at least some or all of its assets,

correct?
A That is correct.
Q And the FINRA arbitrations have not prevented the Debtor from going forward with that sale process, correct?
A Not at this point.
Q Okay. And the Debtors have -- you said the Debtors have been able to maintain their operations, notwithstanding the FINRA arbitrations. Right?
A Up to this point, yes.
Q Okay. So, at least up to this point, the FINRA arbitrations have not prevented the Debtor from operating?
A Up to this point, yes.
Q Okay. And the Debtor, you said, is operating well, correct?
A I said we've been stable, yes.
Q Stable? Okay. Now, you said the Debtors' employees were working on responding to discovery requests from the Committees. By Committees, you mean the DST Committee, the Creditors' Committee in the bankruptcy case?
A That's correct. The Unsecured Creditors' Committee and the Committee of DST Investors.
Q And the Debtor has been able to do that?
A Yes.
Q And the FINRA arbitrations have not kept the Debtor from doing that?

A Not up to this point.
Q All right. And the Debtors' employees have not been involved in the FINRA arbitrations to this point, correct?
A To this point, that's correct.
Q All right. Now, you looked at a selection of Statements of Claim in FINRA arbitrations in your direct testimony from Debtors' counsel, correct?
A That's correct.
Q All right. And you noticed that there are some allegations regarding -- allegations made by FINRA Claimants regarding the failure to do due diligence, right?
A That was one of the allegations, yes.
Q Right. But that failure to do diligence was, as alleged in the arbitration complaint, the Broker-Dealers' failure to do due diligence, correct?
A That is what's alleged, yes.
Q Right. I mean, the arbitration complaints don't say that the Debtor failed to do due diligence, do they?
A They do not.
Q Okay. Now, you testified the Debtors maintained, did you say $10 million of insurance?
A That's correct.
Q All right. And you said, and the Broker-Dealers maintain their own insurance, correct?
A That is also correct.

Q You say the Debtors have claims against the Broker-Dealers. Is that right?
A We believe we do, yes.
Q Okay. What claims does the Debtor have against Broker-Dealers?
A Again, I don't think I can discuss that. It's the subject of an investigation being conducted by Reid Collins.
MR. SIMON: Your Honor, I think I would direct -- ask the Court to direct the witness to go ahead and answer that question.
THE COURT: Answer the question to the extent you know it, unless there's an objection. Yes, sir?
MR. HALL: Only to the extent, Your Honor, of privileged information.
BY MR. SIMON:
Q Sure. I am not asking you to divulge specific communications with your attorneys, --
A Okay.
Q -- with the Debtors' attorneys.
A Okay.
Q Generally speaking, you say the Debtor believes it has claims against the Broker-Dealers?
A Yes.
Q Generally speaking, without divulging any communications from -- to or from Debtors' counsel, what claims does the

Debtor believe it has?
A And again, the investigation is ongoing by Reid Collins. It's not complete. But the Debtors do believe that there are claims related to the fees that were charged, the nature of the relationship between certain of the Brokers and the Debtors, and -- yeah, I'll stop there because I don't want to speculate. Reid Collins is doing the investigation and they're the ones that can answer the question better.
Q Does the Debtor believe the Broker-Dealers overcharged the Debtor?
A The Debtors are looking into the fees charged.
Q Okay. You testified that the Debtor has extended its insurance policy, correct?
A That's correct.
Q Okay. And is that -- first, for how long?
A It's through October of 2026.
Q Okay. And does that extension pick up claims asserted before September the -- does that pick up claims asserted as far back as September the 20th, 2024?
A Yes, because the extension also includes a tail.
Q Okay. And does the extension include any claims that may have been asserted that far back, as far back as September 20th, two thousand -- September -- let me cheat and look at the actual exhibit. June the 20th, 2024?
A I'm sorry, I didn't understand the question.

Q Sure, no problem. It was my mistake. I had misremembered when the Debtors' insurance policy began. If you have Debtors' Exhibit Number -- our Exhibit #6, but it's at Debtors' Exhibit #1. Debtors' Exhibit #1, you'll see the insurance policy, I believe, is attached -- no, it's one. 110. I'm sorry. If you look at Debtors' Exhibit #110, we're talking about the same insurance policies?

A Sorry.

Q Sure.

A I'm just finding the right binder here.

Q Sure.

A VOICE: The insurance policy on one -- starts on Page 21.

BY MR. SIMON:

Q If it's helpful to you, I can bring you our own exhibits. Why don't I do that?

A Sure.

A VOICE: And it's Binder 4.

MR. SIMON: Binder 4?

A VOICE: You can give him this one.

THE WITNESS: I have it. Thank you.

MR. SIMON: Okay. Very well. Thank you, sir.

BY MR. SIMON:

Q If you look at the insurance policy on -- in fact, on the very first page, it says: Effective dates June 20th, 2024 to

June 20th, 2025, correct?
A That's correct.
Q All right. And you say the Debtor has purchased tail coverage from June the 20th of 2024 all the way through October of this year?
A Well, that wouldn't be the tail. That's the extension of the policy. So this policy was extended from its expiration in June of '25 to October of '26.
Q Okay. But with regard to -- this is a claims-made policy, correct?
A It is.
Q All right. So with regard to claims that were made before June the 20th, 2025, has the Debtor purchased a tail?
A The tail is part of the extension of the policy.
Q The tail was part of the extension? Okay. And are the coverage amounts the same?
A Yes.
Q Okay. Where is that document?
A I'm sorry?
Q Do you know? That is, I am not aware of any document that shows that extension. Are you aware of a document that shows that extension?
A I am.
Q Okay. Is it in any of the Debtors' exhibit binders? Because we haven't seen that document.

A I don't know that it is. I'm not sure.
Q Okay. Do you have any idea why not?
A I don't.
Q Okay. Have Broker-Dealers sued the Debtor for indemnification?
A Not at this point.
Q Okay. Has the Debtor received any letters, any demand letters from Broker-Dealers invoking their indemnification rights under the Managing Broker-Dealer Agreement?
A I don't believe so at this point.
Q Okay. So, to this point, indemnification claims are potential claims, correct?
A That's correct.
Q All right. Now, if a Broker-Dealer filed a proof of claim -- excuse me. If a Broker-Dealer asserted a claim against the Debtor, the Debtor is currently in bankruptcy, correct?
A That is correct.
Q All right. And so is it your understanding that while the Debtor is in bankruptcy it is protected by the automatic stay?
A Well, it's protected by the stay, but that doesn't mean that creditors can't file claims.
Q Right. But in a bankruptcy, for a creditor to file a claim means filing a proof of claim, correct?

A A proof of claim is part of the process, yes.
Q Sure. And if a creditor filed a proof of claim, a filed proof of claim is no different from any other claim in the sense that it's a -- unless it's objected to, it's an allowed claim against the debtor, right?
A If it's allowed, sure.
Q Sure. And if a proof of claim is allowed, it would still be just a general unsecured claim, right?
A If it were filed as a general unsecured claim and allowed as a general unsecured claim, then it, yes, would be an unsecured claim.
Q And it's your understanding that an indemnification claim against the Debtor would be a claim just like that, right?
A That's my understanding.
Q Okay. And that claim, an allowed proof of claim for indemnification, would come ahead of the Debtors' equity holders, just like any other general unsecured claim, right?
MR. HALL: Objection. Calls for speculation and legal conclusions. This is a very complex case. There's many different entities with different equity and debt levels. I don't even understand the question, so that's also an objection to form.
THE COURT: Sustained. You can certainly ask his understanding.
MR. SIMON: Sure.

BY MR. SIMON:
Q Is it your understanding that, in bankruptcy, general unsecured claims, if allowed, come ahead of the interests of equity holders?
A Yes, the general unsecured claims have priority.
Q Okay. Thank you. Okay. Mr. Jones, would you please take a look at the GN Defendants' Exhibit #1? Which should be the Debtors' -- yeah.
A Which number?
Q Yeah.
A Which number?
MR. SIMON: Your Honor, Exhibit #1 is just the Debtors' schedules, so we would move for admission.
THE COURT: Any objection?
MR. HALL: None, Your Honor.
THE COURT: All right. GN Defendants' Exhibit 1 is admitted.
(GN Defendants' Exhibit 1 is admitted into evidence.)
BY MR. SIMON:
Q Mr. Jones, did you sign these schedules or did someone else sign them?
A I signed them.
Q Okay. And you signed these schedules under penalty of perjury, correct?
A I did.

Q And you signed these schedules intending for them to be accurate, correct?

A To the best of our knowledge, yes.

Q Sure. All right. Would you please look at Page 47, which is the Debtors' unsecured priority, non-priority creditors. Do you see that?

Q Which numbering are you using?

A Oh, yeah. Sure. Okay. The page number that you're looking at is the fourth in the series of legends at the top of the page, where it's Page 47 of 52. And when you get there, it should say Exhibit E P1, Unsecured Priority Creditors, but I really want you to turn to the next page, Page 48, Exhibit F P2, Unsecured Non-Priority Creditors.

A Okay.

Q All right. Do you see any claims against Broker-Dealers on this schedule of the Debtors' unsecured creditors? Do you see any claims by Broker-Dealers against the Debtor?

A By Broker-Dealers, no.

Q No. So at least at the time the Debtor prepared these schedules, to the best of the Debtors' knowledge, no Broker-Dealers had claims against the Debtor?

A Well, none had been asserted that we were aware of.

Q Okay. And as of that time, the Debtor wasn't aware of any?

A Correct.

Q Would you please turn to -- this would be Schedule G, which begins at Page 28 of 52. And this is a Schedule of Executory Contracts and Unexpired Leases, correct?
A One second, I'm still getting there.
Q Sure.
A Correct.
Q And this says: See Exhibit G. So if we turn to Exhibit G, which is on Page 50 of 52, tell me when you're there.
A Okay. I'm there.
Q Okay. And this is the list of the Debtors' executory contracts, correct?
A Correct.
Q And the Debtor lists an executory contract with DocuSign, correct?
A That's correct.
Q Now, the Debtor does not list any indemnification agreements on this Exhibit G, does it?
A They're not listed.
Q Okay. All right. I'm going to start asking questions about the FINRA arbitrations. The Debtor sold DST Investments to the investing public, correct?
A To who?
Q The investing public.
A Yes.
Q All right. And those securities included fractional

interest in -- those, in fact, those investments were fractional interests in Delaware Statutory Trusts?
A They were interests in Delaware Statutory Trusts fractionally.
Q Okay, sure. Now, thus far, the Debtor has not been named as a respondent -- well, okay. And you are aware that, as a result of the investment products the Debtor has sold, a number of unhappy investors have filed FINRA arbitration actions against the Broker-Dealers or investment advisors who sold them those investments?
A I'm aware of the actions that have been filed, yes.
Q Okay. But the Debtor has not been named in any FINRA arbitration proceedings, has it?
A That's correct.
Q And the Debtor has not been named as a responsible third party in any FINRA arbitration proceedings, has it?
A Correct.
Q And to the best of the Debtors' knowledge, none of the Broker-Dealers in any of the FINRA arbitration actions regarding securities sold by the Debtor has cross-claimed against the Debtor in any of the FINRA arbitration actions?
A Again, I think Debtor -- prior Debtor employees have been named, but I have not seen any formal cross-claims.
Q Okay. No, right, I mean, their names may appear, may have appeared, but the Debtor has not been made a party

either by the -- either by the complaining investor or by the responding broker?
A Correct.
Q Has the Debtor been subpoenaed to testify in any FINRA arbitration proceedings regarding securities sold by the Debtor?
A No.
Q Have any representatives of the Debtor been deposed in any FINRA arbitration proceedings regarding securities sold by the Debtor?
A No.
Q Has the Debtor been served with any subpoenas for documents in any FINRA arbitration actions regarding securities sold by the Debtor?
A Not to my knowledge.
Q And to the extent the Debtor has received letters requesting documents, the Debtor has refused to comply, correct?
A That is correct.
Q When the case was filed back in February, most of these FINRA arbitration proceedings were already underway, correct?
A Again, I'm not sure exactly when they were filed. I don't remember.
Q Okay. Do you know why the Debtor didn't seek to stay the FINRA arbitration proceedings back in February?

A Well, again, I think the Debtor, after we filed for Chapter 11, we kind of laid out our priorities. Stability of the communities, commencing the sales and marketing process, making sure that we gathered information and started to investigate potential claims. And, you know, as was described earlier, you know, those activities have consumed the Debtors' time and resources for a pretty long period of time.

Q So what you're saying is late June was the time the Debtor got around to it?

A No. I think when we were made aware back in February, we didn't understand and know the magnitude of the FINRA claims. And as we became more aware, the Debtors took action to stay those claims.

Q Right. But in the letter that was sent back on February the 17th, 2026, the Debtor said, we intend to go seek an injunction against these FINRA arbitration actions, right?

A That's correct.

Q It just took the Debtor four months to get around to it?

A We did not get around to it until recently, yes.

Q Okay. All right. Would you please look at Debtors' Exhibit -- excuse me, this is our Exhibit #4, which is a copy of the Managing Broker-Dealer Agreement between the Debtor and Emerson Equity.

A Okay.

Q Look at the first page. This is dated July the 27th, 2020, correct?
A It is.
Q And this is the document the Debtor relies upon for its contention that it has indemnification obligations to the Broker-Dealers?
A Correct.
Q Okay.
A One of the documents, yes.
Q Is there another?
A Well, I think there are additional agreements between the Managing Broker-Dealer and the Soliciting Dealers that also create indemnification obligations potentially from those parties through the Managing Broker-Dealer to the Debtor.
Q Right. But the Debtor is not a party to the agreements between the Managing Broker-Dealer and the Subsidiary Broker-Dealer?
A The Soliciting Dealers. No, we're not. But, again, in terms of the kind of full body of documents, I just wanted to be complete.
Q Okay. But in terms of documents to which the Debtor is a party, it's the Managing Broker-Dealer Agreement?
A Correct.
Q Got it. Would you please look at Section 8(d) of the Managing Broker-Dealer Agreement? And that is a long

provision, but it appears on Page 14. Would you agree with me that Section -- based upon your prior testimony, Section 8 is the part of the Broker-Dealer Agreement that deals with indemnification?

A That's correct.

Q Okay. All right. Look at Section (d), 8(d), right in the middle of the page. And I'm going to read this portion to you and read you a portion of it, and then I'll ask you a question.

Do you see where it says: Within 14 days after a claim or action is brought or asserted against Inspired Healthcare or the Managing Dealer, or both, which in the opinion of either is subject to the indemnification provisions contained in Section 8, the party seeking indemnification (the Indemnitee) shall notify in writing the party from whom identification is sought (the Indemnitor) of the existence of the claim or action. Do you see that?

A I do.

Q And did I read it correctly?

A Yes.

Q All right. So, just based upon this language, it appears that Broker-Dealers have 14 days for when they become -- from when a claim is asserted against them to then go assert a claim for indemnification against the Debtor. Correct?

MR. HALL: Objection, Your Honor. Only because we

weren't getting into legal constructions of the document when we were on direct, I don't think we should be doing it on cross.

THE COURT: The objection is overruled. You may answer the question.

THE WITNESS: Again, the document says that, within 14 days, the party seeking indemnification shall notify the other party in writing.

BY MR. SIMON:

Q Right. And for all of the indemnification actions that were filed before the Debtors' bankruptcy, or at least -- excuse me, for all of the FINRA arbitration claims that were filed at least 14 days before the Debtors' bankruptcy, that 14 days would have run, right?

A You're asking if something was filed 14 days before the filing, --

Q Did the Debtor --

A -- it would have been 14 days at the filing?

Q Let me simplify this. Did the Debtor receive any indemnification demands from any Broker-Dealers within the 14-day period that they have under this agreement in which to make that demand?

A I can't interpret when the 14-day period starts, but we have not received indemnification demands.

Q Thank you. And without getting too deep into the

document, it appears that once a claim becomes known, whoever the claimant is would have 14 days in which to assert the indemnification?

A Well, it says they're supposed to within 14 days.

Q Okay. Now I'm going to read the next sentence. It starts six lines down: Indemnitor shall assume the defense of the claim or action by employing counsel for the Indemnitee, and shall thereafter be responsible for the payment of all legal fees and expenses incurred in connection with such defense.

Did I read that correctly?

A Yes.

Q All right. Now, in connection with any of the 109 FINRA arbitration claims that the Debtor is seeking to enjoin, have the Debtors employed counsel and assumed the defense of any of those claims?

A No.

Q Was that a no?

A That's a no.

Q Thank you. Have the Debtors paid any attorneys' fees or expenses on behalf of the FINRA Arbitration Respondents as a result of this indemnification provision?

A No.

Q Please look at Section 5, which is the Representations, Warranties, Covenants of the Managing Broker-Dealer. You'll

see it on Page 9.
A Okay.
Q Okay. Now turn to 5(d), which is on Page 10. Now look at the very last sentence of Paragraph -- of Section (d), 5(d), where it says: Managing Broker-Dealer will comply with all applicable laws, regulations, and requirements of the Securities Act, the Exchange Act, and FINRA, and of applicable states and other jurisdictions.
Did I read that correctly?
A Almost. You put Broker in between Managing and Dealer, and it's just Managing Dealer.
Q Thank you. Thank you. Now, under this agreement, the Managing Dealer is Emory -- excuse me. This agreement has a Managing -- has a Managing Dealer, correct?
A That's correct.
Q All right. And that paragraph, that sentence at the end of Exhibit D -- excuse me. That sentence at the end of Paragraph 5(d) of Debtors' Exhibit 4 on Page 10, that's an obligation of the Managing Broker-Dealer, correct?
A Managing Dealer. Yes.
Q The Managing Dealer?
A Managing Dealer, yes.
Q Okay. Thank you. Now, if we look, let's look up at 5(c). And 5(c) says: The consummation of the transactions contemplated herein and those contemplated by the memorandum

will not result in a breach or violation of any rule, order, or regulation directed to Managing Dealer by any court or federal or state regulatory body or administrative agency having jurisdiction over Managing Dealer.

Did I read that correctly?

A Yes.

Q Okay. And that's also an obligation of the Managing Dealer, correct?

A That's what the document says, yes.

Q Sure. And you understand that in the FINRA arbitration actions, the Claimants are alleging that the Managing Dealer and other Broker-Dealers violated those obligations, generally?

A I understand that the FINRA actions are actions against the Brokers and Dealers, yes.

Q Okay. For violations of their duties to the retail customers?

A Correct.

Q Right. And the FINRA actions themselves are not actions against the Debtor?

A Correct.

Q Okay.

A Not directly.

Q Would you please turn to Section 13 on Page 16?

A Sorry, which section?

Q It's Section 13(b), Relationship of Parties, on Page 16.
A Okay.
Q All right. And I'm going to read this to you, it's relatively short, and ask you a couple of questions about it. It say: Relationship of Parties. It is not the intention of the parties to create, nor shall this Agreement be construed as creating, a partnership, joint venture, agency, relationship, or association, other than as specifically set forth herein, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this Agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship with each other. With the other.
And did I read that correctly?
A Yes.
Q Thank you. So based upon this provision, it does not appear that the Debtor intended for the Broker-Dealers to be its agents under this agreement, correct?
A Well, I think you'd have to look at the beginning of the agreement.
Q All right. But this provision says it is not the intention of the -- not the intention of the parties to create a relationship of principal -- principal --
MR. HALL: Objection.
THE COURT: Yes.

THE WITNESS: I think it says other than --

THE COURT: Hold on, sir. Hold on. Yes? Objection?

MR. HALL: The objection is that he's not reading the provision in full, which it specifically says "other than as listed in this document," which is what Mr. Jones alluded to in his prior testimony. There's absolutely an agency relationship contemplated in this document in Section 1.

MR. AXELROD: And Your Honor, I want to add that this calls -- this calls for legal conclusions. It's an interpretation of a contract. He's not a lawyer.

THE COURT: The Court will sustain Mr. Hall's objection.

MR. SIMON: Which one, Your Honor?

THE COURT: Actually, both of them.

MR. SIMON: Okay.

THE COURT: It's okay that you're reading it and ask his understanding, but, again, all legal conclusions will be made by the Court, obviously, not by the witness.

MR. SIMON: Sure.

BY MR. SIMON:

Q You do see here in the last sentence that it says: In their relations with each other under the Agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship with the other?

A Well, the document says that. But to the earlier comment, it says: Other than specifically set forth herein.
Q Yeah. I'm asking about that sentence, though. The last sentence.
A It says what you read.
Q Thank you. Now, with respect to the Debtors' insurance policies, the Broker-Dealers are not named as insureds under the policies, are they?
A Named as insureds?
Q Yeah.
A No.
Q No. The Broker-Dealers are not beneficiaries?
A No, they're not named as insureds under the policy.
Q Okay. And the Debtor does not share insurance coverage with any Broker-Dealers under the Debtors' insurance policies, does it?
A Correct.
Q Was Luke Lee a Broker-Dealer with respect to any securities sold by the Debtor?
A Was Luke Lee a Broker-Dealer?
Q Yeah.
A I don't believe so.
Q Okay. And is Mr. Lee -- has Mr. Lee been named as a respondent in any of the FINRA arbitrations?
A He's been named. I don't think he's been named a

respondent.
Q Okay. So not named as a party?
A Not to my knowledge.
MR. SIMON: Your Honor, may I confer with my co-counselor here, because I may be --
THE COURT: Of course.
(Pause.)
MR. SIMON: Your Honor, I believe that in terms of exhibits, I want to make sure that our exhibits are in evidence. I'm not going to offer 3.
THE COURT: All right.
MR. SIMON: But 1, 2, I didn't ask questions about it, but it is the Debtors' Statement of Financial Affairs and we would ask that to be admitted.
THE COURT: Okay. 1 is admitted. Any objection to 2?
MR. HALL: No.
THE COURT: All right. Exhibit 2 is admitted.
(GN Defendants' Exhibit 2 is admitted into evidence.)
MR. SIMON: Not 3. 4, Your Honor, is the Managing Broker-Dealer Agreement we've been talking about. And I think that's already in evidence.
THE COURT: It's in evidence. Any objection to that?
MR. HALL: No, Your Honor.

THE COURT: All right. The Court will also include Exhibit 4, or admit Exhibit 4, I should say, GN Defendant.

(GN Defendants' Exhibit 4 is admitted into evidence.)

MR. SIMON: 5 is unnecessary.

6 is the same as the Debtors' insurance policies, so --

THE COURT: It's already in evidence.

MR. SIMON: Already in evidence.

Didn't ask anything about 7.

Actually, I think I need to ask the -- may want to ask the witness a question about Exhibit 8.

BY MR. SIMON:

Q Mr. Jones, have you reviewed every Statement of Claim?

A I did flip through all of them, yes.

Q Okay. I mean, did you actually read them, or did you just flip through them?

A I read parts of them.

Q You read parts of it? Okay. Do you know in which ones any of the Claimants have alleged any misconduct by the Debtor?

A I could not tell you specifically. But again, certain of the Statement of Claims do reference the relationship between the Debtors' former head of sales in capital markets and the Brokers. And while the Debtors may not be named, again, one of the base allegations is one related to due diligence and information provided, which implicates the Debtors, as they

prepared those materials.
Q Okay. But the Broker-Dealers could breach duties by failure of disclosure even if the Debtor didn't do anything unlawful, correct?
A Again, I'm not a FINRA expert.
Q Okay.
MR. SIMON: All right. Pass the witness, Your Honor.
THE COURT: All right. Thank you, sir.
Ms. Jones?
MS. JONES: Your Honor, may I just have very -- the briefest of -- so I can -- because I --
THE COURT: Of course. Do you want a break?
MS. JONES: Because he's been thorough and I don't want to repeat anything he's done, so --
THE COURT: No worry.
MS. JONES: Okay.
THE COURT: We'll take a little break.
MS. JONES: Okay. Great.
THE COURT: You can organize your thoughts. All right. Just let us know when you're ready for us.
MS. JONES: It'll just be a couple minutes.
THE COURT: The Court will be in recess.
(A recess ensued from 3:58 p.m. until 4:04 p.m.)
THE COURT: All right. Please stay seated. Thank

you.

A VOICE: I'll go let them know.

THE COURT: Oh, I'm sorry. I thought you all were in.

What's that?

A VOICE: We're ready.

A VOICE: We're waiting on the Debtor.

A VOICE: Sorry.

THE COURT: That's okay. No worries. Yes, I don't mind.

A VOICE: I saw --

THE COURT: Yes, don't be sorry. It's okay.

A VOICE: We're just eager.

MS. JONES: We're ready --

THE COURT: We're eager little beavers.

MS. JONES: We're ready to close.

THE COURT: There we go. No, I'm sorry, I came out prematurely. It's on me. Sorry about that.

MR. SIMON: You got very lucky in terms of --

THE COURT: I apologize. I came out a little prematurely.

MR. SIMON: It is not normally this pleasant here.

MR. HALL: Not a problem, Your Honor. Sorry for our --

THE WITNESS: Oh, well. It's been a hundred degrees

--

MR. SIMON: This time of year.

THE WITNESS: It's been a hundred degrees at home, so --

THE COURT: It's all okay.

A VOICE: Last week it was 95 degrees every day.

THE COURT: Everybody ready? Everybody okay?

MR. HALL: Yes, Your Honor.

THE COURT: All right. We'll go on the record. Again, Mr. Jones, as I do every time, I'll just remind you you're still under oath, sir.

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Ms. Jones?

MS. JONES: Thank you. So, much ado to let Your Honor know that we're going to pass the witness, so thank you.

THE COURT: Ah, very good. Okay.

MS. JONES: No questions.

THE COURT: So any redirect?

MR. HALL: Briefly, Your Honor, if I may.

THE COURT: Of course.

REDIRECT EXAMINATION

BY MR. HALL:

Q Mr. Jones, are you aware that discussions have occurred between the Debtors and Broker-Dealers regarding

indemnification claims and claims that the Debtors may have against the Broker-Dealers, like the two-way street of settlement?

A Yes.

Q You were asked whether the Debtors have been able to comply with all of the UCC/DST discovery that has been sent to the Debtors. Do you have an understanding of the DST Committee and UCC's views of whether we have complied?

MS. JONES: Objection as leading. Calls for a yes or no answer.

THE COURT: Well, that doesn't necessarily mean leading. It's not a leading question. So that objection is overruled. You may answer the question.

THE WITNESS: Yes, I do know, and I know that at least the UCC would like us to produce more information faster. So, --

BY MR. HALL:

Q We've been in court on that subject multiple times, yes?

A We have.

Q Is that in any part because our staffing levels are stretched at the corporate level?

MR. SIMON: Objection. Leading.

THE COURT: Sustained.

MR. HALL: I'll move on.

BY MR. HALL:

Q You were also asked a series of questions about whether any FINRA Claimant or Broker-Dealer has leveled accusations or involved the Debtors as a respondent or a third party responsible -- sorry, a responsible third party. Do you recall those questions?
A I do.
Q Have you seen every pleading in the FINRA arbitrations at issue in this case?
A Every pleading?
Q Correct.
A No.
Q Are you aware of every arbitration that may have been filed in the universe, not just in this case?
A No.
Q You were asked whether or not the Debtors got around to filing a complaint after four months. Were the Debtors actively pursuing the complaint that was filed in June throughout the bankruptcy case?
MR. SIMON: Objection. Leading.
BY MR. HALL:
Q What efforts were the Debtors --
THE COURT: Well, --
MR. HALL: I'm sorry.
THE COURT: Go ahead.
MR. HALL: I'm happy to rephrase it.

BY MR. HALL:
Q What efforts were the Debtors undertaking in order to be in a position to file the complaint between February and June?
A Well, the Debtors had to do a lot of diligence. That included opening dialogues with the Brokers and Dealers to actually understand the magnitude and nature of the complaints and understand that there were actually arbitration hearings that were proceeding forward which could cause risk to the Debtors' estate. Back in February, we just had document requests. We didn't know the magnitude and scale and timing of the FINRA actions.
Q You were asked about agency relationship. Do you recall whether or not -- you can go to the exhibit if you'd like. This is the Managing Broker Agreement. It's attached to Exhibit 1 of the Debtors' Exhibits. Do you recall whether or not there is an express authorization of agency in Section 1 of that agreement?
A I think it's in the second paragraph of that agreement. I can go to it, if necessary. But it is contained in the agreement. And that's the additional answer that I was trying to provide because it says "except as stated herein."
Q And then you were also asked about Section 8(d), which has the 14-day notice obligation in it?
A Correct.

Q Are you aware of where in the Managing Broker-Dealer Agreement it spells out the consequence for that failure to give notice within 14 days, assuming there has been such a failure?
A I'm not.
Q Are you aware whether there is any assert... expressed, sorry, consequence?
A I am not. Not to my understanding.
MR. HALL: Your Honor, I'm going to pass the witness.
THE COURT: All right. Mr. Axelrod?

RECROSS-EXAMINATION

BY MR. AXELROD:
Q Mr. Jones, I believe you testified that, as a general matter, general unsecured creditors get paid in a bankruptcy ahead of equity holders?
A As a general matter.
Q Are DST Investors, are they equity or creditor -- or general unsecured creditors?
MR. SIMON: Objection. That calls for a legal conclusion. The DST Investors can easily be both.
THE COURT: I'm sorry, you trailed off.
MR. SIMON: Objection. That asks for a legal conclusion. And the DST Investors can easily be both.
MS. JONES: I also think it's beyond the scope.

THE COURT: I'll overrule the beyond the scope. I'll let the parties go back and forth to the extent necessary before I cut it off.

I'm going to sustain Mr. Simon's objection.

BY MR. AXELROD:

Q Do you have an understanding as to the nature of DST Investments in this case?

A I'm not sure I understand your question when you say the nature.

Q Do you have a view as to whether -- let me phrase that differently. If you were to look at any investment by a particular plaintiff in an arbitration, do you believe you could form a view as to whether it was a debt investment or an equity investment?

MR. SIMON: Objection. Calls for -- it's actually speculating as to whether he could form a legal conclusion.

MS. JONES: It's an improper hypothetical.

THE COURT: I'm sorry?

MS. JONES: I think it's an improper hypothetical.

THE COURT: I'll overrule both objections. You may answer the question.

THE WITNESS: Okay. Ask again, please.

THE COURT: Listen carefully.

BY MR. AXELROD:

Q If you were to look at an investment by any particular

plaintiff in one of these arbitrations, do you believe you could form a view as to whether it's a debt or an equity investment?
A I think if you look at the information that I've seen in the arbitration, it simply outlines the amount of capital that was invested, and it talks about the type vehicle that it was invested in being the Delaware Statutory Trust.
Q Is it possible that there's an outcome in these cases where some are debt -- are held as debt, some are equity?
A I'm not going to speculate on that because that does call for legal.
Q Would you say today that it's definitely true that DST Investors are going to be general unsecured creditors?
A Would I say that that is true?
THE COURT: Hold on. Hold on.
MR. SIMON: Objection. Leading.
THE COURT: Sustained.
MR. AXELROD: That's okay. We'll move on.
BY MR. AXELROD:
Q Your declaration in this case, which is an evidence, that was filed after the petition date, correct?
A My declaration?
Q Yes.
A It was filed along with the first day motions.
Q Did you make any prior disclosures on behalf of IHC prior

to the petition date?
A What kind of disclosures are you referring to? I don't understand the question.
Q Disclosures comparable in scope and detail to your first day declaration.
A To whom?
Q To anyone.
A I mean, we had regular meetings with the independent managers. Information was shared with them during the course of those board meetings. Some of that information would be similar to what's in my declaration. But I'm not sure I understand your question.
Q Did you -- did you release any comparable statements to the public?
A To the public? No.
MR. AXELROD: That's all, Your Honor. Thank you.
THE COURT: All right. Thank you.
All right. Any --
(Pause.)
THE COURT: Yes?
MR. SIMON: No redirect, Your Honor.
THE COURT: How about you, --
MR. SIMON: No recross, Your Honor.
THE COURT: How about you, Ms. Jones?
MS. JONES: None from us.

THE COURT: All right. Anyone else? Final call?

(No response.)

THE COURT: All right. Thank you, Mr. Jones, for your testimony. You're excused as a witness.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you.

(The witness steps down.)

THE COURT: All right. Back to you, Mr. Hall.

MR. HALL: Yes, Your Honor.

(Discussion.)

MR. HALL: Your Honor, the Debtors have concluded their evidentiary presentation.

THE COURT: All right. How about either Committee? Do you have any witnesses or exhibits you'd like to either offer or call? Mr. Taylor?

MR. TAYLOR: No, Your Honor.

THE COURT: All right. How about --

MR. KURZWEIL: No, Your Honor.

THE COURT: All right. Mr. Axelrod?

MR. AXELROD: Thank you, Your Honor. No witnesses. I'd like to move for some exhibits to be entered into evidence.

If Your Honor has the binder or our exhibit and witness statement in front of you, Docket No. 42, first, I'd like to move into evidence the non-sealed exhibits, which are Numbers

1 through 11.

THE COURT: Give me one minute to catch up.

MR. AXELROD: And I did not previously receive any objection from any party, but I defer.

MR. SIMON: Yeah. Your Honor, --

THE COURT: Hold on. Let me catch up. I need to make sure I've got them in front of me.

All right. Docket 42? Okay. You're offering which exhibits in Docket 42?

MR. AXELROD: Numbers 1 through 11, Your Honor.

THE COURT: All right. Any objection to 1 through 11?

MR. SIMON: Yes. Yeah. Yes, Your Honor. I mean, 1 through 6 appear to be pleadings. And I don't -- I don't have any -- yeah, 1 is a pleading. It's admissible for the limited purpose of showing it was filed. It is not admissible for the truth of the matters stated.

Number 2, Debtors' Emergency Motion for Injunctive Relief. Same thing. It would be admissible for the purpose of showing it was filed, but not for the truth of the matters stated.

Number 3, Objection to Debtors' -- that is a pleading by Ms. Jones. I have no objection to that.

Number 4 is our response to the Debtors' -- to their Motion for Injunctive Relief. No objection there.

Number 5 is Ms. Jones' witness and exhibit list. No objection there.

Number 6 is a transcript of the prior hearing. Your Honor, transcripts are full of hearsay, so, yes, we object.

Number 7 is the declaration of Mr. Jones. We would object to that. Mr. Jones testified, his testimony was fine, but the declaration is hearsay. So, yes, we object.

Number 8 is Goodman and Nekvasil's webpage. I don't know what that accomplishes. We object to 8.

We object to 9.

MR. AXELROD: Could we maybe stop before we get to 8, 9, and 10, Your Honor?

THE COURT: All right. So, 3, 4, and 5 are each admitted.

(Ad Hoc Group of Broker-Dealers' Exhibits 3, 4, and 5 are admitted into evidence.)

THE COURT: 1 through 3, the objection is sustained. Are you limiting it to -- are you going to limit the offer?

MR. AXELROD: Yes.

THE COURT: All right. Based on the limited offer that it's simply filed and not for the truth of the matters asserted, any objection to that?

MR. SIMON: No.

MR. HALL: Your Honor?

THE COURT: All right. Then 1, 2, and --

MR. HALL: If I may, for the Debtor?

THE COURT: Yes, of course.

MR. HALL: The Debtors take the position that all pleadings, to the extent that they're admitted, which is fine, we're not objecting to that, should be admitted on the same basis, which is not for the truth of the matter asserted, but rather judicial notice of the filing.

THE COURT: And I think that's what the limited offer is for.

MR. HALL: Well, I thought Mr. Simon was being very clever in saying these ones can come in for the truth of the matter asserted.

THE COURT: Oh, I see. The 3, 4, and 5? Okay. You --

MR. HALL: Yes.

MR. AXELROD: Correct. Limited as to all, Your Honor.

THE COURT: Good call.

MR. SIMON: And that is correct, Your Honor.

MS. JONES: And I -- the same.

MR. SIMON: I have no objection to my pleadings (inaudible) in.

THE COURT: Let me re-ask the question, Mr. Axelrod. Are you offering Exhibits 1 through 5 just for the fact that they were filed and not for the truth of the matters asserted

therein?

MR. AXELROD: That's correct, Your Honor.

THE COURT: All right. Based on that limited offer, is there any objection?

MR. HALL: None from the Debtors, Your Honor.

THE COURT: Okay. 1 through 5 are each admitted for the limited offer.

(Ad Hoc Group of Broker-Dealers' Exhibits 1 through 5 are admitted into evidence, as limited.)

THE COURT: 6, the transcript?

MR. AXELROD: Similarly, not for the truth of the matter asserted, Your Honor.

THE COURT: Well, that's what a transcript is, I think, so I think it probably is full of -- the fact that it's there, I guess. I don't know. You tell me, Mr. Simon, your --

MR. SIMON: Well, Your Honor, the problem with transcripts is they're out-of-court statements. And particularly in this case, it -- they're -- as out-of-court statements, I don't know what relevance they could possibly have other than for the truth of the matters stated. Therefore, they are hearsay.

THE COURT: The Court will sustain that objection and not admit Exhibit 6.

(Ad Hoc Group of Broker-Dealers' Exhibit 6 is denied

admission into evidence.)

MR. AXELROD: Okay.

THE COURT: What about 7, which is the declaration of Mr. Jones?

MR. AXELROD: There are portions of it that I would like to discuss in my closing argument. I do not believe I'm going to be citing them for the truth of the matter asserted, so I would like it admitted on that basis. I think Mr. Jones' testimony just now contextualized that filing, and I did ask a couple of questions about it, so I would like that admitted.

THE COURT: I think --

MR. SIMON: Your Honor, the testimony stands on its own.

THE COURT: Yes, I think --

MR. SIMON: The declaration is hearsay.

THE COURT: I think the Court will sustain the objection. It's without prejudice to making a closing argument. And if there is going to be objection to something, we will deal with it at that point. But the objection is sustained, and Exhibit 7 is not admitted.

(Ad Hoc Group of Broker-Dealers' Exhibit 7 is denied admission into evidence.)

THE COURT: 8 and 9, what's --

MR. AXELROD: 8, 9, and 10 are -- they are

extractions from the websites of the -- of the witnesses that we're expecting to hear from. They contain admissions of party opponents, and I expect to introduce them on that basis.

THE COURT: Why don't we wait and do that if and when the time comes?

MR. SIMON: Your Honor, obviously, if there are prior inconsistent statements, they can use them to impeach, but the webpages are hearsay.

THE COURT: I tend to agree, so we'll just hold off on those, and to the extent you want to use them or try to develop them at a later time, there's no prejudice to doing that.

MR. AXELROD: Your Honor, respectfully, they're marketing content. They indicate what these witnesses are saying to the public, and it's relevant not just as rebuttal testimony --

THE COURT: Understood. Understood. If you're going to -- if there's going to be a witness that can authenticate and all that, then do it at that time.

MR. AXELROD: Okay.

THE COURT: But I'm not going to pre-admit, because I have no idea what witnesses are actually going to be called.

MR. AXELROD: Okay. I think the rest of my -- so,

#11 is the Managing Broker-Dealer Agreement. I -- that is already in evidence. The rest were filed under seal. I think -- I want to reserve on that for a moment.

At Docket No. 37, the Nekvasil firm filed a number of Statements of Claim and answers and affirmative defenses. That is -- and I would like to introduce into evidence Docket -- Exhibit Numbers 10, 12, 14, 17, 20, 23, 26. Actually, I'm just going to make this simple. Let's introduce 10 through 35 from the Nekvasil firm.

MR. SIMON: 10, Your Honor, is a Shepherd Smith webpage. That's not admissible.

MR. AXELROD: I --

THE COURT: No, that's not what I have.

MR. AXELROD: I'm sorry?

MR. SIMON: 11 is the Managing --

MR. AXELROD: No, I'm talking about your exhibits. I'd like to introduce your exhibits.

MR. SIMON: Oh, ours? Ours. Yeah, I think our 9 through 35 were --

THE COURT: They're already, they're already in evidence.

MR. AXELROD: Great. I will contextualize, then, the other, exhibits we put in under seal. They are Statements of Claim and answers of -- sample answers from parties in different arbitrations. They were introduced,

basically, with substantially similar language as to the answers and affirmative defenses that we see in the filings from the Nekvasil firm.

Those may not have been circulated in timely fashion, and so I'm anticipating Ms. Jones will stand up and say she objects. I just do want to say I have a closing prepared and I'd love to refer to my own exhibit numbers, but if Ms. Jones feels she's prejudiced, I will withdraw that request.

MS. JONES: Are these -- are these also ones that were in the Debtors' list?

MR. AXELROD: So all the Statements of Claim were in the Debtors' list. I believe my Exhibits 25 through 28 are substantially similar to what the Nekvasil firm filed. I do not believe they were introduced by the Debtors. They are Sample Answer and Affirmative Defenses from Broker-Dealer Firms.

MS. JONES: Yeah. I mean, I think those, at least the Statements of Claim, I mean, they were all admitted not for truth but -- so with that -- if that stipulation carries, I don't have an objection.

THE COURT: Are you limiting an offer to that?

MR. AXELROD: Yes.

THE COURT: All right. So and that is, again, which exhibits?

MR. AXELROD: Are we saying 12 through 28?

12 through 28, Your Honor.

THE COURT: All right. Based on the limited offer, the Court will admit 12 through 28.

MR. AXELROD: All right.

THE COURT: And this is the Ad Hoc.

(Ad Hoc Group of Broker-Dealers' Exhibits 12 through 28 are admitted into evidence, as specified.)

MR. AXELROD: All right. That is it, Your Honor.

THE COURT: Well, I need -- and then I did, I just want to make sure on the record, I'm not sure you quite offered it, although #11 is the Managing Broker-Dealer Agreement, which is in evidence. Would you also like your Exhibit 11 admitted if you're going to refer to your exhibits?

MR. AXELROD: Yes, Your Honor.

THE COURT: Any objection to that? It's already in evidence.

MS. JONES: None --

THE COURT: All right.

MS. JONES: with the representation that it's identical to the other one. There's not anything --

MR. AXELROD: Admitted on the same terms, and to my knowledge, it is identical to the copy that was previously reviewed in this case.

MS. JONES: Okay. Great.

THE COURT: All right.

MS. JONES: Thank you.

(Ad Hoc Group of Broker-Dealers' Exhibit 11 is admitted into evidence.)

THE COURT: All right. Then, with that, the Broker-Dealers Exhibit 11 -- so in summary, then, 1 through 5 are admitted for the limited purpose that they have been filed. 11 is admitted in full. And 12 through 28 had the limited offer, and they've been admitted.

Anything else?

MR. AXELROD: Thank you, Your Honor.

THE COURT: At this time, it's without prejudice to seeking admission of any further evidence, or exhibits that you've listed.

All right. So back to -- anyone else on the support of extension of the stay or issuance of preliminary injunction?

(No response.)

THE COURT: All right. We'll go to Mr. Simon or Ms. Jones. How would you like to proceed?

MR. SIMON: Do you want me to go first?

MS. JONES: Yes.

MR. SIMON: I'll go first.

All right. Your Honor, my group of Claimants calls Kalju Nekvasil.

THE COURT: All right.

MR. NEKVASIL: Kalju Nekvasil.

THE COURT: All right. Very good. Come forward, Mr. Nekvasil.

MR. NEKVASIL: Your Honor, it's a pleasure to be in this courtroom.

THE COURT: Pleasure to have you here.

MR. NEKVASIL: I came here yesterday morning from Cape Cod, Massachusetts, just to come here.

THE COURT: Have a seat.

MR. NEKVASIL: So you can tell, I'm an arbitration guy. I don't even know where to sit.

THE COURT: There you go. And remain standing. I'm going to swear you in. And then I'm going to ask Mr. Simon a question first.

KALJU NEKVASIL, FINRA ARBITRATION CLAIMANTS' WITNESS, SWORN

THE COURT: All right. Thank you. You may have a seat.

Let me just ask Mr. Simon. It's not for me, I don't really care what the answer is: How long do you think you'll have for this witness? I just need to let the folks out front know if we're going to go beyond 5:00, which is fine. I don't mind.

MR. SIMON: This, Your Honor, is about a 12-page outline, and that usually would be about 15 to 20 minutes.

THE COURT: All right. Perfect.

DIRECT EXAMINATION

BY MR. SIMON:

Q All right. What's your name?

A My name is Kalju Nekvasil. I'm with the St. Petersburg, Florida -- I don't think I need the microphone -- Law Firm of Goodman & Nekvasil, P.A.

Q All right. And are you an attorney?

A I am.

Q What is your principal practice area?

A My principal practice started as securities litigation 43 years ago. And since 1991, for the last 30-something years, it's been exclusively FINRA arbitrations except for the occasional class action.

Q All right. And would you tell the Court briefly what is a FINRA arbitration?

A Yeah. In virtually every customer account agreement between a broker-dealer and a customer, there is an arbitration provision. In addition, every broker-dealer agrees to comply with the laws of FINRA. And FINRA has a rule, Rule 12200, that says even if the arbitration agreement -- even if there's no arbitration agreement in a contract with a broker-dealer, a customer can demand arbitration under the FINRA rule. The purpose is to encourage arbitration because it's a cost-effective, efficient alternative to corporate litigation.

FINRA, really, is an enforcement agency. The SEC only has so many hands, can only do so much. So under congressional charter, FINRA, formerly the NASD, was formed to basically serve as a self-regulator. Now, they also operate the NASDAQ market. Okay?

Q All right. Maybe -- yeah.

A Anyway, so this would be -- so the FINRA has a series of -- they offer both enforcement mechanism and a dispute resolution mechanism. And these -- all of the claims in question were filed in FINRA pursuant to arbitration.

Q And do you represent approximately 23 Claimants in 11 FINRA arbitrations against broker-dealers who sold IHC Investment securities?

A Presently before the Court, yes. But in terms of the relief that's being requested, that goes beyond just these -- the 13 arbitration claims I represent. I have dozens of other arbitration claims pending involving, at least in part, IHC Investments against other broker-dealers.

Q Okay. And do your clients' rights to FINRA arbitration arise under the Bankruptcy Code or some other --

A No, they, as I stated earlier, and I'm going to be really quick, they arise under the FINRA Rule and the arbitration provisions. Further, in every one of my cases, after we filed and served the arbitration claim, the Broker-Dealer signed a submission agreement agreeing to arbitrate the

dispute, any answer, any third-party claim. Under the case law, that submission agreement is -- works -- serves as an independent arbitration agreement.

Q All right. And before the Debtor filed its bankruptcy case, did any of the Broker-Dealers object to FINRA arbitration?

A None of them. Every one of these claims except one was filed before the IHC bankruptcy, just from a timing standpoint. Some of them have been pending -- one has been pending for more than a year, with an October final hearing date. And in none of the cases have the Broker-Dealer -- has the Broker-Dealer -- I think we named in one case a Financial Advisor -- in none of the cases have they objected to FINRA jurisdiction over the dispute.

Q Okay. And are you one of the attorneys who represents the certain group of Defendants who filed a response to the Debtor's Motion for Injunctive Relief in this adversary proceeding at Docket No. 44?

A Yes.

Q All right. And does the response filed at Docket No. 44 list your FINRA arbitration clients?

A Yes.

Q And are you familiar with each of the FINRA arbitrations?

A I am.

Q And in those FINRA arbitrations, do your clients assert

any claims against the Debtors in the Inspired Healthcare bankruptcy case?
A Our clients do not. In none of the cases is the Debtor listed as a Respondent.
Q Have any of your clients asserted in any of the FINRA arbitration actions that the Debtor violated any law or otherwise engaged in unlawful conduct?
A I can't speak to every arbitration claim we have filed, but certainly the ones that were the subject of the adversary complaint, in none of those claims is it alleged that IHC did anything wrong.
Q And so who are the Respondents in those FINRA arbitration claims?
A They are -- in virtually all, in every one, there is a Broker-Dealer named Respondent. In several cases, I've also added the financial advisor who sold the investment to the client as a Respondent.
Q Have any of those Respondents brought the Debtors into those actions as responsible third parties?
A They have not. They have not ask -- they have not named them. They have not requested that they be named. No.
Q All right. Have any of the -- are any of the FINRA Arbitration Respondents also officers of the Debtor?
A No.
Q Do you know who Luke Lee is?

A I know -- I know who Luke Lee is. He was the former CEO of IHC, yes.
Q Is he a Respondent in any of the FINRA arbitration actions that you filed on behalf of your clients?
A Absolutely not.
Q Are any of the Respondents in the FINRA arbitration actions that you filed on behalf of your investors employees of the Debtors?
A No.
Q Why are your clients pursuing the Broker-Dealers and not the Debtors, the actual issuers of the securities?
A Okay, that's a good question. All of these arbitration claims really revolve around one FINRA rule, FINRA Rule 2111, the Suitability Rule. And that rule has two components that I will simplify, Your Honor, as the know-your-product component and know-your-customer component.
What is the know-your-product component? The real term is called reasonable basis suitability. What it means -- what the rule says is that a broker-dealer has to have a reasonable basis to believe, after conducting a reasonable investigation, that the recommendation is suitable for at least some of their clients. The term -- we've used the term due diligence, but that's really shorthand, Your Honor, for reasonable investigation.
And it's important that everyone understands that broker-

dealers can and do frequently decline to sell investments because they don't meet the reasonable basis standard, even if the issuer has done nothing wrong, even if the disclosure documents are accurate, et cetera.

What would the basis be for declining it? If the broker-dealer decides it's too risky. For example, --

Q Do your clients --

A -- if I can relate --

Q Sure. Do your clients contend that Debtors engaged in wrongful conduct?

A No.

Q Do your clients contend the Brokers engaged -- at least some Broker-Dealers engaged in wrongful conduct?

A Yes.

Q And what wrongful conduct do your clients contend some Broker-Dealers engaged in?

A Well, first is the reasonable basis standard. And what FINRA indicated in a seminal notice on private placements, I think it's Notice 10-11, is that the broker-dealer has to, as part of its investigation, understand the track record of the issuer.

And by way of example, I think the restructuring officer has indicated that of the 31 DST offerings that he looked at, only eight were profitable. So we allege that the Broker-Dealers failed to investigate the track record. There's no

allegation that the Debtor refused to provide salient information about its track record to the Broker-Dealers. There's no allegation that the -- that IHC provided inaccurate information about its track record to the Broker-Dealer. This is an independent duty of the Broker-Dealer.

The second component is we have, of course, alleged -- this is the individual know-your-customer part of the rule -- that the Broker-Dealers in question recommended these investments to investors, our clients, who did not meet the risk profile --

Q Sure.

A -- from a financial situation, et cetera.

Q Even if the security itself was lawfully issued, was perfectly fine, can it still be inappropriate for a particular client?

A Yes, it could be inappropriate. It could either fail the reasonable basis suitability standard or the individual -- know-your-customer, the individual suitability standard. Those are unique duties of the Broker-Dealer under the FINRA Rules.

Q And do the -- in the -- in your client's FINRA arbitrations, is the allegation made that, regardless of the Debtors' conduct, the Broker-Dealers breached their duty to your clients to make sure the investment was suitable?

A Yeah. Actually, in these, in the ones that are the

subject of the adversary complaint, we don't talk about the Debtors' conduct at all. And I'd be happy to look at one of these claims for demonstrative purposes, and the answers. We focus solely on the Broker-Dealer's duties, and we allege that they did not comply with these duties under FINRA Rule 2111. We also allege oral misrepresentations --

MR. TAYLOR: Your Honor, I'm going to object. This is a narrative, and it's nonresponsive.

MR. SIMON: Sure.

MR. TAYLOR: He asked a very direct question, and this has continued to move on.

THE COURT: Sustained. You may ask the next question.

MR. SIMON: Sure.

BY MR. SIMON:

Q Do Broker-Dealers have an independent duty to their clients, regardless of Debtors' conduct?

A Yes.

Q And in the FINRA arbitration claims that you filed, is the allegation made that the Broker-Dealers breached that independent duty to their clients?

A Yes.

Q All right. And why would Broker-Dealers sell a security they should advise their clients to avoid?

A The compensation. In this case, I think the six percent

commission. All of the Broker-Dealers also received from the investors a one-percent due diligence fee, whether they did their reasonable investigation or not.

Q Okay.

A So --

Q Have all of the Respondents filed answers in the FINRA arbitrations you filed?

A All of them except the most -- except the most recent ones that we have filed.

Q All right. And are you generally familiar with the Statements of Claim that you filed on behalf of your clients?

A I'd say I'm intimately familiar, yes.

Q All right. And in any of these Statements of Claims, do your clients contend the Broker-Dealers were acting as agents of IHC or any of the other Debtors?

A Absolutely not.

Q Are you generally familiar with the answers filed by Respondents in the FINRA arbitration proceedings?

A Yes.

Q And do the Respondent Broker-Dealers contend that they were acting as agents of IHC or the other Debtors?

A No.

Q And how long have these arbitrations been pending?

A The first one was filed in July of last year. I'm sorry, June of last year. So more than a year ago. And we have a

final hearing in October.
Q All right. Have any of the Respondents asserted in their answers that the Debtor is a responsible third party?
A No.
Q To your knowledge, have any of them asserted a claim for indemnification against the Debtors?
A No.
Q Have the Debtors appeared in any of the FINRA arbitrations?
A No.
Q Do you know if any of the Respondents have insurance policies applicable to your clients' claims?
A Several may, several have indicated that they do not, but that's in the context of settlement discussions, so I prefer not to go further because it's privileged.
Q Very well. Do any of the insurance policies of the Broker-Dealers that you have seen name the Debtor as an additional insured?
A No.
Q Have you sought any discovery from the Debtors in relation to the FINRA arbitrations?
A None.
Q Will you need to get discovery from the Debtors in the future in relation to the FINRA arbitrations?
A No.

Q Do you believe you'll need to subpoena any representatives of the Debtor at the final arbitration hearings?
A No.
Q Is the final arbitration hearing the equivalent of a trial?
A Yes.
Q Have any of the Respondents in your clients' FINRA arbitrations sought discovery from the Debtors?
A So far, no. I mean, to the best of my knowledge, no. All I see is what's been filed in the record.
Q Sure. Do the FINRA Rules provide that claimants in FINRA arbitrations are entitled to a speedy adjudication of their claims?
A Yes.
Q And generally speaking, when must claims be adjudicated?
A Some of our clients are -- some of our cases involve elderly people, people, some of whom are actually very ill, and they're on an expedited track in which the final hearing is to be scheduled within six months of the initial pre-hearing conference. So I'd say within roughly nine months of filing.
Q Okay.
A For the standard case, the final hearing is to be held within nine months of the initial scheduling conference, so

I'll put that loosely at twelve months. So to answer your question, I'm sorry I took so long to answer, but I'd say typically the final hearing is scheduled within nine months in an expedited case, twelve months in a non-expedited case.

Q Are many of your clients elderly?

A Yes, some -- yeah, a number --

Q And --

A Many of our clients are elderly, yes.

Q And are some of your clients ill?

A Some of our clients -- I can't speak necessarily to the ones that are named in the adversary complaint, but certainly the ones that would be subject to a broader order are, yes, some of them are ill, very elderly.

MR. AXELROD: Objection.

MR. SIMON: How --

MR. AXELROD: Speculative and beyond the scope. Like, every investor in this case?

THE WITNESS: I'm talking about -- I'm sorry, I'm talking about my firm's clients.

THE COURT: Hold on. Hold on.

THE WITNESS: Sorry. I apologize.

THE COURT: The objection -- go ahead, finish your objection.

MR. AXELROD: Objection. I think, first of all, the testimony is going beyond the question. But I think what

we're hearing is hearsay. And it's also, he's saying that people who could be subject to the scope of this order are, you know, X, Y, Z in character. We don't know what that means at all.

THE COURT: Okay. The hearsay objection is overruled. I'm not sure how to articulate the second objection, but --

MR. AXELROD: It's hard to formulate the exact objection because the answer is going so far beyond the question, but I think it's to the form.

THE COURT: Beyond the scope? Okay. Nonresponsive? The Court will sustain the nonresponsive.

BY MR. SIMON:

Q Okay. Speaking only about your clients, are many -- are some of your clients ill?

A Yes.

Q Okay. And have some of your clients who invested in the Debtor securities invested substantially all of their life savings?

A Yes.

MR. AXELROD: Objection. Hearsay.

THE COURT: Overruled. The answer will remain.

(Pause.)

THE COURT: Actually, I'm going to reverse myself. That really is hearsay, so I'll sustain the objection. Sorry

about that. Once in a while, I do that, as I sat here and thought about it.

BY MR. SIMON:

Q Do some of your clients allege that they have invested their life savings or substantially all of their life savings in the Debtors' investments?

A Yes.

Q Okay. What -- would your clients be prejudiced if the Court entered an injunction that stayed the pending arbitrations?

A Yes.

Q Why is that?

A A number of reasons. First of all, let's take the clients whose cases are scheduled for a final hearing in October of this year and the succeeding months. If the case is -- if the case is -- if the stay continues, it means no more discovery. It means the final hearings will be taken off calendar. And given that we don't know how long the stay would be, and given that even when the -- if and when the stay is lifted, you have to -- you have to coordinate with the schedule of the three arbitrators and the lawyers for both sides and important witnesses, it frequently would take -- you'd frequently have a hearing date that is a year or so after the stay ends. So that's the first prejudice.

The second prejudice, ironically, of a stay is I will

take --

Q I know where you're going. Do some of the Broker-Dealers have insurance policies?

A Yeah. With respect --

Q And are some of the Broker-Dealers also Defendants in other arbitrations that implicate their insurance policies?

A Yes.

Q And if the Court entered a stay of this proceeding, would that allow other claimants against those Broker-Dealers access to those insurance policies when Claimants who bought IHC securities would not have access to those insurance policies?

A Yeah. By way of example, we have $9 million in claims against $8 million in claims based on real investments that are not subject to this proceeding because they're not IHC claims against one of these Broker-Dealers that are set for hearing this year, before the end of the year.

If this Court, ironically, stays the IHC claims, it means, frankly, that my other clients, if they're successful, could get all insurance policies of that Broker-Dealer and those IHC investors are left out completely in the cold. And that's just talking about my cases, not cases that other law firms may have filed.

Q Got it. Do any of your FINRA arbitrations seek to collect any property from the Debtors?

A No.

Q Do any of your FINRA arbitrations seek to control any property of the Debtor?

A No.

Q Do any of your FINRA arbitration proceedings make claims against any of the Debtors' insurance coverage?

A No.

Q Do any of your FINRA arbitrating proceedings make claims against Broker-Dealers for the sale of securities not issued by the Debtor?

A Yes. Three of the claims that the Debtors are seeking to stay include, cumulatively, about $1.3 million in non-IHC securities sold to those investors.

Q And if the Court entered an injunction against the continuation of those actions, would that prevent your clients from being able to pursue their claims against Broker-Dealers for non-IHC investments?

A Yes.

Q And would that prejudice them?

A Yeah, absolutely. May I?

Q Is there something else you want to add?

A May I also add that I have reviewed many of the arbitration claims in evidence, and a very statistically significant number, not just the ones filed by our firm, include non-IHC investments.

Q Okay.

MR. SIMON: All right. Pass the witness.

THE COURT: All right. Ms. Jones? Ms. Jones, any questions for this witness?

MS. JONES: Oh, none.

THE COURT: All right. Mr. Kurzweil?

MR. KURZWEIL: Your Honor, David Kurzweil, Greenberg Traurig, on behalf of the Committee of Unsecured Creditors.

CROSS-EXAMINATION

BY MR. KURZWEIL:

Q Mr. Nekvasil, am I pronouncing that correctly?

A I have a thick skin, I'm a claimants' lawyer, so Nekvasil is perfect.

Q It's not an easy name like Kurzweil, right?

A Nekvasil is perfect.

Q Okay. I apologize if I mispronounce that.

A No, it's perfect.

Q How many clients do you have in these FINRA proceedings?

A In -- how many clients do I -- I have right now, my law firm has right now 80 -- I think 86 pending FINRA arbitration claims. Not all 86 involve these Respondents or IHC investments. I'm interpreting your question as how -- I'm interpreting your question as how many arbitration claims is my firm presently handling.

Q How many are involved in these proceedings with these

Broker-Dealers and Inspired?
A Could you clarify between the ones that are listed in the adversary complaint and the other ones that are not but that -- or would be included in the stay order by the Judge?
Q As many as you have related to Inspired.
A I would roughly estimate -- and I did ask my office the question, and I may have gotten the answer, but I don't want to consult my phone in front of you, I don't want to be rude, so I have to go purely from my head. I would estimate that I have roughly 40 cases.
Q Okay.
A Roughly.
Q And, sir, --
A I could be wrong about the number exactly.
Q And these are clients of your firm?
A Yes.
Q Okay. And how are you compensated for taking on these cases?
A I would say on a -- it's on a contingency fee basis, absolutely.
Q And what percentage contingency fee basis are you on?
A I would say, given the competitive nature of this field now as opposed to when I started 30 years ago, I would say the typical contingency fee would be 25 to 30 percent of what we recover. I think in a couple of cases it may even go up

to 35 percent over -- if the case progresses over a certain period of time.

Q And what is the value of the claims that you're pursuing in Inspired?

A The value. I really can't answer that because it all depends on, you know, if you have a small broker-dealer with limited funds and they explain to you that they may file for bankruptcy unless you settle for 20 cents on the dollar and they make a compelling case, you may recommend that to your clients. So I don't really know the value. It all depends upon -- frankly, I only bring cases that I can win. And so it's really not the merits of the case. I don't bring cases just to settle. It's -- the value is dependent on the solvency of the broker-dealer.

MR. KURZWEIL: Your Honor, I move to strike as being nonresponsive to the question.

THE COURT: Sustained.

THE WITNESS: He asked -- I'm sorry.

THE COURT: Sustained.

BY MR. KURZWEIL:

Q What is the amount of the value of the claims that you're pursuing? What's the --

A I can't give you a value. If you ask me about the dollar amount invested, I can answer that, but I can't answer the value.

Q The dollar amount invested?
A I would say -- I would say north of $15 million, maybe more. I'm not -- I'm concerned because --
Q So, --
A -- I have not looked at -- I have not done that calculation myself.
Q If it's north of $15 million and you were to pursue all those claims, is it safe to say that your firm would benefit 25 to 30 percent of that?
A Of any recovery, not the face value of the investments, yeah.
Q Thank you. Do you have exhibits in front of you? I'd like to direct your attention to Emerson Exhibit #8.
A I think I'm going to need help with the books because I've just sat up here. Can you tell me which binder it would be in? Can you help? Okay, work from that. Okay. 8.
MR. KURZWEIL: Your Honor, does the Court have Emerson Exhibit #8?
THE COURT: I'm going to have to look. I don't think I have a hard copy, but I can look online. What is it?
MS. JONES: Which exhibit?
MR. SIMON: 8.
MS. JONES: 8(b)? Of who?
MR. SIMON: 8.
THE COURT: Ah, I've got it.

MS. JONES: Whose 8?

THE COURT: I've got it right here. Thank you. I'm there. 8.

THE WITNESS: I'm there.

BY MR. KURZWEIL:

Q Okay. And the first page is titled, I just want to make sure we're on the same -- talking and about the same document, Inspired Healthcare Capital Senior Living of Hamilton DST Investigation. On Exhibit #8.

A Yes.

Q And do you recognize that document?

A I'm not the one who prepares this, so I would say I don't, but you're -- I would say, though, that looking at the language in this, I would surmise that this is a document that was prepared by somebody in my office.

Q Okay. And if you turn to the second page of Exhibit #8, it says: Goodman & Nekvasil, P.A. has filed numerous cases against brokerage firms, some with high-risk investments.

Does that help also refresh your recollection that this is an advertisement for your firm?

A Yeah. And actually, if you look at the bottom of the next page, Goodman & Nekvasil, P.A., in big letters, that's why I'm telling you, even though I've not seen this document before, I can represent to you this would have been something prepared by my firm.

MR. KURZWEIL: Your Honor, we move to admit Emerson Exhibit #8.

THE COURT: Any objection?

MR. SIMON: Your Honor, I don't know for what possible purpose this would be admitted, what it could be -- in what way could it be relevant to whether the Debtors are entitled to an injunction.

THE COURT: The relevance objection will be overruled. That will go to the weight, if any, the Court gives this.

Any other objection?

MR. SIMON: No.

THE COURT: All right. Emerson Exhibit 8 is admitted.

MR. KURZWEIL: And --

THE COURT: I've been calling it Ad Hoc Exhibits, but just making sure the record's clear.

MR. KURZWEIL: Ad Hoc.

THE COURT: That's fine. Or Broker-Dealer.

MR. KURZWEIL: We're we referring to it as the Ad Hoc?

THE COURT: Broker-Dealer, whatever.

MR. KURZWEIL: Okay, Ad Hoc.

THE COURT: I'm just making sure the record's clear, so --

MR. KURZWEIL: Thank you, Your Honor.
BY MR. KURZWEIL:
Q And if you look at Page 1, it directly ties to conduct of Inspired Healthcare Capital and says: Investor Warning. Inspired Healthcare Capital may recover investor losses, and the investor should be aware that Inspired Healthcare Capital and its affiliates have filed bankruptcy petitions.
That's how the advertisement starts; isn't that true?
A This is the first page of the post that you're calling an advertisement. And I guess, technically, it would be an advertisement. Yeah, I agree.
Q And it ties it immediately directly to the bankruptcy filing of Inspired Healthcare?
A Yes.
Q It doesn't talk about misrepresentation in the first paragraph, does it?
A The first paragraph, the first paragraph does not reference any misrepresentations.
Q It doesn't talk about a claimant's rights for misrepresentations by a Broker-Dealer, does it?
A That is not included on the first page.
Q In fact, it specifically only talks about the bankruptcy filing of Inspired Healthcare; isn't that true?
A You are correct insofar as the first page of this document is concerned.

Q In fact, the second paragraph immediately goes on to talk about Delaware Statutory Trusts; isn't that true?
A Are you referring to the paragraph that appears on the next page, Page 2?
Q No, I'm talking about the second paragraph at the bottom of Page 1.
A Okay, I'm now -- I'm now --
Q The paragraph that begins, --
A I'm now concerned because I --
Q -- "This development."
A The last paragraph says, Investor Warn -- oh, you're talking about -- do you call the second paragraph the heading, Inspired Healthcare Capital? Can you --
A No. The one at the bottom that starts: This development is especially concerning for investors.
THE COURT: Do you want to approach the witness and just show him the paragraph you're talking about?
MR. KURZWEIL: Okay.
THE COURT: I think he's got it in front of him, if you just want to walk over and point it to him.
BY MR. KURZWEIL:
Q Yeah, just --
A Yeah, I don't see where it is in the document you're looking at.
Q Oh, you are looking at a different wording on your

document.

MS. JONES: Yeah. And Judge, --

THE WITNESS: Okay, this is 8 -- so I may be testifying about a different document. Okay.

BY MR. KURZWEIL:

Q Yours has the same line, but --

A Okay. Well, --

Q Would you turn to the second page of that?

A One second. Whose -- this is not my book. This is a book by --

Q Oh, turn over to the --

A Who's Brown -- who's Reed Smith Brown? I'm looking at a volume that's been handed to me by counsel. It's the Ad Hoc Group of Broker-Dealers.

Q It's the same one. Just flip over to the next page.

A Page 2. Okay.

Q And it says, "This development" on Page 2.

A Yeah.

Q It says: This development is especially concerning.

THE COURT: Yes?

BY MR. KURZWEIL:

Q Do you see that?

A Yes.

Q Okay.

THE COURT: Hold on. Hold on. Yes, Ms. Jones?

MS. JONES: Your Honor, I declined a book earlier because I was working off of the electronics, and I thought -- and what we got was a cover page that says Exhibit 8, and it has the URL.

THE COURT: I got it. Do you need a book?

MS. JONES: And I put in the URL and it says, Page Not Found. So I literally don't have any idea what --

THE COURT: That's fine.

MS. JONES: I've never even seen this document.

THE COURT: We'll get you a book.

MS. JONES: I think we're all looking at something different.

THE WITNESS: I hope the Court understands that I'm looking -- the page I was looking at earlier was different, hence the difficulty. I'm now on this paragraph. I'm sorry. Are we waiting?

MR. KURZWEIL: Are you able to share with Ms. Jones? I'm sorry.

MS. JONES: Okay, I'll hover. All right. May I stand, Your Honor?

THE COURT: Of course. I apologize. I wish I could stand. I would love to stand right now.

MS. JONES: I don't know if I can stand very long, but I'll --

THE COURT: That's all right.

BY MR. KURZWEIL:

Q Mr. Nekvasil?

A Yeah.

Q Just so it's clear from the record, what I was referring to was the paragraph that starts: This development is especially concerning for investors who were sold Delaware Statutory Trusts.

A Yes.

Q I think on your document it begins on the following page, but it is the second paragraph.

A Yeah, I apologize for the confusion. Yes, I see that paragraph completely. Can you repeat the question that you wanted the answer to that relates to that paragraph?

Q That the first two paragraphs of the advertisement specifically focus on the conduct of Inspired Healthcare.

A I would disagree when you mention conduct. I believe they talk about the bankruptcy of Inspired Healthcare Capital.

Q Okay. But it doesn't talk about conduct of Broker-Dealers, does it?

A I'm -- disagree with that. I'm reading the very -- the very sentence ends with, if I can read the end: Who were -- This development is especially concerning for investors who were sold Delaware Statutory Trust, DST's, Private Placement Funds or other IHC investment products through broker-dealers

or financial advisors. So I would disagree with you. I believe that Broker-Dealers --

Q Okay.

A -- and financials referenced in the very first sentence of that paragraph.

Q Okay. And then if you continue through the document, can you go to the paragraph, I think it's about two more paragraphs, that start: According to court filings.

A Yes.

Q Why don't you read that for the Court to make sure we have the right paragraph?

A Again, unfortunately, I can't read it because, after the first sentence, mine is cut off.

It says: According to court filings, IHC and CEO Luke Lee are accused of concealing -- and then there's a pause. It's after -- the first paragraph talks about that Emerson Equity lawsuit and the second paragraph talks about -- unfortunately, after the first sentence, my copy is cut off. Can I show it to you?

MR. AXELROD: May I interject for one moment?

THE COURT: Of course.

MR. AXELROD: There are A and B tabs to Exhibit 8. And I think we may have people looking at different tabs. It's basically just that Exhibit B -- one of the exhibits, and I think it's Exhibit B, contains --

(Discussion.)

MR. AXELROD: Well, I -- Your Honor, just a technical issue on my end. I think these are -- these are different pulls from different programs that are intended to authenticate the website when it's pulled. And I apologize for the mix-up here. But I believe that they're just looking at different tabs of the same exhibit that was filed.

THE COURT: I can tell you what I'm looking at is Exhibit 8(a), which is the first page. And then the second page --

MR. KURZWEIL: Your Honor, --

THE COURT: I was following what the witness was reading, but mine was on, so it's at different page.

THE WITNESS: Maybe I can help you. That very paragraph that starts in the bottom of Page 2 that you wanted to direct me to -- According to court files, IHC and CEO Luke Lee are accused of concealing -- I believe for some reason that same paragraph appears on Page 3 in its entirety.

BY MR. KURZWEIL:

Q Okay. Would you read the paragraph, please?

A Yeah. (reading) According to court filings, IHC and CEO Luke Lee are accused of concealing significant financial distress and failing to disclose more than $200 million in personal guaranties. The lawsuit claims IHC misrepresented its solvency and financial position to secure fundings.

Investors in IHC-sponsored DSTs and private healthcare real estate funds should be aware of these allegations, as they may indicate deeper financial instability within the company's offerings.

Q Okay. And if you continue in the information before you, can you -- the following page starts: August 15th, 2025 Update. Do you --

A What date do you have?

MR. KURZWEIL: Your Honor, may I approach just to make sure we're talking about the same --

THE COURT: Yes, of course. Please.

MR. KURZWEIL: Okay. Thank you.

THE WITNESS: I see August 28th.

BY MR. KURZWEIL:

Q All right. August 20 -- it's an August 15th.

MS. JONES: No. We're talking about --

THE WITNESS: No, it's -- the one I have, again, and I'm not being difficult, mine has August 28th on it.

(Discussion.)

MR. KURZWEIL: Oh, yeah.

THE WITNESS: That's September 15. But can I help you again?

BY MR. KURZWEIL:

Q Yeah, sure.

A If you go to the succeeding page, --

Q Okay.
A Just so that the Court knows, I'm reading from Page 6.
MR. KURZWEIL: I apologize, Your Honor. These are not our exhibits, and I'm working off --
THE WITNESS: If you go to Page 6, there is a reference to August 15 --
MR. SIMON: Need the one --
THE WITNESS: That's what I was telling you. So I'm on Page 6 of this document. One, two, three, Page 6.
BY MR. KURZWEIL:
Q Okay. Please. If you would read the August --
A Sure. (reading) AUGUST 15th, 2025-UPDATE! Investors and advisors are reporting news from Inspired Healthcare Capital. Distributions remain suspended. There's been no date given for when distributions may resume. IHC is refusing in-person meetings.
Q So, earlier in your testimony, when you were talking about the FINRA arbitrations, I think that you said that, and I'm quoting here, if we go back to the record, they don't talk about the Debtors' conduct at all. That's what you said earlier today. You said the FINRA arbitrations don't talk about the Debtor's conduct at all. Do you remember that?
A It's about the investors -- I would, yeah, I would -- I don't remember saying it, but I would agree with that statement, except they do mention that IHC filed for

bankruptcy. I don't consider that conduct. I consider that a statement of financial performance. But you are correct that I do not believe that any of the claims allege any kind of conduct by IHC, let alone misconduct.
Q Yet your advertising materials from the beginning focus on the Debtors' conduct?
A I disagree. That from the very beginning in the documents, it talks about claims against Broker-Dealers. If you go to Page 2, the paragraph says, and I'm reading from Page 2: Goodman & Nekvasil, P.A. has filed numerous cases against brokerage firms selling high-risk investments and has recovered more than $500 million from that for victimized investors. By the way, now it's over $600 million.
You go to the bottom of the next page, it says that we filed FINRA arbitration claims, are alleging that the recommended investment strategy violated FINRA suitability rules in FINRA Rule 2010. This was written, the clear wording of this is to hopefully induce victimized investors to retain our firm to bring FINRA arbitration claims against the Broker-Dealer.
Q But you have to admit, sir, that you do mention and talk about the conduct of Inspired Healthcare in your advertising materials?
A No doubt. In this -- in the advertising material, yes.
Q Okay. Now, are you familiar with the -- The White Law

Group?
A Yes. Yes, I am familiar with them.
Q In fact, there is -- is there an attorney in the courtroom today with The White Law Group?
A Yes.
Q And who is that?
A Dax White.
Q And --
A Sitting there patiently.
A And how long have you met -- have known Mr. White?
Q Well, I've known him from industry conferences probably for 10 or 15 years, but I've probably spoken to him only three or four times during those 13 or 14 years, until recently when we began talking about a case that has nothing to do with DSTs or this.
Q Have you spoken to him about the Inspired matters?
A About the who?
Q The Inspired matters. Inspired Healthcare. Have you spoken to him about that?
A You're talking about the IHC matters?
Q Yeah, IHC. Yes.
A Because there's some DSTs called Inspired sold by another firm that -- so yeah.
Q IHC. The reason we're here today.
A Yes, I have. That's a fair statement. Yes.

Q Okay. And what have you spoke to him about?
A I think I may -- I think I may have even told him that I hope the judge follows the law and doesn't enjoin these proceedings. I probably said that.
Other than that, he, you know, he --
Q And has --
A We have a different counsel. We also talked about the -- well, you asked. We talked about the expedited nature of the FINRA arbitration process and that we believed would be a violation of the Federal Arbitration Act, 9 U.S.C., for this judge to stay noncore arbitration matters. But other than that, I can't -- I can't really think of anything else we've said.
Q Were you both concerned about the money he would lose if the judge stays in arbitration proceedings?
MS. JONES: Objection, Your Honor, as argumentative.
THE WITNESS: The answer is --
MS. JONES: And -- and --
THE COURT: Hold on, hold on. I've got to respond to the objection.
MS. JONES: I also don't understand the relevance to the issues before the Court.
THE COURT: Response?
MR. KURZWEIL: Your Honor, it's absolutely relevant. First of all, he's an adverse witness, so I can ask questions

of that type.

Secondly, it goes to credibility and why he's here today. If he's being paid a lot of money for the judge to rule in a specific way, it's extremely relevant for the Court to weigh his testimony.

MR. SIMON: Objection, Your Honor. He's not being paid any money for the Court to rule in a specific way, and that's a rather outrageous statement.

I don't think that's really what he meant. I think what he really meant was, oh, gee, if I can go forward in my law practice, I might continue to earn a living. Yes, sure. Of course.

THE COURT: The objection is overruled. You may answer the question.

THE WITNESS: Yeah. It should come as no surprise to you that if our law firm has recovered over $600 million for victimized investors, that means I have developed a considerable net worth. My wife is -- hates when I describe myself as a lawyer who both helps people and makes money, because typically you either make money or you help people. So, honestly, this -- I could stop working today and enjoy the same lifestyle. I have this job because I believe I'm helping people. And any money I might make from these cases is honestly at this time of zero moment to me. I've never, honestly, I've never been motivated by money. It's pure

coincidence that this is a job that I can make money when I help people. Like, what if I had become, you know, a clay potter instead, right? I might be the most talented one, but poor.

So, no, in response to your broad question, the money is really of no consequence to me, both from what I've already made and just from how I operate.

BY MR. KURZWEIL:

Q In your profession, sir, do you ever look at the advertisements of your competitors online?

A The answer is no.

Q You've never? You're under oath.

A Yeah.

Q You've never looked at the advertisements of your competitors?

A Well, when you say never, could I have -- let me be clear. Could I have, eight, ten years ago, looked at an ad? The answer is yes. But the -- but generally speaking, absolutely not. And there's actually a reason for it, and maybe that plays into where you want to go. Is I have an employee in my office who is responsible for these blogs, and I'm sure looks at other people's ads. But to be honest with you, I don't have time. I --

MR. KURZWEIL: Your Honor, move to strike. It was a yes or no question.

THE COURT: Sustained.

MR. KURZWEIL: Okay.

BY MR. KURZWEIL:

Q Now, have you ever looked at Mr. White's law group, his materials online?

A I believe the answer is no, and I caution that because seven or eight years ago I could have looked at something of his.

Q Okay. But --

A Do I recall ever looking at anything of his? No.

Q Okay. Now, you hold yourself out as an expert in this field; is that correct?

A I believe I'm an expert. Now, this Court has not -- has not accepted my testimony as expert testimony. Are you offering that I can testify as an expert?

Q No.

MR. KURZWEIL: Your Honor, I move to strike, then, everything that he's said that's an opinion testimony if he's not admitting that he's an expert here.

THE COURT: Overruled. The testimony will remain.

MR. KURZWEIL: Okay.

BY MR. KURZWEIL:

Q Now, if I could direct your attention to Exhibit #9 in front of you. Have you ever seen this document before?

A No.

Q The third page of the document that starts at the top, if I have the right one, it says Attorney at the top of that.
A Yeah.
Q Does it say that?

MS. JONES: Judge, I'm going to object. The witness has testified he's never seen the document before and it's hearsay because it's not his document.

THE COURT: Sustained.

MR. KURZWEIL: Well, I just asked him to turn to the page. That's all I did, was ask him to turn to the page.

MS. JONES: Okay.

MR. KURZWEIL: So I don't understand what the objection is.

THE COURT: I assume you're going to ask a question on this.

MR. KURZWEIL: Yeah.

THE COURT: He's identified he's never seen this document before. It's not from him or his law firm. There's no foundation been laid even for him to testify anything about this page, so --

MR. KURZWEIL: Well, Your Honor, if I just may, if the Court will just indulge me for one --

THE COURT: Well, of course.

MR. KURZWEIL: -- just quick question.

THE COURT: Of course.

MR. KURZWEIL: And if there's an objection, I'm happy to respond to that.

BY MR. KURZWEIL:

Q Just direct your attention to that.

A So is this the top of Page 3 of 19, the one with the --

Q Yeah.

A With the --

Q Knowing that you've never seen this document before, and we have Mr. White --

A Really? Honestly, I really haven't.

Q Okay.

A I'm sorry. I apologize.

Q And you see where it says Attorney at the top. I just want to make sure.

A Good point. I do, yes.

Q Okay.

A No, no, --

Q And --

A -- this is a page that hopefully --

Q And the question I have for a document that we've put in court that you've never seen before, it says: Investors don't need to wait for the bankruptcy to recover losses.

Do you see that provision?

MS. JONES: Your Honor?

MR. KURZWEIL: I'm just asking that he sees it.

That's the only thing I'm asking at this point.

MS. JONES: Your Honor, he's reading the document into the record.

THE COURT: Sustained. It's not appropriate. So if you want to get somebody who can testify to this, --

MR. KURZWEIL: Okay.

THE COURT: -- so we can do it that way.

BY MR. KURZWEIL:

Q If an attorney advertised saying a comment, investors don't need to wait for the bankruptcy to recover the losses, would that be appropriate, in your view?

MS. JONES: Objection, Your Honor.

MR. SIMON: Objection. Speculation. Improper hypothetical.

THE COURT: The objection is overruled. You may answer the question.

THE WITNESS: It's, in my opinion, it's perfectly appropriate. If you're -- as long as you're bringing a claim against -- a noncore claim against -- as long as you're bringing a claim against someone other than the Debtor that's not subject to the automatic stay, absolutely. Because, you know, -- and in fact, you shouldn't wait because of statutes of limitation, for example. And FINRA has a six-year eligibility rule that some arbitration panels interpret, unfortunately, as not tollable. So I have no -- I have no

problem with that sentence.

(Counsel confer.)

MR. KURZWEIL: Your Honor, I just may have one, and then I'll be able to finish up.

BY MR. KURZWEIL:

Q Do you -- in pursuit of the Inspired FINRA actions, we asked you about Mr. White. Have you consulted with other counsel with respect to the FINRA proceedings?

A Yes, I have.

Q Okay. What counsel? What other law firms have you spoken with?

A I've spoken with Sam, and I believe --

Q Just last name, please.

A I'm horrible with names. Okay. In fact, to be honest with you, I've forgotten your name. Sam -- I should --

MS. JONES: Edwards.

THE WITNESS: Sam Edwards.

BY MR. KURZWEIL:

Q Okay.

A He's with the Shepard Law Firm.

Q Okay.

A And with some other lawyers.

Q Did you speak with Mr. Simon?

A Yes.

Q Okay.

A Don't strap me there. Yes.
Q And when you talked about Mr. Simon, you talked about the --
A You're talking about Mr. Simon; is what you said?
Q Yes.
A Oh, Mr. Thomas? No?
Q Okay.
A Mr. Simon. I thought you said -- yes.
Q And you talked about the importance of these cases, the importance of these --
MR. SIMON: Objection. Attorney-client privilege. What he talked about with me is privileged.
THE COURT: Any response? I know that the first response that was filed was on behalf of the law firm. The second response was on behalf of individuals. I'm not sure who Mr. Simon and his law firm's clients are or is. So --
THE WITNESS: We've retained -- we've signed a retainer agreement.
THE COURT: The law firm?
THE WITNESS: Because, because the first response is on behalf of our firm.
BY MR. KURZWEIL:
Q So if I could just understand the relationship, if you could tell the Court the relationship between you and Mr. Simon. He is your counsel?

A Yes.
Q Okay. And he also has FINRA claims that he is pursuing on behalf of FINRA parties?
A No.
Q Just for today? These are all -- when you talk about the 23 claimants, those are all your claimants?
A Yeah.
Q Okay.
A Sorry, I didn't mean to confuse you.
Q Okay.

MR. KURZWEIL: And, Your Honor, I have no further questions at this time.

THE COURT: All right. Thank you, sir.

Yes?

CROSS-EXAMINATION

BY MR. HALL:

Q How's it going?
A Hi.

THE COURT: Mr. Hall.

MR. HALL: I'm sorry?

THE COURT: I just want to make sure the record got this.

MR. HALL: Oh, sorry, yeah. Jerry Hall for the Debtors. Apologies.

THE COURT: No, I generally introduce someone so

that they know, so never mind. It's getting late. You may proceed.

MR. HALL: Fair. I'll try to be quick.

BY MR. HALL:

Q In a FINRA arbitration, can -- a claimant can amend a claim, correct?

A Yes.

Q And in some --

A Subject to certain procedural requirements, they can.

Q In some of these FINRA arbitrations that are relevant to this adversary proceeding, amended claims have been filed, correct?

A Absolutely.

Q Yes.

A Yes.

Q A FINRA Claimant can serve discovery?

A Yes.

Q So could a FINRA Defendant?

A Yes. We call them Respondent.

Q Respondent?

A Yeah, that's just the term of art.

Q The most recent claims, FINRA claims, that you have filed for your clients has been postpetition, post-February 2, 2026?

A That's a fair statement.

Q Do you anticipate filing any more FINRA arbitration claims related to IHC Investments?
A Hopefully.
Q You are still actively marketing for them?
A Well, I mean, when you say marketing, yeah, but in addition we -- you know, I've practiced law for about -- for over 40 years. I do get referrals frequently.
Q Okay.
A So it's not just about marketing.
Q In the FINRA claim -- FINRA arbitrations, your clients are seeking compensatory damages based on their investment losses?
A They have a variety of claims for relief. They are seeking compensatory damages related to investment losses, along with attorneys' fees, costs, probably punitive damages. There is a panoply of relief sought. If I'm not responsive, I apologize.
Q Your clients are also seeking recoveries in the Chapter 11 cases? Have they filed proofs of claim?
A I believe that my -- we don't represent our clients in connection with the filing of the claim process. I personally believe that all of our clients have filed claims in the bankruptcy, but I can't say that absolutely.
Q And are those claims for the same compensatory damages that the clients are seeking in the FINRA arbitrations? I'll

say it a different way, if this helps.
A Yeah.
Q Is the basis of the claim the loss related to their investments in each instance?
A I would say -- I would say the basis of the proof of claim is the investment that they made in IHC. And I'd also point out that they also seek the recovery of the investment against the Broker-Dealer, which actually helps the bankruptcy, because typically the bankruptcy trustee will offset the claim against any recovery that our clients achieved in -- against the Broker-Dealer. They will -- because they don't want you to have a double recovery.
So typically -- in fact, typically every -- with every bankruptcy form I've seen over the last several years, and we've done a *GWG* bankruptcy and many others, when it comes time to a distribution, the investor has to disclose all money they received from other sources relating to their investment, and the bankruptcy trustee will offset it. So, so yeah.
Q And then I think my last question. You mentioned that you have dozens of arbitrations related to IHC securities against other brokers. I want to make sure I understood your testimony. Is that unrelated to this adversary?
A No, they would be -- we have filed a number of arbitration claims against Broker-Dealers who have not yet

retained counsel or coordinated with the trustee to seek a stay of their claims.

Q Okay. So the IHC securities is not the subject of this current adversary proceeding as it's currently constituted?

A Well said. But they would be subject to the order. That's why I keep hedging. There's an adversary complaint, but then there's a proposed order that goes beyond the claims at issue, so that's why I'm hedging.

Q They're not on that Schedule 1, for example?

A Exactly. Yeah, absolutely right.

MR. HALL: Pass the witness, Your Honor.

THE COURT: All right. Thank you.

Mr. Axelrod?

CROSS-EXAMINATION

BY MR. AXELROD:

Q Mr. Nekvasil?

A Nek -- oh, it's okay, it's Nekvasil.

Q Nekvasil.

A That's okay.

Q Excuse me.

A That's okay.

Q You have reviewed the responses, answers, and affirmative defenses filed by Broker-Dealers in the arbitrations in which you are counsel, correct?

A Yes.

Q Do any of the Broker-Dealers admit to any failure to do diligence in connection with IHC Investments?
A They do not. They deny it vehemently.
Q What would be the evidence to determine a factual dispute between you and -- between your clients and the Broker-Dealers as to whether diligence was performed?
MR. SIMON: Objection. Calls for speculation.
THE COURT: Overruled. You may answer the question.
THE WITNESS: We would look, basically, at what did the Broker-Dealer do. Obviously, as I said before, the litmus test is did the Broker-Dealer have a reasonable basis to believe, based on a reasonable investigation, that the recommendation was suitable for at least some customers. So we would ask the Broker-Dealer -- and the term "due diligence" is really -- it's probably an inappropriate term because it has legal connotations that are totally different than we have here.
But we would ask the firm for their complete due diligence file, but I guess you'd say reasonable investigation file, right? And the file could have a variety of things in it. Broker-Dealers who do thorough due diligence get data from numerous sources. Yes, some from the issuer, but some of them retain an independent advisor to do their own due diligence. And there are actually companies out there that specialize in that.

And a lot of them now, obviously, now with social media and things like that, a lot of them -- typically, a Broker-Dealer has a, as you know from the supervisory manual, the supervisory manual sets forth what steps the Broker-Dealer should take as part of its due diligence. And it's a three- or four-page document that lists all sorts of things the Broker-Dealer should do, all sorts of sources it should go to, including, of course, the Internet.

BY MR. AXELROD:

Q Thank you. So I do understand from your response that it would be relevant to know, in a due diligence -- in a review of due diligence, the communications and investigation performed between the Broker-Dealer and the issuer; is that correct?

A Yes.

Q And in fact, the Broker-Dealer might wish to know whether the communications it received from the issuer were accurate in that due diligence review, correct?

A You mean might -- can you give me a temporal time on that? You mean, might wish to know --

Q Let me -- strike the --

A Are you talking about production --

MR. AXELROD: Strike the question. Strike the question.

THE WITNESS: Yeah.

BY MR. AXELROD:
Q Okay. Do any of the Broker-Dealers in their responses say that damages were in fact caused by persons and events outside their control?
A They -- what was the word before events?
Q Persons and events.
A No, actually, the ones I've seen say, for example, that they were caused by -- am I allowed to mention the name of the Broker-Dealer? Well, Emerson's name has come up. They're the managing Broker-Dealer.
THE COURT: No. No, just avoid names.
THE WITNESS: Okay.
BY MR. AXELROD:
A One of the Broker-Dealers says that it occurred as a result of unforeseen events occurring over the last year. Another had said that it occurred because of events in the summer of 2025.
Q So you don't recall any Broker-Dealer offering an affirmative defense that there was a superseding cause of any damages experienced by your client?
A Oh, I'm sure they -- I'm sure that there is probably an answer that says that. I can tell you that none of those affirmative defenses mention IHC. They -- superseding event. You know, they don't mention a misconduct by IHC or the Debtors.

Q Do they have to?
A Do they have to? I think there's no requirement that the Broker-Dealer in its answer say anything it doesn't want to say. I mean, its answer is optional. I mean, I'm unaware of any requirements as to --
Q Sir, --
A -- what has to be in an answer. Some firms don't even file answers.
Q Thank you. So you do recall that Broker-Dealers have offered affirmative defenses that there were superseding causes, correct?
A I thought the -- I thought the word was superseding events. If you're telling me -- if you're making a representation that it's causes, I'll accept that if you -- I thought it was superseding events.
Q I -- should we pull up your exhibits and see?
A I'm not offended at all. Let's do that.
Q Okay. We'll start with your Exhibit #10.
A Okay.
Q And I apologize for the delay here, --
A Can somebody hand --
Q -- but my computer decided to die as we were speaking.
A I think I'm going to need help. Can you tell me where we begin here? Well, let' see. Right. I think I'm with you. 10. I have 10 as being -- I'm sorry, I'm not to mention

names. If I'm looking at the right one, this is not a claim filed by my firm.
Q This is -- this is a response filed by your counsel, I believe.
A Okay. I think I need some clarification. A response filed by my counsel? I'm not -- I'm not sure what you mean. You're talking about a pleading filed.
Q This was -- excuse me. So can you pull up, please, GN Defendants' Exhibit #10?
A Sure. Perfect.
Q Okay. And can you go to Page 23 of 24 of that exhibit?
A Yes.
Q Okay. Can you read the 22nd Affirmative Defense?
A (reading) Twenty-Second Affirmative Defense: Claimants' damages, if any, were the consequence of the superseding cause of one or more third party's conduct.
Q Would it surprise you if Broker-Dealers added similar affirmative defenses in all or nearly all of the arbitrations at issue in this hearing?
A I can't speak to that. Can I also direct your attention to Page 7?
Q No, you cannot. I'm asking questions. Thank you.
A Okay.
Q Would you like to review additional examples of similar language? Would that assist you --

A In answers to claims that -- that -- in answers to claims filed in my firm's cases? If you're asking me whether I would like to review answers in claims filed by other lawyers, the answer would be no, because all I -- frankly, we're here to ask the Court not to enjoin my clients' arbitration claims. So if you can clarify.
Q Do you recall any Broker-Dealer failing to offer an equivalent affirmative defense in any of your arbitrations?
A I can't recall either way.
Q And would you -- and you recall your testimony that IHC cannot, in fact, be a party in a FINRA arbitration, correct?
A No, not -- that's actually an incorrect statement. I never said that IHC cannot be a party. Obviously, before the bankruptcy stay, 10 of the 11 arbitration claims filed by my firm were filed before the bankruptcy filing. In any of those claims, the Broker-Dealer could have requested -- sir, in any of those cases, the Broker-Dealer could have requested -- could have named IHC as a Third-Party Respondent and requested that IHC agree to FINRA jurisdiction. And frankly, that happens commonly because arbitration is considered to be a cheaper, quicker alternative to courtroom litigation. So FINRA has a very extensive voluntary arbitration component.
So I never said that a -- that IHC could not be in an arbitration claim. I've said that we've never named IHC in an arbitration claim and that there are no third-party claims

against it in our cases.
Q I believe that you filed a declaration in this case?
A I? See, now you're confusing me again, sir, respectfully.
Q You personally filed a declaration on the docket in this adversarial proceeding. Did you not?
A I'll have to see -- again, you're confusing me again, --
Q No.
A -- just like your reference a minute ago. I have not filed a declaration.
MR. SIMON: To our knowledge, no.
A VOICE: Maybe we confused on some firm.
MR. AXELROD: Excuse me, Your Honor. I'm a little mixed up here.
BY MR. AXELROD:
Q Your testimony, though, was, I suppose, not only could IHC become a party in these proceedings, correct?
A Or before the bankruptcy stay. This bankruptcy -- my understanding, I'm not a bankruptcy expert, but my understanding is that a bankruptcy stay stops all what I call core proceedings, which are claims against the Debtor. So of course at this point in time no claim can be asserted against the Debtor in an arbitration. I think it would be stayed automatically. If --
Q Do I understand correctly that if this Court granted

relief from stay, IHC could become a party in arbitrations?

A No, that's --

MR. SIMON: Objection, Your Honor. You're asking the witness to be a bankruptcy lawyer.

MS. JONES: Well, --

THE COURT: Ms. Jones?

MS. JONES: -- he's also trying to use this witness to get in evidence that he can bring a witness to put in evidence of whether they're going to do that, whether they're going to move to lift the stay. Instead, he's saying, like, is it a possibility? That hypothetically, like, could that happen? And I just, you know, it's an improper hypothetical. He's asking him to speculate.

THE COURT: The Court will sustain. It's an improper hypothetical.

BY MR. AXELROD:

Q Do I understand your testimony just now correctly that, setting aside the bankruptcy stay as a general matter, the issuer can become a party in proceedings, in FINRA arbitrations?

A Absolutely. No, no. My understanding is if the judge -- if the judge denies this request for a stay, these arbitration proceedings continue against the named Respondents, which are the Broker-Dealers. I don't believe that by denying the stay that the Judge is giving the -- and

again, if I'm using the wrong term -- the Claimants the right to transform this from a noncore arbitration proceeding involving someone else to include a bankrupt defendant. So the answer would be no. That's absolutely not how I would interpret it.

MR. AXELROD: Move to strike it as nonresponsive.

BY MR. AXELROD:

Q What I'm asking is, but for the automatic stay -- is it your testimony that, but for the automatic stay, and setting aside that issue, as a general matter, the issuer can become a party in a FINRA arbitration?

A Can you clarify what stay, the general stay of bank -- the general stay triggered by the filing of the Debtor or this Honorable Court's extension of the stay to my arbitration claim? Can you clarify which stay?

Q The automatic stay that is implemented at the onset of a bankruptcy case.

A Yeah. If IHC had not filed for bankruptcy and been subject to the stay, either a Claimant or a Respondent in arbitration procedure could include -- a Claimant could include them as a party, a Respondent could include them as a third party, and request that they accept FINRA jurisdiction. If they decline, then any such case, again, if there were no bankruptcy, would have to be filed in court. But, either way, there's a bankruptcy, so there's a stay, so no claim can

be filed against the Debtors in court or in arbitration, based upon my primitive understanding of bankruptcy law.

Q It was also your testimony that -- again, we'll set aside the bankruptcy automatic stay -- as a general matter, the Respondents in a FINRA arbitration can seek discovery from the issuer, correct?

A I would ask that you not use the word also, because you earlier asked me a question which -- and said was it my testimony, I said no. So when you say also, you're implying -- you're somehow giving credit to that question. It is -- but striking the word also from your question -- oh my god, can you repeat the question without the word also? It threw me for a loop, to be honest with you.

Q Has it been and is it now your testimony that, setting aside the automatic stay, the Respondent in a FINRA arbitration proceeding may seek discovery against the issuer?

A Putting aside -- yes.

MR. AXELROD: Your Honor, may we have one more moment?

THE COURT: Of course.

(Pause.)

MR. AXELROD: Nothing further, Your Honor.

THE COURT: All right. Mr. Taylor?

MR. TAYLOR: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. TAYLOR:
Q I wrote it up phonetically. Good afternoon, Mr. Nekvasil.
A By the way, I had no doubt that you would. And can you tell me your name again?
Q My name is Mark Taylor. I'm here on behalf of the DST Investor Committee.
A Hi, Mark. Hi.
Q Good. How are you doing this afternoon?
A Good. Good.
Q Great. Just a few questions for you.
A Sure.
Q You represent a discrete set of DST Investors in connection with claims arising from investments in IHC, correct?
A That's true.
Q And you represent only those investors; isn't that right?
A As --
Q In connection with claims arising?
A As opposed to who else?
Q Your clients --
A Oh, you mean I only represent investors.
Q Yes. The answer --
A I don't represent brokers.
Q Yeah. Hold on just a minute.

A Yeah.
Q We don't talk over each other.
A No, that's no problem.
Q Your clients are your group of investors that have signed agreements with you to represent them in connection with their investments relating to IHC, correct?
A Partially correct.
Q Okay.
A The retention is limited to retaining our firm to bring claims against the Broker-Dealer that sold the investment.
Q I'm not asking who you're bringing the claims against. I'm just saying you have a discrete group of clients --
A Yes, that's fair.
Q -- that you're bringing claims on behalf of in connection with their investment in IHC, correct?
A That's fair.
Q And you're trying to recover on behalf of those clients, aren't you?
A Yes.
Q And you're not trying to recover on behalf of some other clients or some other people, not clients, who may have claims against Broker-Dealers with respect to their investments in IHC --
A No. But I'm -- I'm -- I'd love to --
Q No, that's the question. Thank you very much. You're

not representing anyone else?
A The answer is unfortunately no.
Q Correct. And what you'd like to do is to recover an award against the Broker-Dealers; isn't that right?
A Yes.
Q And you'd like to do that as quickly as possible, correct?
A Yes.
Q If the Court does not extend the stay or does not otherwise enjoin you from proceeding, you'll continue to pursue those claims on behalf of your clients, won't you?
A Yes.
Q And as you discussed with Counsel, you may get other clients along the way that you sign up to pursue claims on their behalf as well; isn't that right?
A Whether or not the stay is extended, the answer would be yes.
Q Okay. And if you're able to do so, what you'll have to do is push that arbitration forward, right?
A I'm sorry, repeat that?
Q If the stay is not extended, you'll have to push the arbitration forward to conclusion, right?
A If the stay is not -- I don't -- if the stay is not extended --
Q You'll have to push the arbitration --

A -- then the cases will proceed. When you say push, the cases will proceed.
Q Well, at some level you have to push the case forward yourself, don't you? You have to conduct discovery, right?
A Yeah.
Q You are the one that files pleadings on behalf of your clients, right?
A Yeah.
Q And those require a response by the other side, don't they?
A Yeah, I just, I'm not used to the word, maybe it's the text, I'm not used to the word push. We proceed with preparing the case. I've never heard that term push before and that threw me for a loop.
Q Okay. In connection with trying to get an award from the Broker-Dealers, you'd like to get the highest award possible, isn't that right, for your clients?
A Yes.
Q And you want the flexibility to recover from as many sources as possible, up to the amount of the award. Fair statement?
A Excuse me? As many sources? You --
Q From as many places you can get money from. That's plain English.
A Yes.

Q You want get money wherever you can to satisfy the award. Fair statement?
A Are you saying, if I receive an award, I would --
Q That was the premise to the question, sir.
A Well, I don't understand the question.
Q Okay. Let's pause here for a minute.
A Yeah.
Q You're a trial attorney, right?
A Absolutely.
Q And you like the witnesses, when you're asking them questions, to, when you ask questions, to answer the question you're asking. Isn't that right?
A Yeah, and I ask clear questions.
Q So just hold on just a minute. Just listen very carefully. I'll take it very slowly.
A Please do.
Q You want the flexibility, if you have an award, to recover on that award from as many sources as possible, don't you?
A Yes.
Q There's been a lot of talk about insurance in this case. You have not agreed to forego recovery from insurance policies to collect an award for your clients, have you?
A We have not agreed -- the answer is, yes, you're right. We have not agreed to -- I'm restating the question you

asked. We have not agreed to forego collection against any applicable insurance policies.

Q Correct?

A Yes.

Q Thank you.

MR. TAYLOR: Pass the witness, Your Honor.

THE COURT: All right. Thank you.

All right. Ms. Jones, any questions?

MS. JONES: No, Your Honor.

THE COURT: All right. Mr. Simon?

THE WITNESS: Your Honor, can I ask for clarification on something?

THE COURT: Yes, you may.

THE WITNESS: Because --

THE COURT: Well, go ahead.

THE WITNESS: If, again, if I would like my lawyer to ask me a question, am I allowed to present it to him or not?

THE COURT: No.

THE WITNESS: Okay. Thank you.

THE COURT: You may yell at him in the hall if he doesn't ask the question. All right.

THE WITNESS: That, I won't do, but thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. SIMON:
Q Very few questions. Do you believe your clients have any claims against the Debtors' insurance policies?
A Absolutely not.
Q All right. Have your clients filed any claims against the Debtors' insurance policies?
A No.
Q No? All right. In response to questioning from Counsel for the Ad Hoc Group of Claimants, with regard to Debtors -- to the GN Defendants' Exhibit #10, you asked to -- if you could go to Page 7.
A Yes.
Q All right. Would you go to Page 7?
A Yes. If you go to Page 7 of Exhibit 10.
Q It's GN, GN Defendants' Exhibit #10?
A Yeah.
Q Yeah. There is something you wanted to say before you were cut off.
A Yeah. This same sentence appears in most of the answers filed in the arbitration claims that the Debtors are seeking to enjoin. And it appears on Page 7 of 24. And I would direct you to the first full paragraph. And in fairness, I'll read it beginning with: A Due Diligence Review. A due diligence review offers a snapshot of an issuer's business based upon documents and information available at the time

the due diligence was conducted. The process involves no crystal ball, and those conducting due diligence cannot be held responsible for unforeseen future events, such as those that occurred at IHC.

That answer appears in the vast majority of the -- that sentence appears the vast majority of the answers filed by the Broker-Dealer -- by one of the Broker-Dealers. I'm sorry. In the vast majority of the answers filed in the arbitration claims that the Debtor is seeking to enjoin filed by our firm.

Q And what is the significance of that sentence?

A The significance of this statement, well, this statement actually patterns a statement filed by another Broker-Dealer in their answer where they attribute the present problems at IHC to new developments that occurred in 2025, as opposed to misconduct by IHC at or around the time of the offering.

Q Okay. And would you look at Page 23 of 24 in that exhibit, at the affirmative defense that was pleaded that you were directed to previously? Do you see that?

A Yes.

Q Where it talks about the acts of unforeseen events and third parties?

A You're talking about the 22nd Affirmative Defense?

Q I believe that's correct.

A VOICE: Yeah.

THE WITNESS: Yes.
BY MR. SIMON:
Q Yeah, 22nd Affirmative Defense.
A Yes, sir.
Q Okay. Does that mention -- does that paragraph mention ISC?
A It does not.
Q IHC, pardon me. Does it mention IHC?
A It does not.
Q Does it mention any specific conduct by IHC?
A It does not.
Q And do you put any part of your advertising materials in the FINRA arbitration complaints you file on behalf of your clients?
A I do not. FINRA is much more relaxed in their pleading practice than the courts, than even bankruptcy courts, but that would not be deemed proper practice.
Q Okay.
MR. SIMON: Pass the witness, Your Honor.
THE COURT: All right. Thank you.
Last round. All right.
(No response.)
THE WITNESS: Am I excused?
THE COURT: Yes.
THE WITNESS: There's no reason to yell at my lawyer

in the hallway, Your Honor.

THE COURT: All right. Thank you.

THE WITNESS: Thank you.

THE COURT: Thank you, Mr. Nekvasil. You're excused as a witness.

(The witness steps down.)

THE COURT: All right. Back to you, Mr. Simon.

MR. SIMON: Your Honor, we're done, so --

THE COURT: Rest and close? Rest?

MR. SIMON: We are resting, yes, Your Honor.

THE COURT: All right. Any rebuttal? Or are we done with evidence?

MR. SIMON: Oh, Your Honor, --

THE COURT: Oh, I'm sorry.

MS. JONES: We're not -- we're not the same case.

THE COURT: Okay. I misconstrued. I thought you were looking at each other.

MS. JONES: We are sitting at the same table, but --

THE COURT: No, I did. I certainly apologize.

Ms. Jones, who would you like to call as a witness?

MS. JONES: I'd like to call Sam Edwards.

THE COURT: All right. Mr. Edwards? Good afternoon, or good evening, Mr. Edwards.

MR. EDWARDS: Good evening.

THE COURT: Please raise your right hand.

SAM EDWARDS, CERTAIN FINRA CLAIMANTS' WITNESS, SWORN

THE COURT: Thank you, sir.

And just for housekeeping, how much time do you think we'll have? I need to let the guys out front know.

MS. JONES: I think maybe 20 --

THE COURT: And it doesn't matter what the answer is.

MS. JONES: Twenty, thirty.

THE COURT: All right.

(Discussion.)

MS. JONES: Am I to wait, Your Honor? I'm sorry.

THE COURT: Yes, you may.

MS. JONES: Okay, I wasn't sure.

THE COURT: No, I'm listening intently.

MS. JONES: Okay. Thank you.

DIRECT EXAMINATION

BY MS. JONES:

Q Can you please state your name for the record?

A Samuel Benjamin Edwards.

Q Okay. And are you a practicing attorney?

A Yes, I am.

Q And where are you licensed?

A I'm licensed in Texas, Michigan, California, and probably a dozen or more different federal courts.

Q What's your earliest date of licensing?

A I got licensed in Texas a little more than 25 years ago.
Q Okay. Do you have a specialization?
A I have been practicing in the same area that entire time. I generically call it Securities Litigation Arbitration Work for a good portion of that. I've practiced almost exclusively doing first NASD, now FINRA arbitration. Now it's about 75-25. About 75 percent of what I do is represent investors in FINRA arbitrations like this, the ones we're talking about here, and about 25 percent of what I do is federal and state court.
Q Okay. And can you just explain in the most general and shortest way possible how a FINRA arbitration works?
A A FINRA arbitration is, like any arbitration, it's a creature of contract. And so there's an entire set of rules, you know, that are very different than the Federal Rules. You know, and it's much more relaxed, especially in terms of discovery. There's no depositions. There's no interrogatories. It's really just document requests and some of it is what we call requests for identification.
Q Okay. And in a FINRA proceeding, like, who can you take discovery from?
A The general rule, I mean, as in with most proceedings, it's against parties. And so you -- we, you know, sue respondent firms and sue brokerage firms, sometimes brokers. We get it from there.

You can seek third-party discovery, but not -- but it doesn't really have the force and effect of being in court, I mean, because it's a subpoena. For example, if I issue a subpoena to, you know, some random third party that I need stuff from, it's a subpoena from a FINRA arbitration. Unless they're a FINRA member, they're not technically subject to that subpoena. And so they could tell us, sorry, I'm not responding. And they do that sometimes. Frankly, we saw it here that IHC did that with someone.

And so you can take it to federal court under the Federal Arbitration Act, but it's a very long process, and in 25-plus years of doing this, I've probably done that three times.

Q Okay. So a non-party can ignore a request for discovery from you?

A And they, sadly, often do.

Q Okay. When did your firm first start filing cases relating to IHC?

A I think we filed our first case in August, so just about a year ago.

Q In August of 2025?

A Yes, sorry, August 2025.

Q Okay. And how many cases have you filed relating to IHC?

A The list that they put together of the 105 that's set, and so, of those, 31 of those cases are ours. There's actually 32 on there, but they're wrong, one of them has been

dismissed. And so -- and there's cases that are not on there that are ours. I would say that we probably have 35 or so cases that have been filed.

Q Okay. And those involve, one way or another, an IHC-sponsored investment?

A Yes. And some of them only are IHC investments. Some of them are IHC and, you know, with one or more other investments that are at issue in that case.

Q Okay. So of the 31 cases that are on the Listed Actions in this adversary proceeding, how many involve IHC-sponsored investments? Of yours, sorry.

A Well, they all involve IHC to some degree. Of those 31, we went back and looked at them, 17 of them are IHC only; 14 of them are IHC and another investment or one or more investments. I mean, some of them, IHC is a very small part of it. I have a case that we filed where IHC is, you know, $50,000 out of an almost $3 million claim. So it's a very small part of a much larger claim. There are other cases where it's, yeah, there is IHC and then a smaller other investment involved.

Q Are you able to describe, on whole, because that was an example, are you able to describe, for all of those cases, the 31 cases, approximately how much of the FINRA arbitration proceeding relates to, and damages, relates to an IHC versus a non-IHC-sponsored investment?

A Right. Collectively, across those 31 cases, it's about -- it's about what I heard Mr. Jones respond to, it's about 55-45. So about 55 percent of the damages are related to IHC and about 45 percent to other investments.

Q Okay. And what's the total amount?

A My recollection is it's something close to $20 million on the IHC investments and something like $17 to $18 million for the non-IHC investments.

Q Okay. So in your 31 cases, these arbitration proceedings that the Debtors are seeking to stay involve claims against Broker-Dealers for $17.5 million, approximately, of non-IHC-sponsored investments?

A Yes.

Q Okay. In the cases -- in the cases where you're representing a FINRA claimant in those FINRA proceedings, what types of claims are your clients asserting?

A Most of the claims are related to either breach of fiduciary duty or some version of negligence. You know, again, they're going to be based on the claims of what the Broker-Dealer owes, you know, the fiduciary duties the Broker-Dealer and/or a broker owe to a customer and the duty of care that's owed to a customer as well.

And so you heard some testimony earlier about suitability is a big part of every -- almost every FINRA arbitration case, where it's not just a question of the investment, but

is it the right investment for this person.

We also, you know, we have cases that deal with concentration, for example, where, yes, IHC is the investment at issue, but it's really not -- this would be true of any investment, which is, you know, if I give you a million dollars and you put it all in one investment, that's a concentration problem, really, regardless of what the investment is. And so --

Q And would an overconcentration, a claim against a Broker-Dealer for overconcentration of the investment, putting all the proverbial eggs in a basket, does that have anything to do with the Debtors' conduct?

A No. Again, it really wouldn't matter what investment that that would relate to. Any investment, any time you put somebody's, you know, all their money in one thing is sort of a very well-known, you know, problem for Broker-Dealers to do that.

Q Okay. And the cases, the 31 cases where your firm is representing FINRA Claimants in a FINRA proceeding, has -- have any of them asserted claims against IHC?

A Absolutely not.

Q Okay. And is IHC a party in any of those cases?

A No.

Q Okay. In those cases where an answer has been filed, have the Broker-Dealers brought in IHC?

A No. Not only that, I mean, the Broker-Dealers have not -- all the ones that I've read, they've not even asserted, oh, this is really IHC's fault, not our fault for what happened.
Q Okay. In cases where you're representing FINRA Claimants in a FINRA proceeding, have they sent discovery, any discovery requests to IHC?
A No, we have not sent discovery requests. In my knowledge, none of the Broker-Dealers have sent discovery requests to IHC in any of the 31 cases that are listed.
Q Okay. In any of the cases where you're representing FINRA Claimants in the FINRA proceeding, has IHC shown up in any of those cases to participate?
A No.
Q Okay. If I can have you turn to Debtors' Exhibit 62. It's going to be in --
A That's what I'm going to be confused about.
Q -- a book.
A Which is which?
Q Okay.
MR. HALL: Binder 3.
MS. JONES: Binder 3. Thank you. Thank you, Mr. Hall.
THE WITNESS: One of two. Two of two. Not I don't have a binder of -- I apologize.

MR. HALL: It might be one of the ones standing up on --

THE WITNESS: Two of five. Two of five. Four of five. Sorry. Got a whole -- there we go. Three of five. And Exhibit 2?

BY MS. JONES:

Q Yes.

A Okay.

Q Here we go.

A All right. Got to put my glasses on here.

Q Okay. Without identifying anybody by name, can you tell the Court what this case is about?

A Sure. This is one of the FINRA arbitration cases that my office filed. And to be fair, so this one I know pretty intimately because I personally filed this case. And so I've got partners, you know, in my law firm, so there's -- of the 31 cases, I am not personally, you know, the person that filed every case, so I don't know all the details. But this one I know very well because I've spent time with this.

So these are -- this is actually a brother and sister, adult brother and sister. The sister is autistic, she's disabled, and parents passed away, and they inherited some investments. Turned it over to a financial advisor, who then invested that money for them.

Q Okay. And what -- and this particular proceeding

referenced in Exhibit 62, what investments are at issue?
A IHC is a very small part of this. My best recollection is I think IHC is $75,000 of the total investments of I think it's about $1.3 million in other investments. So IHC is one small part of a larger case.
Q Okay. And what, what are the -- what are the types of claims that are asserted in this action? Or in this Statement of Claims? Sorry.
A Sure. Our claims are fairly similar in all of our cases with, as we talked about before, breach of fiduciary duty, negligence. You know, depending on the state that we're in, we may or may not include a State Securities Act violation, which I know this is -- this particular case is Colorado, so I know we do. Some states we don't. It depends on the state.

And so, again, but they're all allegations of wrongdoing by the Broker-Dealer or the Broker. None of them are any kind of a claim against IHC.
Q Okay. And without saying names, again, was an answer filed by Respondent, Respondents in this case?
A Yes.
Q Okay. And what is -- can you describe the nature of the answer?
A Well, in this -- in some of these cases, we name both the advisor and the firm. Some cases, we don't. So in this one,

we received actually two answers, right? So we got an answer from the brokerage firm, and actually the principal behind the brokerage firm is also a part of this case, and then the advisor hired his own separate counsel. So we received answers from both of them.

Q Okay. Are they blaming IHC for --

A No. Neither one of the answers, you know, said that the reason why these losses happened was because of anything IHC did.

Q Okay. And has IHC been involved in this proceeding in any way?

A No. Not to my knowledge.

Q Okay. Can I ask you to turn to Debtors' Exhibit 56?

A 5-6. Yes.

Q Okay. Again, without names, can you just briefly describe what this case is about?

A This is a case on behalf of two retirees that they're in their 70s that live in Reno, Nevada and had some rental properties that they sold. And that's what happens a lot of times with DSTs, is you sell some kind of real estate. And that's why a lot of these DST Investors are older. It's because you have an older person that was managing some real estate, they get older and they don't want to manage it anymore, and so they sell it, but they don't want to pay the taxes on it. And so one of the ways to get around that is to

give it to a DST, and that's what these particular people did.

And so this couple invested in a bunch of -- in fact, if you -- I know this one, there's a whole chart of -- it starts on Page 4 and on Page 5 -- there's a whole chart of the various investments involved. And so they had a whole bunch of different -- these are -- virtually all of them are, you know, various different DST Investments.

Q Okay. So this breaks out which investments are at issue in this proceeding?

A Yes.

Q Okay. And for this case or for this proceeding, how much relates to IHC?

A My recollection is something right around, I've got to do the math quick, something right around $200,000.

Q Okay. And what's the total amount involved in this case?

A I think it's like $3.2 million.

Q Okay.

A So, I mean, IHC is a relatively small part of what's at issue in this particular case.

Q And you know approximately how many non-IHC-sponsored investments are addressed in this proceeding -- in this Statement of Claim?

A I think I counted about 25.

Q Okay. So 20 -- so 25 that have nothing to do whatsoever

with IHC?
A Right. And there's a few IHC. It's not just one IHC investment. There's two or three different IHC investments in here.
Q Okay. Thank you for that clarification. Was an answer filed in this case?
A Yes.
Q Does it seek to blame IHC?
A I don't remember seeing anything that blamed IHC as being the problem behind any of this.
Q Okay. Has IHC been involved in this proceeding in any way?
A Not that I've ever seen.
Q Okay. All right. Have you ever been involved in a FINRA proceeding where you were not able to proceed forward due to a bankruptcy stay?
A Yes.
Q Okay. And were any of those where you were suing the actual Debtor that filed bankruptcy?
A Yes.
Q Okay. And any of them where the stay was extended to a non-Debtor?
A Once.
Q Okay. And what effect on the FINRA proceeding would a stay have if the bankruptcy court, because the Debtors aren't

involved, the bankruptcy court extends the stay to Nondebtor Defendants or parties? What effect will that have on the FINRA proceeding?

A It sort of depends on how the Court would do it. If it's a blanket stay, which is, you know, any of these cases, and they have to stop entirely, then that's what would happen, right? They would stop entirely. We would have to quit discovery. And some of these cases are fairly far along in discovery; some of them are not. You know, they -- any of them that -- if there was a blanket stay, they would all get rescheduled, frankly.

And so FINRA goes through and they -- FINRA takes them off the calendar, and then -- and says you have to reschedule them once the stay is lifted. And so -- which I've had to do before a number of times, and it's -- after that, it's usually nine months to a year before you can get a case rescheduled, because you have to -- you have three arbitrators in all of these cases. They have their own calendars and their own conflicts. And you have lawyers on each side who have their own calendars and conflicts. And so when we get it together and everything, a year is probably average of how long it takes us to reschedule something when we have to take it off the calendar.

Q Okay. And when you said some of these cases it would stay discovery, is that discovery that -- is any of that

discovery discovery you need from the Debtors?
A No.
Q Do you have any active cases against these Broker-Dealers that don't involve IHC?
A Yes.
Q Okay. So cases where there's -- so of the 31 that are in the -- described as, under the definition Listed Actions, as the Debtors defined it, of those 31, all of them in some form or fashion have at least some part of it is relating to IHC?
A Correct.
Q Okay. And then you have other cases against these Broker-Dealers where IHC is not mentioned at all?
A Correct. We have a number of cases against, I think, all of the different brokerage firms that are listed as a part of this and -- that don't involve IHC. And that's the -- it wouldn't be impacted by the stay, of course.
Q Right. And so are those cases proceeding?
A Yes.
Q Okay. And do they involve the Broker-Dealer insurance policies that are at issue here?
A Sure. It would be -- they're all claims-made policies. It would be the same. And so whether it was -- whether it does or doesn't involve IHC, and that's one of the big issues, is entering a stay here is actually a huge disadvantage to the ISD -- the IS -- all the Inspired

Healthcare investors, because it's not like all the other cases are going to stop. Those cases are going to keep going forward. They're going to keep eating away at those policies. And then when the stay is finally lifted and the IHC investors can go forward, well, that money's already gone.

And so you have, you know, the -- it hurts the IHC investors, it really permanently hurts them, because once the insurance money is gone, it's gone. There won't be any way to recover.

Q Right. And is it your understanding that those types of cases that don't involve IHC at all are not -- that the Debtors are not asking for those to be stayed?

A No, and I can't imagine how they could. And again, we're going forward with those. We have, you know, dozens of those cases against all -- I think every single firm that's listed as a part of this.

Q Okay. Let me just look here.

(Pause.)

MS. JONES: Your Honor, I think, with that, I'm going to pass the witness.

THE COURT: All right. Mr. Simon, any questions?

MR. SIMON: No questions.

THE COURT: All right. Mr. Kurzweil?

MR. KURZWEIL: Thank you, Your Honor. For the

record, I'm David Kurzweil on behalf of the Committee of Unsecured Creditors.

CROSS-EXAMINATION

BY MR. KURZWEIL:

Q Mr. Edwards, isn't it true that you are targeting Inspired Healthcare investors?

A Targeting? I have no idea what you mean by targeting.

Q Targeting them for clients. That you're specifically seeking out Inspired Healthcare investors to pursue claims on their behalf?

A Yes.

Q And I want to direct your attention to Emerson Exhibit #10. A.

A Which will be -- which will be where? I apologize.

Q 10-A.

MR. KURZWEIL: If I may approach, Your Honor?

THE WITNESS: Yes, please do.

MR. AXELROD: That would be the Broker-Dealer Group Exhibits 10, Subtab A.

THE WITNESS: All right. Usually when I do this, I purposely make them different colored binders. And so when they're all the same color, I'm super confused.

BY MR. KURZWEIL:

Q I'm using what was provided here. Do you recognize the document that's marked as 10-A?

A Do I recognize it? No.
Q Okay. It says, Shepard Smith Edwards & Kantas. Is that your law firm?
A Yes.
Q Okay. And it says, Investors Lawyers Blog.
A Yes. I see that.
Q Okay. And it says, By Shepard Smith Edwards & Kantas. Is that your law firm?
A Yes, it is.
Q Okay. And this was prepared by your law firm?
A This, I mean, we have a blog writer --
Q Okay.
A -- that we hire. And so presumably the blog writer wrote this. I certainly did not write any of this. And so I -- and we have hundreds or thousands of pages on our website, so I --
Q But you're the --
A -- am not familiar with all of them.
Q But you're, yeah, but you're the Mr. Edwards we've referred to.
A I am.
Q Okay.
A I'm not denying that this is on my -- I presume this is accurately from my website. It looks like it. I'm just -- you're asking if I'm familiar with it, and the answer is I am

not.

Q Okay.

MR. KURZWEIL: I offer Exhibit 10-A into evidence, Your Honor.

THE COURT: Any objection?

MS. JONES: Other than the fact that I still haven't seen it, you know, no.

MR. AXELROD: It's filed on the docket at --

MS. JONES: It's not filed on the docket. There's a cover -- there's a slip sheet filed on the docket that has a link, but it's not this document. I've never received this document. It's not in the link that I received with exhibits that was only in the mailbox.

MR. AXELROD: Your Honor, we filed the link that this was pulled from. We circulated hard copies in the courtroom. The witness has indicated --

THE COURT: Has she been provided a copy? I'm just wondering if somebody can give her a copy or show her a copy. Do you have one right there in front of you, Mr. Simon?

MR. AXELROD: There's a copy in front of Mr. Simon.

THE COURT: Let her take a peek at that and see if --

MS. JONES: I'm meant to share a copy with Mr. Simon, I think, Your Honor.

THE COURT: All right. I'm just waiting. So is

there an objection?

MS. JONES: Yeah. I mean, it's -- I think it's a late-filed exhibit and I haven't been --

THE COURT: That objection, again, is overruled, but it's continued with all of the exhibits both for you and Mr. Simon.

MS. JONES: Thank you.

THE COURT: So any other objection to the admissibility of Exhibit 10, which is from the Ad Hoc Broker-Dealer's exhibits?

MS. JONES: And I am struggling with the relevance of it, but I know Your Honor can decide, you know, --

THE COURT: The relevance objection will be overruled. That will go to the weight, if any, that the Court gives this exhibit.

MS. JONES: Thank you.

THE COURT: So Ad Hoc Broker-Dealer Exhibit #10 is admitted.

(Ad Hoc Broker-Dealer's Exhibit 10 is admitted into evidence.)

BY MR. KURZWEIL:

Q And, Mr. Edwards, the date on the lawyer blog on the first page after the title, Another Inspired Healthcare Capital Investor Sues Nine Advisors, that's dated May 21st, 2026; is that correct?

A Yes.
Q Okay. And this was published after the bankruptcy was filed?
A If it was published on May 21st, 2026, yes, that would be after the bankruptcy.
Q And if you turn to the second page of this, it talks about, Why are Inspired Healthcare Capital Investors Filing Federal Lawsuits?
A Yes.
Q Is that correct? And it talks about the bankruptcy case, doesn't it?
A Well, it talks about why filing a federal lawsuit -- you know, I guess it does mention that. And this is, to be fair, this is reporting on a case that was filed. I don't know that I would call this an advertisement. This is, I mean, this is reporting, you know, we filed this case against this particular brokerage firm.
Q So it's your testimony --
A So --
Q -- that this is reporting on a case that was filed?
A That's what it says. The -- I mean, I haven't even read this whole thing, if you want me to, but it says, Another Inspired Healthcare Capital Investor Sues. And I'm not going to say the Advisors. We've been told not to. Although I don't think they're a part of the group over here. But,

yeah, I mean, that's what it is. It's giving some details about, you know, this particular case that we filed.
Q Okay. Well, take your time with the question I'm about to ask, because if you look at the third bullet point, it says: With bankruptcy proceedings, investors often don't get most of their money back.
Is that reporting on the Inspired Healthcare case, or is that an advertisement to get money back when a bankruptcy case is pending?
MS. JONES: Your Honor, the document speaks for itself.
THE COURT: What's the question?
MR. KURZWEIL: Is that --
THE COURT: I'm struggling with that question.
MR. KURZWEIL: Does that have to do with the Inspired bankruptcy case?
THE COURT: Okay. The objection is overruled. It's a specific question.
BY MR. KURZWEIL:
A It's a generic statement. It doesn't say anything about Inspired Healthcare. It says: With bankruptcy proceedings, --
Q Well, it does say --
A -- investors often don't get most of their money back.
Q Well, it's the third bullet point before the caption of:

Why Are Inspired Healthcare Capital Investors Filing FINRA Lawsuits? And it's the third bullet point saying that. with bankruptcy proceedings, investors don't get most of their money back.

MR. SIMON: Objection.

BY MR. KURZWEIL:

Q So it's okay to infer --

MR. SIMON: Objection.

BY MR. KURZWEIL:

Q -- that that relates to the --

MR. SIMON: Objection.

THE COURT: Let him --

MR. SIMON: That --

THE COURT: Let him finish the question, then raise the objection.

MR. SIMON: Yes, Your Honor.

THE COURT: Please complete your question.

BY MR. KURZWEIL:

Q Is it reasonable to infer that the third bullet point under the subheading refers to the Inspired bankruptcy case?

THE COURT: Okay. Mr. Simon?

MR. SIMON: That's fine. He can answer that question.

THE COURT: You may answer the question.

THE WITNESS: I don't know what would be reasonable

to infer. You asked me a question about that particular bullet point, and I said that it didn't mention IHC in there. And so, I mean, I don't think -- I did not personally write this, and so the blog writer who wrote this, I cannot imagine they're saying this is what's likely to happen in the IHC bankruptcy, because if this were to be published in May of 2026, I mean, we had no possible idea of what's going to happen in the IHC bankruptcy.

BY MR. KURZWEIL:

Q So this would be confusing?

A I think if you infer anything, you're confusing it, because you're -- that's -- you're making assumptions about things. That's the nature of what an inference is.

Q And what about the bullet point below that under the caption: Why Are Inspired Healthcare Capital Investors Filing FINRA Lawsuits? Do you see the fourth bullet point where it says: Investors are regarded as unsecured creditors in bankruptcy court?

A I see that.

Q Is that about the Inspire bankruptcy case?

A Again, it's a generic statement.

Q About Inspire?

A It's a generic statement that I believe to be true, but in fairness, I did not write it and I'm not a bankruptcy lawyer. But I think I've actually heard people testify today

that that's a true statement.
Q Okay. And then if you look at the middle of the page and the caption: Why Hire Seasoned Inspired Healthcare Capital Loss Lawyers? So, why hire seasoned Inspired Healthcare Capital loss lawyers? What is a seasoned Inspired Healthcare Capital loss lawyer?
A Your guess is as good as mine.
Q Okay. But this was published under your law firm's moniker.
A This was published -- you're saying it was published on our website. I'll take your word at that. And so, yes, I don't know exactly what was meant there. I think it was a -- maybe a little bit of a -- there's either something missing or a comma misplaced or something like that. Normally, I've seen things on our website that's like, you know, why hire a seasoned investment fraud lawyer or something like that. And so the way this is phrased is awkward, I guess, to me.
Q Well, it doesn't say Broker-Dealer lawyer. It says -- or it talks about an Inspired Healthcare Capital loss.
A Everything in this is so clearly focused at suing Broker-Dealers and FINRA arbitration, there's zero doubt that that's all that we're talking about here.
Q You're not talking about Inspired Healthcare here?
A About suing Inspired Healthcare? No.
Q Oh. And the next bullet point says: You want to be

represented by securities attorneys who are knowledgeable about this assisted-living developer and the IHC Funds and the DSTs they were issuing. Isn't that about Inspired Healthcare?
A No.
Q Then why do you say "knowledgeable about this assisted-living developer"?
A Because you need to know about that and why we're suing the Broker-Dealer who sold it to them.
Q So knowledge about an assisted-living facility developer doesn't mean anything?
A It's knowledge about whoever is the sponsor behind the investment.
Q But it says it here. That's what it says. You're saying that's meaningless?
A No, I'm saying that you are reading things into it that are inaccurate.
Q Okay. And if you look at the middle of the page, it says, where it says it's posted, do you see that, and it says, Tagged.
A Right.
Q Do you see the term Tagged in the middle of the page --
A No.
Q -- about three-quarters of the way down? It says, Tagged: Inspired Healthcare Capital Loss Lawyers.

A Okay. I see it. Yes.
Q What does tagged mean?
A I have no idea.
Q Sir, doesn't it mean that if somebody searches Inspired Healthcare, that this advertisement would come up on their web page?
MS. JONES: Judge?
THE COURT: Yes?
MS. JONES: I object. He just testified that he doesn't know what it means.
THE COURT: Sustained.
BY MR. KURZWEIL:
Q Sir, you're -- as a trial lawyer, you're testifying under oath right now that you don't understand what the term tagged means --
MS. JONES: Your Honor, now it's argu...
MR. KURZWEIL: -- with respect to an advertisement?
MS. JONES: Your Honor, now it's argumentative.
MR. KURZWEIL: Huh?
MS. JONES: He's testified that he does not know what it means. He said, no, I don't know what it means. And he's continuing to badger him about whether he's under oath. He's trying to intimidate him. And I --
THE COURT: Sustained.
MS. JONES: Thank you.

MR. KURZWEIL: Okay.
BY MR. KURZWEIL:
Q Does this generate business for your law firm?
A This particular ad or blog post, I would say very unlikely. Because our website in general does, but I can't -- I wouldn't see that we get much of anything off of something like this.
Q Okay. And Mr. -- I think you earlier testified that there are 31 cases that are FINRA arbitrations. Was that --
A Of the 105 listed, 31 of the -- actually, 32 of those are ours of the 105, but one of those that's listed is no longer a case. It's been dismissed.
Q Okay.
A And so of the, really, 104, 31 of them are ours.
Q And of the 31 cases, you said about 55 percent of those involved Inspired Healthcare?
A Well, a hundred percent of them involve Inspired Healthcare or they wouldn't be on the list. About 55 percent of them, it's only Inspired Healthcare. That's the only investment that we're complaining about in that case. About roughly 55 percent of them are that. And about 45 percent of them include Inspired Healthcare and, you know, one or more other investments.
Q Okay. And you referred to those 55 percent as $20 million, so how much other value are you pursuing on behalf

of Inspired Healthcare investors in addition to the $20 million?

A Right. The $20 million -- collectively in those cases, it's something between $37 and $38 million. And about $20 million of it is Inspired Healthcare and $17.5 million or so are other investments.

Q And how are you compensated by your clients?

A Depends on the case, but more often than not it's going to be a contingency.

Q And what's the approximate amount of the contingency fee?

A It's different in every case.

Q Okay. So what is the range for the Inspired Healthcare cases?

A I honestly don't know it off the top of my head. And like I said, I've got partners, and so I have not personally signed up each one of these cases, so I don't know. I wouldn't have even seen probably a half or two-thirds of these contracts before. But they're probably in what Mr. Nekvasil was saying. They probably are in the 25-to-30-percent range.

Q So if you were to collect this, your firm would benefit in excess of $16 million?

A If we collected a hundred percent of everything that was claimed in all of the cases, that sounds right. But that's -- we're certainly not thinking that's a likely outcome, I'm

sorry to say.

MR. KURZWEIL: No further questions, Your Honor.

THE COURT: All right. Thank you.

Mr. Hall?

MR. HALL: Yes. Jerry Hall for the Debtors.

CROSS-EXAMINATION

BY MR. HALL:

Q It's probably fair to say good evening at this point.

A It is.

Q You testified a little bit ago on -- about knowledge about the sponsor behind the investment. You said that was important.

A Yes.

Q Why is that important?

A Because we need to understand the investment and -- or why it may -- this goes very heavily to the whole suitability analysis, right? And so a big part of these FINRA arbitrations boils down to suitability analysis, is was this a suitable investment for this investor? And you've got to understand the investments very well, including the sponsor. And so that's a big part of it.

Q How important is that, in the relative scheme of things, for your ability to succeed in a case?

A Depends on the case. But it can be an important part, just in trying to determine -- in every case, I want to

understand the investments as well as humanly possible, so that we can truly, truly understand.

I mean, these DST Investments are, in the scheme of investments that we deal with, they're not all that complicated, but we deal with some stuff that is really, really complicated at times. And so you've got to really dig in there to understand it so you can actually understand the risk.

Q You also testified earlier about insurance and claims that might be able to proceed and exhaust the insurance. What is the recourse within the cases that you bring if the insurance is exhausted? How do you collect?

A Well, if the party we're suing has money beyond insurance, of course, we would get money that way. If not, and they file for bankruptcy, or -- in FINRA, we have -- it's a widely-talked-about thing, I've actually testified in front of Congress about it before, about this was -- this big problem called unpaid arbitration award, where these are not court proceedings and so, I mean, sometimes these firms just don't pay awards. And it's a crazy, real nuanced issue with that. And so, if, like with any case, if nobody has any money, then there's not really anything you can do about it.

Q So, fair to say insurance is important, then, in the collection of the awards that your clients would be getting from FINRA arbitration?

A It can be. It depends on the case. It depends on the situation.
Q Is it typically?
A I'm sorry?
Q Is it typically?
A Typically, no, it's not, actually.
Q What is the typical source of recovery?
A Usually the firm. But the majority of the brokerage firms that we deal with are self-insured. You know, you're suing Merrill Lynch or UBS or something like that. They're not touching an insurance policy. We're not messing with that. And so it's only with the smaller broker-dealers that we deal with insurance policies at all.
Q The Broker-Dealers at issue with respect to Inspired Healthcare, are those the Merrill Lynches or are they the smaller ones?
A Oh, yeah, the only kinds of firms that would sell stuff like this are smaller firms. And I don't know about the insurance situation for all of them. I know a little bit because of my dealings with them in other cases and things like that. And so -- but so I don't know if they all have insurance. I don't know if an insurance policy is the issue for all of them. But --
Q Have you received any insurance information in discovery in the FINRA arbitrations?

A No.

MR. HALL: No other questions, Your Honor.

THE COURT: All right. Thank you. Anyone else? Mr. Axelrod?

CROSS-EXAMINATION

BY MR. AXELROD:

Q Mr. Edwards, did any -- do you recall any of the broker-dealers against whom you filed arbitrations denying allegations against them?

A Meaning denying our claim or -- I'm sorry, I'm not sure I understand your question.

Q Do you have a recollection of any Broker-Dealer denying the allegations against them in your arbitration complaints?

A If I understand you right, I think that would be true in every case. They certainly have never admitted in any case that, yeah, we did it. And so I think that's true in every case.

Q Thank you. And in fact, in every case, they have lodged affirmative defenses that there was a superseding cause of your client's damages or something to that effect; is that right?

A I don't know that to be true.

Q Would you be surprised if it were true?

A Well, I would not be surprised if there was a boilerplate list of affirmative defenses. And that is, in every answer

I've ever seen, you know, there's 20 different affirmative defenses or boilerplate ones. If that's one of the boilerplate ones, that wouldn't shock me, but I don't know that to be true.
Q Okay. Can you go to Broker-Dealers' Exhibit #16? I want to look at the hard copy you are looking at to make sure it's exactly what it is on the screen. Yes.
A Okay.
Q And could you go to Paragraph 12 of that Statement of Claim?
A It's on Page 5?
Q Page 5, Paragraph 12.
A Okay. Yes, I'm there.
Q Could you read aloud Paragraph 12, please?
A (reading) On February 2nd, 2026, IHC filed for Chapter 11 bank...
Q I'm sorry. I'm going to interrupt you. Could you just look at the entirety of the Statement of Claim and let me know if you recognize it. I believe that your signature appears at the end of the document.
A Yes. I do, I mean, I do recognize this case.
Q Okay. And I apologize. Could you start again reading Paragraph 12 on Page 5?
A (reading) On February 2nd, 2026, IHC filed for Chapter 11 bankruptcy protection for itself and 160 of its affiliates

and subsidiaries. In its bankruptcy filing, IHC listed liabilities of between $1 billion and $10 billion, and that it had between 10,000 and 25,000 creditors.

As a part of its bankruptcy filing, IHC admitted that the vast majority of the properties it managed did not generate enough net operating income to pay obligations, meaning that much of the money being paid monthly to investors as distributions was not a distribution of profits, but rather money from other investors. That is essentially the definition of a Ponzi scheme. As a result, it appears the investors in IHC may lose all or most of their investment.

Q Okay. So Broker-Dealers have lately alleged, you concede, that in some of these cases there might be a superseding cause of Plaintiffs' losses?

A I'm sorry. I thought you were -- are you saying something or are you asking me a question?

Q Do you concede that in at least some of these cases, Respondents may have alleged that there is a superseding cause of your clients' losses?

A I concede that, again, that they may have alleged that, but what the basis of it is, I don't have any idea.

Q Would you agree that when you say that the issuer is a Ponzi scheme, and as a result, investors will lose their investment, that might be construed as a superseding cause?

MS. JONES: Objection. He's asking him to speculate

about what somebody else means by superseding cause.

MR. AXELROD: I'm asking whether someone might construe that based on his experience in these cases.

MS. JONES: He's asking him to speculate about some hypothetical person, who is unknown to anybody in this room, what they might think.

THE COURT: The objection is overruled. It's his pleading that he signed, so it's fair to ask what he meant.

THE WITNESS: In fairness, I don't know how anybody would construe anything. What I can tell you is our claim isn't about IHC in terms of saying that IHC did this wrong. This is just an explanation of why you -- these people may not get their money back.

BY MR. AXELROD:

Q Thank you. You recall filing a declaration in these cases?

A Yes.

Q I'm going to read -- no, let's go to it. I think this was admitted. It appears at Docket Entry No. 17 in the adversary proceeding. And I --

MS. JONES: Judge?

MR. AXELROD: -- think I need to look at the exhibit.

MS. JONES: Judge, that exhibit hasn't been offered or admitted. I mean, it's not admitted for truth and he's

here to testify. He's not offering this --

MR. AXELROD: Right. That's why I'm asking it, to confirm his statement.

MS. JONES: Then are you impeaching him? This is improper impeachment. He can ask a question. If he thinks he's testified improperly, then he can try to impeach him on his declaration.

THE COURT: The Court agrees, so is there something you need to impeach him with?

BY MR. AXELROD:

Q Okay. Mr. Edwards, do you recall filing a declaration in these cases where you said: Claims against non-FINRA members are not brought in FINRA arbitration as they cannot be brought there except in a few limited circumstances that would not apply to these cases. None of these Debtors in these jointly-administered cases can be sued in a FINRA arbitration because they are not FINRA members.

Do you recall putting that in a declaration?

A I do.

Q Okay. Do you wish to alter your testimony at all?

A I heard Mr. Nekvasil's testimony, and I can't -- do I think what he was saying was accurate? I have not seen it in the -- I mean, because -- I mean, all arbitration is a creature of contract, so parties can agree to pretty much whatever they want to agree to. And so non-FINRA members can

agree to participate in a FINRA -- or they can't be forced to do it, but they can agree to participate in a FINRA arbitration.

And I have seen that happen, you know, in circumstances not identical to this, but it happens on a somewhat regular basis with what's called investment advisory firms, too technical to get into all that, so they're not FINRA members. But that happens on a not-unfrequent basis. I haven't seen it as direct as this, but I don't disagree with anything that Mr. Nekvasil said. Yes, if IHC agreed to be sued in FINRA arbitration, that that would be a possibility.

Q Have you ever experienced an issuer who is a debtor in bankruptcy agreeing to also be part of a FINRA arbitration?

A Again, not that specific scenario. I have seen a variety of other scenarios where non-FINRA members have agreed for a variety of reasons. And I think Mr. Nekvasil was also correct. I mean, because it's cheaper and faster and things like that, parties will sometimes agree to it.

MR. AXELROD: I have nothing further at the moment. If we might confer, Your Honor?

THE COURT: Of course.

CROSS-EXAMINATION

BY MR. TAYLOR:

Q Mark Taylor for the DST Committee. I'll be very quick, Mr. Edwards. I know it's getting late. You --

A And I think they turned the A/C off here. All of a sudden, it's gotten --
Q Well, fortunately, it's a cool day in Texas. So we're lucky. It could have been a couple of weeks ago.
You heard Mr. Nekvasil's testimony, didn't you?
A Yes.
Q So I'll kind of shorten that. You have a set of clients that you're representing in connection with their investments in the DST Investments in connection with IHC, correct?
A Yes.
Q And you're trying to recover rewards in the arbitration on behalf of just those clients; isn't that right?
A Yes.
Q And if you're not restrained by this Court, you'll proceed with those arbitration proceedings, won't you?
A Yes.
Q And you'll try to get an award as quickly as possible, won't you?
A Yes, especially for our older clients.
Q And you'll try to get -- and let's stop there for a minute. You're not suggesting to this Court that there aren't other elderly investors out there that aren't your clients, are you?
A I don't know the answer to that question.
Q I'm saying you're not suggesting that that's the case,

are you?
A I'm saying I don't know the answer.
Q Thank you. So you want to get an award as quickly as possible, right?
A Yes.
Q And you want to get as big of an award as possible for your clients, don't you?
A Yes, I want to do the best job for my clients as I can do.
Q And you want to collect from every possible source, don't you? To satisfy an award, you would like to collect from every possible source, up to the amount of the award. Fair statement?
A With reasonability. I mean, I wouldn't want to collect against a party that I --
Q That's --
A -- don't really have a right to collect against, but yes.
Q That's legally permissible.
A And ethically permissible, yes.
Q And you, much like Mr. Nekvasil, you have not agreed not to attempt to collect from insurance proceeds, have you?
A No. And in fact, as I said earlier, there's a big problem here, because I've got cases that are going to take that --
Q My -- that wasn't my question. That was a yes-or-no

question, sir. And you're a trial lawyer, aren't you?
A Yes.
Q And you understand the yes-or-no question, don't you?
A I do.
Q And you have not agreed, have you, not to collect from insurance proceeds? Isn't that right?

MS. JONES: I'm just going to object, Your Honor. He's not specifying which insurance proceeds.

MR. TAYLOR: It doesn't matter. Any insurance proceeds.

BY MR. TAYLOR:
Q You have not agreed not to collect from any insurance proceeds, whatever or wherever they may come from, have you?
A I've not agreed --
Q That's yes or no. You have not agreed, have you?
A I guess the answer is no, but, I mean, --
Q Thank you, sir.
A Yeah.

MR. TAYLOR: Pass the witness, Your Honor.

THE COURT: All right. Anyone else over here? Back to you, Ms. Jones.

MS. JONES: I think Mr. Taylor overruled my objection. But it's okay. I'm okay with it.

THE COURT: I'll make it clear. The Court overruled your objection.

MS. JONES: It's okay. It's fine.

REDIRECT EXAMINATION

BY MS. JONES:

Q Okay. And the Broker-Dealers showed you an exhibit at 42-10, which is a post on your firm's website. You'll recall that exhibit?

A Yes.

Q Okay. So on that web posting, your firm says the words IHC, right?

A I believe so, yes.

Q Okay. And it discusses IHC generally, correct?

A Yes. Well, it discusses -- it's discussing a case that we had recently filed, apparently. And it also talks about there was an IHC case against a different Broker-Dealer than I think that's involved in this. And then it discusses some more general stuff about IHC.

Q Are you able to show me anywhere on that exhibit where you're offering to sue IHC on behalf of investors?

A Oh, definitely not, I mean, because we -- we don't do that. I mean, I know there are some people that do, but that's not a part of our practice.

Q Are you even advertising to file a proofs of claim for people in this bankruptcy case?

A No, the exact opposite. We have very explicitly told our clients that we're not bankruptcy lawyers and we don't want

to be responsible for it.
Q So when you discuss IHC Investments and proceeding in a FINRA proceeding, you're not talking about against the Debtors, correct?
A Absolutely not.
Q Okay. You were shown a Statement of Claim on Broker-Dealer Exhibit 42-16. You don't discuss, in that Statement of Claim, you don't discuss superseding causes of harm, right?
A No. I'd have to go back and read it word for word, but I cannot imagine.
Q Well, it was Paragraph 12.
A Yeah, it was certainly not in that paragraph that I read, no.
Q Okay. And so the superseding cause that was discussed by the Ad Hoc Committee was the broker-dealer's allegation in response to that Statement of Claim, correct?
A If I was understanding what he was saying, he was saying there's a generic affirmative defense in some of these answers that says, you know, that a superseding cause, an unnamed superseding cause out there.
Q Right.
A And he was trying to suggest that I was saying this is what the superseding cause was, which was clearly not the case.

Q Okay. It might be nonresponsive, but what I'm going to ask is do you know when the Broker-Dealers, if they have alleged there's a superseding cause, do you know what that is?

A No idea.

Q Is it specified in any of the answers?

A Not in any that I can recall reading.

MS. JONES: Pass the witness.

THE COURT: Thank you. Mr. Simon?

RECROSS-EXAMINATION

BY MR. SIMON:

Q Two very brief questions. Your clients have not made any claims against the Debtors' insurance policies?

A No.

Q And to the best of your knowledge, your clients don't have claims against the Debtors' insurance policies?

A I'm not aware of any. I haven't investigated it, quite frankly. Until this proceeding started, I had no idea they even had insurance policies.

Q And the Debtor is not a party to any of the FINRA arbitration actions in which you represent Claimants?

A No.

MR. SIMON: I pass the witness.

THE COURT: All right, Mr. Edwards, I believe your testimony is complete. Thank you very much for your

testimony.

THE WITNESS: Thank you.

THE COURT: You are excused.

(The witness steps down.)

THE COURT: All right. It's back to you, Ms. Jones.

MS. JONES: I am going to spare everyone here and Mr. White. I'm not going to call him. I think we have enough -- we have enough testimony.

THE COURT: All right.

MS. JONES: And so we'll rest.

THE COURT: You'll rest? Any rebuttal?

MR. HALL: So, Your Honor, no rebuttal.

THE COURT: All right.

MR. HALL: But can we have a restroom break?

THE COURT: All right. So the parties rest and close on evidence?

MR. HALL: Certainly on this side.

THE COURT: All right. So it's 6:40. I know we've got several sets of lawyers. Do you want to do closing arguments today or do you want to do them -- yes, okay.

MR. SIMON: We do not want to come back.

THE COURT: You do not want to come back? Very much so.

MR. HALL: We're at the --

THE COURT: That's fine. We'll take --

MR. HALL: -- beck and call of the Court. Can we take a break for restroom and --

THE COURT: Of course. That way, you can gather your thoughts and then be picky with your closing arguments.

MR. HALL: How long, Your Honor?

THE COURT: As long as you think you need.

MR. HALL: Well, I'm sensitive to the hour. Is five minutes --

THE COURT: I will let you all make the case that you believe is necessary.

MR. SIMON: Judge, ten minutes.

MR. HALL: Ten minutes? Okay. Thank you.

(A recess ensued from 6:39 p.m. until 6:51 p.m.)

THE COURT: Thank you. Please be seated.

All right. We're back on the record. Mr. Hall?

MR. HALL: Yes, Your Honor. Jerry Hall for the Debtors. If it please the Court, we'll proceed with closing arguments. I propose that we'll make all of ours, they'll make theirs, and if the Court will have it, we'll reserve just a few minutes for any rebuttal.

THE COURT: Of course.

MR. HALL: Thank you, Your Honor.

CLOSING ARGUMENT ON BEHALF OF THE DEBTORS

MR. HALL: So now that the record is developed and closed, I want to revisit what I started with, which was

whether or not the Debtors will provide enough evidence to demonstrate to this Court, on one of two alternative grounds, under Section 362 or under 105 equitable, but all of it really funneling down to these four elements that the law requires for any preliminary injunction. Likelihood of success, which in this context is about reorganization. The evidence on that matter is unrebutted. Mr. Jones is the only person who testified -- oh, before I get started, Your Honor, may Mr. Jones be excused to make a flight?

THE COURT: Yes.

MR. HALL: I apologize.

THE COURT: Yes.

MR. HALL: I'm sorry.

THE COURT: Sorry. Best of luck to you. Okay.

MR. HALL: I'm trying to move this along, and I completely spaced on that.

MR. AXELROD: Mr. Jones gets to make his flight.

MR. HALL: But also, any witnesses that want to leave, as far as I'm concerned, --

THE COURT: Anybody who wants to leave may leave. It will not offend the Court. Best wishes on traffic, and safe travels back to your destinations. I apologize for having gone so late.

Okay, Mr. Hall. Back to you.

MR. HALL: Thank you. So likelihood of success, in

this context, that's reorganization. There is no evidence to the contrary than that the Debtors are on track for a successful Chapter 11 case. They will have a successful sale process. This is already evident just in the stalking horse portion of the process. They will have a series of plans, a combined plan, whatever the parties ultimately work out, and will seek confirmation of that, and we are expecting that we will succeed in that effort.

Again, even if there is a trap that I'm just not aware of today, there is no evidence that that's not what's going to happen.

Vis-a-vis Section 362, *Reliant Energy*, which I know Your Honor is familiar with, I will not bother with all the details of the case, but I know Your Honor is familiar with it because it was the basis for the TRO ruling. *Reliant Energy* allows the extension of the stay in the context of identity of interest. And in this case, the identity of interest is both contractual and common law.

The identity of interest as to the contract has been the subject of much testimony, but the document itself and the fact of a contractual indemnity is uncontested. In fact, every party wanted to admit the Master -- or, sorry, the Managing Broker-Dealer Agreement into evidence as part of their own case.

Section 8 of that Agreement provides the indemnification

obligation for the Debtors as to the Broker-Dealers, all of the Broker-Dealers, the Managing Broker-Dealer, plus any Selling Broker-Dealer, I think is the defined term within that Agreement.

All those parties are subject to indemnification rights. And the only testimony that you have on the record in this proceeding is that the Debtors expect and have had conversations with Broker-Dealers about, among other things, indemnification rights that they will assert against the Debtors.

It's not evidence, but for purposes of argument, Your Honor also has the record of the prior proceeding, and most likely following behind me at some point Mr. Axelrod will affirm again that his clients intend to assert indemnification rights to the extent that awards are entered against them.

And I believe, at the time, back in June 30 when the TRO hearing occurred, Mr. Axelrod's comment was that the indemnification volume is millions of dollars and climbing. And that's, of course, because of the defense costs that they are incurring, which they will ultimately seek to claim against the Debtors.

In terms of estate property under 362(a)(3), again, this Court is aware of the Debtors' view that these FINRA arbitrations are significant to them, that they carry risks,

and that we are paying attention to them.

Our testimony went all the way back to February, when we first received discovery requests from at least some of the FINRA Claimants, and responded to those by saying, among other things, you know, you haven't given us a deadline, you haven't -- I mean, the letter speaks for itself, of course, and it's in evidence, but you haven't given us deadlines, there's no formal demand here, and we, of course, intend to do what we are now doing, which did take some time to get to, but in the greater context of everything that was going on, we were as diligent as we could. And because these are confidential private arbitrations, it's not easy to come by the information that we need.

And I actually think what Your Honor can draw from the testimony from the FINRA Claimants' case-in-chief is that there are numerous, at least four from one testimony and dozens from the other, of claims that are not yet subject to our complaint but which are pending and which involve IHC securities.

So, sorry, back to property of the estate. Our insurance, to the extent that we are involved or to the extent that we are required to reimburse defense costs to any of the Broker-Dealers, would all be in play. And while I have no doubt there will be arguments about whether the indemnification claims are viable or valid, there's that 14-

day "shall" issue hanging out there in 8(d), whether or not reimbursement would be viable or valid, maybe these are all prepetition and all they can do is file a proof of claim and there's no postpetition admin angle, I'm pretty confident that the estate will be spending time and resources fighting over all of that, negotiating over all of that. And that is part of what we would like to avoid.

And in particular, we'd like to avoid it because of that sale process and reorganization effort that we are undertaking. This is 160 Debtors. This is 33 communities. This is thousands of Claimants, I'll say -- some creditors, maybe some equity, some maybe are a mix, maybe some have multiple claims -- but it's a lot. And even just in the context of discovery, as Your Honor knows, as we had with Mr. Jones on testimony, we've been here on discovery matters. Everybody's unhappy with the pace. What we're trying to do is avoid distractions to the pace that will undermine the significant things that we need to accomplish in order to deliver on our promise to this Court, to all the constituents, to everyone, to have a successful Chapter 11.

So, irreparable harm. This is probably the big action spot in this matter. From our vantage point, irreparable harm comes in several flavors. One is the distraction that these FINRA arbitrations have and will continue to impose on the Debtors and its management, which is a small team, as

Your Honor heard. I believe the testimony was they've got a full-time job in sort of operations and then they got a full-time job in restructuring. They can't really afford -- in fact, as I just said a second ago, the full-time job in restructuring is itself overwhelming, to the point that you have had two or three hearings already. I know I've been a part of several of them with the UCC and then subsequently with the DSTs on discovering information flow in these cases.

We have investigation to undertake, to coordinate. We have a sale with multiple stalking horse bidders already, an auction to come in August, and then a closing that will involve regulatory hurdles, administrative matters, obviously there will be ongoing substantive issues, and that's going to carry us through to closing.

And of course we also have a plan to try to negotiate with two separate Committees, dozens of different interested parties, secured lenders, unsecured creditors, and the like. That is probably the number one concern and issue for the Debtors.

Related but second is --

THE COURT: Let me ask a question on this.

MR. HALL: Yes.

THE COURT: This is the distraction issue?

MR. HALL: Yes.

THE COURT: All right. The testimony of Mr. Jones

was pretty clear that, at least up to this point, it didn't appear, at least from the record -- I'm going to ask you where in the record is there evidence prior to this point where there was a distraction.

I think the testimony from Mr. Jones was pretty clear that, up to this point, not a lot of energy and effort or distraction was caused by these FINRA actions. So is it the potential future? And if so, where in the record is the evidence to support the distraction of these FINRA actions as the impediment?

MR. HALL: So what I would say on that point, and it's a fair point, it's sort of the obvious thing, because all the testimony from the FINRA Claimants is, hey, we don't need to do anything with IHC, with the Debtors. We don't need to talk to them. We don't want to talk to them. We don't know what the Broker-Dealers will do, except we know that at least in several of the matters they have asserted a superseding clause. They certainly have the right to take discovery. Everybody's conceded --

Let me start there. Everybody's conceded that it can happen. Your Honor's question is sort of, but will it? And what I would say about that is, one, it did happen at the beginning. And, yes, we said, no, thank you, and nobody pushed us, nobody followed up. And the testimony from the FINRA Claimants' counsel, one of the witnesses, seems to be

we could push it. Maybe there are some limits to how much we could push it because FINRA itself may be toothless and not able to enforce a subpoena, although they could certainly issue one. They have rights to go to district court if they deem that appropriate or necessary. So, again, could happen. Seems to be uncontroverted.

Will it happen? It has happened so far in a *de minimis* way, we would all agree. It was -- not *de minimis* in the sense of some 20 or whatever -- I mean, the letter in our response lists everybody. It's, I think, 22, 23. So it wasn't *de minimis* in that sense. How we reacted to it and what followed from it, I would agree. The question is what will happen in the future?

So in that point, I sort of teased out the one bullet that I thought was significant from each of the two witnesses for the FINRA Claimants. And for Mr. Edwards, it was the knowledge about the sponsor behind the investment. And then I asked him just a couple of questions about it, pretty open-ended. It's not really a cross, even. I just wanted to understand what he was talking about. And what he's talking about is, well, we've got to know who the sponsor is in order to understand the investment. And in his words, it can be very significant. He said it varies. Depends on what the case is. It can be very significant.

What I'll say is there's no evidence in here about

whether it is or isn't significant in any particular matter, but sort of like what almost always is the case when we're before a court on this matter, it's not usually because there is a matter. It's because there are a hundred matters, and we know well more than a hundred, we just don't know how many more, but we know just from testimony that there are matters of which we are not yet aware. They're not on Schedule 1.

So, a hundred-plus, and what we don't know is how many of those are going to be significant vis-a-vis their need to know something about the sponsors, its conduct. Because one thing we all know in this case is that there is a record of allegation relating to misconduct by the prepetition entities, right, by the Debtors before they filed. That was, as much as possible, addressed and cleaned up. Independent managers are in place. A CRO, who's now gone, is in place.

So the Debtors were doing what they could to sort of right that issue. And that issue is the subject of a significant investigation right now. Actually, it's the subject of three significant investigations right now.

So from my perspective, will it? Why wouldn't it? It's the number one thing everybody -- I actually remember one of the comments Your Honor made at the very first motion to compel by the UCC on their discoveries, when they first said, hey, we need a 2004 order. And Your Honor said, well, the investigation's one of the most important things happening in

this case. I'm not quoting. But it was that sense of the comment.

This is an important matter. The investigation's important. Everybody needs to understand what happened. Mr. Kurzweil, up in his opening remarks, same thing: This is important. We all need to know what happened.

Why would that be limited to just the Chapter 11? Why would the Broker-Dealers, for example, who don't have the same bias and incentive as the FINRA Claimants, who are, like I said, they're going to tell you absolutely unconditionally no. I'm surprised they didn't actually testify we absolutely promise not to do it.

And I'll say this, Your Honor: Whatever you want to do, if it's not to give us a stay, you should at least enjoin them from taking any action whatsoever to seek any information whatsoever from the Debtors, so that the promise becomes true, that we don't get any distractions, other than the risks, then, of indemnification, which I'm going to turn to in a bit, and whatever that litigation stream might look like for the estate.

Because everybody is so hands-off. It's so unimportant. We said nothing whatsoever. We can't even agree that they're talking about our bankruptcy sometimes. Okay, fine. That, to me, is a minimum where we should leave this hearing. Frankly, I think that we should have a stay imposed until the

effective date. I understand the DST and UCC have a different view of timing. Maybe that persuades Your Honor. I don't know. But everybody's saying that this is a significant issue, right on up to the Court.

I don't understand why it's a significant issue in every aspect except the one aspect where it seems most obviously relevant, which I assume is why these Broker-Dealers have asserted the superseding cause defense. Because at some point they're going to say, you know what, we did our jobs. We did it right. We did it well. That's sort of line of defense number one.

But if you aren't buying that, Arbitrator, well, guess what? It wasn't us. It was these conniving scoundrels who were defrauding everybody. Right? And that's going to be the allegation. I'm not conceding, I want to be clear, but that's going to be the allegation. And I don't understand how that's not plain. For me, that is plain. That is where this will all go.

And at that point, somebody who's going to be representing their client zealously is going to at least try to get us involved. And that's going to be where the source of distraction starts, even if it's just us resisting and saying no, no, no, and testing exactly how toothless FINRA really is.

But we'd rather not do that. We'd rather focus on the

sales of 33 communities covering 160 Debtors and thousands and thousands of Claimants.

So I don't know if that really answers Your Honor's question, but --

THE COURT: It did. It did. You may -- I didn't mean to derail you.

MR. HALL: No, not at all. But, yes, so the knowledge about the sponsor, I guess what I would say is at least that much trickled out from the FINRA Claimants' testimony and evidence. They acknowledge that IHC is involved.

And actually, if Your Honor will recall back to Mr. Jones, entities and individuals who are former Debtor officers are present throughout these Statements of Claim.

So, again, it's not as if people are unaware. They just haven't taken the action. And frankly, if you look at those -- I mean, maybe only one of them got into evidence, I can't remember, one or two, of those website documents where Mr. Kurzweil was doing the cross-examination related to those matters. I mean, one of the things that's pretty clear to me, the bias that I would point to on that matter, it's not whether they're going to get paid and what people deserve to get paid. It's that this is a conscious strategy to avoid the problem that we are trying to create for them, which is you don't get to jump the line. Everybody's got to win or

lose together. Because I know there's other stuff out there. I will say this: We are absolutely going to be trying to, whatever the outcome of this Court -- of this hearing, we are going to be trying to secure a result with the Broker-Dealers ahead of everyone else, because that's the only way that we can ensure that piece of all of this.

But again, that's just a piece, and that's not the main piece. The main piece for us is we have a process. We want that process to succeed. It's succeeding right now. It's succeeding very well. It's probably succeeding more so than most of us expected. Maybe all of us, I don't know, but for me, certainly more so than me. We would like that to continue.

This is a case that ought to succeed, deserves to succeed, is on track to succeed. We just want to make sure that stays in place. So we're pretty jealous about anything that might interrupt that.

And, yeah, we're happy that it hasn't been a problem so far, but there's a hundred of them plus, and I don't know whether you'll hear it from anybody, but I can't imagine that people don't at least try to get in line if Your Honor says, no, this doesn't work, you had your 14-day stay but you haven't carried the day. And then we're talking about even more.

And again, I can't tell you for sure, because it's

predictive, but if we're right and anybody, the FINRA Claimants, the Broker-Dealers, decide that they need to come after us to get information, to do whatever, well, then there we are. I guess at that point maybe we'd come back to Your Honor with different evidence and a new pleading, but we'd rather not have to undertake that effort as well.

All right. Sorry. So, irreparable harm. I was saying the first thing is this whole let us reorganize and leave us in peace to do so. I mean, the primary matter of the automatic stay applies to stop litigation against us. We want to extend that to litigation that can involve us or for which the outcome can become effectively our problem and will precipitate even more litigation.

The second piece of this relates to our insurance policies. Our insurance policies, which is a $10 million stack, the money that we spend on these matters could be covered by insurance, potentially. To the extent that we either are spending it or we are being required or asked to reimburse others, that money is not available for us to do that we want to do with that money. That's D&O coverage, right? We want to use that to pursue claims against third parties. So we'd love for that to remain as in place as possible.

I think Your Honor is aware there's a motion, Mr. Lee has filed it, seeking to have access to some of that. There are

discussions around that. I believe the hearing is coming up. It's been pushed because of those discussions. We're hopeful to have a resolution of that, but I don't want to mismanage people's expectations. There isn't one until there is, but the parties are talking. And if that happens, that will be yet another way that we're able to limit that piece. When that's gone, that's gone. So that's point two.

Point three, and this is a kind of an unusual one, but it gets back to the whole who gets to be first in line to chase that insurance for the Broker-Dealers. Despite the objections to our case-in-chief, everybody seems to acknowledge that some of the Broker-Dealers have insurance, there's money left on those policies, and that is a source, and in some cases, a primary source. I believe the evidence was if it's a smaller Broker-Dealer, which is really the only kind of Broker-Dealer that deals in the securities of the nature that IHC had, the Debtors, then it's usually insurance. So it's important there. Everybody wants to get there first. You have non-IHC component; you have IHC component, which is the FINRA Claimants here; and then you have us. And the question will be who gets to go first and what's the outcome?

This maybe is more of a neutral factor in this sense. For irreparable harm, for the legal standard, money is not usually irreparable harm. Your Honor is undoubtedly well

aware of that. But it can be. Justice Scalia and the Supreme Court have actually opined on that. And if I can find it, I will give Your Honor a cite.

It is the *Philip Morris* case, *Philip Morris USA v. Scott*. And it originated in Louisiana, actually, the case did. And what the Supreme Court said is: Normally, the mere payment of money is not considered irreparable, but that is because money can usually be recovered from the person to whom it is paid. If expenditures cannot be recouped, the resulting loss may be irreparable.

And here, there's no evidence of wherewithal by these Broker-Dealers. If there's any evidence, it's that, other than insurance, there isn't wherewithal. The testimony that Your Honor heard about smaller Broker-Dealers who basically are looking to insurance. So, here, that policy vis-a-vis the Debtors, and maybe it feels unfair, but we're the Debtors, we're the ones who are in Chapter 11, so it's our irreparable harm. It may be the same consequence for everybody else, but from a legal standpoint, this is our problem.

So reorganization, our policies, and the Broker-Dealer policies, because there may be nothing else after, so those claims, for us, would just be dead.

THE COURT: Let me ask a question that's an offshoot of that.

MR. HALL: Yes, Your Honor.

THE COURT: I understand the Debtors' argument on the irreparable harm issue, a component of those policies that Broker-Dealers may or may not have. What's your response and where in the evidence should the Court weigh and balance of the equities when the testimony was, if I enjoin the DSTs in this case from pursuing that, that's not going to prevent other investors, other matters, going against those same Broker-Dealers, and those proceeds will be eaten up by all of them, those potential investors ? Which I'm guessing is going to be an argument on balancing of the equities. That's a big component that the Court is going to have to weigh. What's your response to that and what's the controverting evidence to give the Debtor the greater weight on that?

MR. HALL: Sure, Your Honor. So I think the place I would start on that point is this third-party universe that will not be subject to a stay. They affect everybody today, stay or no stay. So I want to think about it, because it's a fair question. I have thought about it a little bit, but not in this particular context. I'm not sure it favors anybody in that sense.

What I will say is if we get the stay, we know, and there is evidence on this point, Your Honor, we're already having conversations with the Broker-Dealers. We're hearing them on

what they think their claims look like. They're hearing us on what we think our claims look like. And we're talking to them about how to have a prompt, efficient resolution. Having the stay in place will facilitate that.

This is a little bit of a curveball, maybe, to the argument, but the stay helps us because it helps them. Rather than them spending all their time and treasure and resources and attention fighting on these FINRA matters, doing discovery back and forth, whatever, having hearings, which start maybe in September or October, they can talk to us and we can reach a resolution, which, if we are prompt enough, will somewhat moot that issue.

One thing that we can do that they can't do is we can get there faster. We think we can get there faster in part because we have the ability to collectively act. So, for example, any FINRA Claimant, even a collection of FINRA Claimants, can negotiate with maybe a Broker-Dealer, maybe a handful at most. They don't have the same wide swath that we do.

A specific Claimant can negotiate against whoever the Broker-Dealer was that they had sued, arbitrated with. But we have the ability to act in an ominous fashion. So we have more negotiating capability. Not just leverage, but like actual logistical capability because we can get more people together all at once. We have the DST Committee, who speaks

for way more than a hundred people. I forget what the number was that Mr. Coleman used, but it was past 2,000. So we have that ability as well.

And if we're able to succeed on this, especially if we're able to get the insurance, put it into the estate, put it where it belongs within the estate, because it doesn't need to go to me, it should go to them, because that's the whole goal here anyway as to this piece. Again, the main goal, reorganization; but as to this piece, let's get these folks the money that they have lost. And maybe the sale process will facilitate that as well. But as to this, get it to them.

I'm sure Mr. Coleman will have things to say within the context of our negotiation about how this should go. Mr. Kurzweil, the same. But from our perspective, we can do it better. I think we can do it faster. And if we do it and we put it into a plan and there's no other insurance available and no other assets for these Broker-Dealers, which, of course, we're going to be exploring with the Broker-Dealers as we negotiate, then maybe that solves that piece.

We're ignoring the third-party people that we just can't control and therefore can't care about. But the FINRA Claimants themselves, if there's no pot of gold at the end of the rainbow for them any longer, maybe they will be satisfied with the results of our sale process and our ability to

leverage a resolution out of the Broker-Dealers.

Some of that was indirect, Your Honor, but I hope it was an answer.

THE COURT: You answered my question.

MR. HALL: Okay. Thank you.

Okay. So I was talking about monetary losses, irreparable harm. I gather, Your Honor, Your Honor gets that point. I won't belabor it.

So, balance of the equities, that was the next thing I was going to talk about. And here, what I would say, setting aside just the piece we just talked about, but what we're discussing and what we're asking for, and even what the Committees have asked for in a maybe more limited and certain way, is a temporary stay.

And I realize from the testimony, which we were not in a position to rebut, that a stay here could cause further stays, like further extensions, not just beyond what our stay is, but it's limited. It won't deprive anyone of their rights. It may deprive them of assets, because it is obvious that we are going to be chasing the same, as will third parties that we can't control, but it will otherwise leave everybody in the position that they're in now.

Alternatively for us, if we are somehow impaired in our reorganization, that's a broader harm and it's a permanent one. If we are unable to access either our own or other

insurance, same. Maybe the latter one is a wash because the Broker-Dealers have limited insurance and there's, as Your Honor saw from the demonstrative, way more, way more claims than there are insurance coverages to support those claims. But we think, on balance, a temporary imposition is less onerous than potential risk to a company that ought to be able to reorganize.

And then in terms of public interest, I mean, I think what I would say, Your Honor, is I'm biased on this matter, but bankruptcy trumps arbitration. I'm not just biased because I'm here on behalf of the Debtor. I'm biased because I actually think that's right. The goal of bankruptcy is much broader than the goal of arbitration. Arbitration is intended to make private disputes more efficient than ordinary litigation. The Federal Arbitration Act in particular, which is what governs these FINRA actions, is designed to avoid what can sometimes be an expensive and long road through a federal district court.

Unlike that, in bankruptcy, our Code itself mandates speed. So, for example, we currently have exclusivity through, I think, the end of August. We are in a position where we will undoubtedly be seeking to extend that exclusivity, but there's a cap, as Your Honor knows. We can't go much further than where we are. We're six months into this case, give or take, and we have 300 days.

So we've got to get a sale process out. We got to get closings to start occurring. We've got to get far through the regulatory process. We've got to get a plan on file, a confirmation hearing set. Of course, we also have to be able to disclose it, so we've got that little piece. We have a lot to do and we have a finite amount of time within which to do it.

As Your Honor, I'm certain, is well aware, no debtor comes into bankruptcy with the goal of losing exclusivity and allowing it to become a free-for-all on competitive plans. So we're very sensitive to that. We are tracking toward the resolutions that we want and we believe we will achieve.

So, again, public interest, bankruptcy trumps definitely arbitration, but frankly, a lot. Because when you look at the number of people affected, which is just a different way, and maybe this is also an indirect way of talking again just for a second about balancing of the equities, our cases affect 2,600 residents, 2,000 employees. I don't know, collectively, 4,000-5,000. Mr. Kurzweil just gave me hands. 5,000 Claimants -- again, creditors, equity, whatever -- but Claimants, and that's just from those two sort of classes and communities.

Then there are, you know, the secured lenders. There are others involved. We affect a lot. And we don't want to be here, but circumstances drove it. And so here we are, but

now we're going to do our best, and we're going to cover as many people as well as we can, which, frankly, includes all of the FINRA Claimants. They are our constituents, too.

And I understand they're unhappy about what we're doing. We're cajoling them out of a place in line that they love to have. We think it's an unfair place. But again, that's not really the main reason we're here. The main reason we're here is because we have a greater duty to the estate, and it requires us to be focused as much as possible, like a laser, which is why Your Honor heard me squawking on about discovery this and discovery that back when the Motion to Compel was filed, because we don't have the time that we need. We don't have the resources that we need to devote and give them what they otherwise, frankly, probably would be asking for without much trouble. But here, we struggle a bit. Some of it's technical, but a lot of it's just resources.

THE COURT: Okay.

MR. HALL: We're operating under a DIP. We have what we have.

THE COURT: All right. Thank you. Anything else?

MR. HALL: No, Your Honor. Any other questions?

THE COURT: No.

MR. HALL: I guess the thing I would say is, of course, we are asking Your Honor to extend the stay until the effective date of a Chapter 11 plan or such earlier time as

Your Honor deems appropriate, in light of what we know are going to be some other arguments coming from other parties.

THE COURT: Thank you, sir.

MR. HALL: Thank you, Your Honor.

THE COURT: Mr. Axelrod?

CLOSING ARGUMENT ON BEHALF OF THE AD HOC GROUP OF BROKER-DEALERS

MR. AXELROD: Thank you, Your Honor. I will try not to repeat Mr. Hall's excellent presentation. I'll organize it as best I can on the fly, and if things don't go exactly together, I trust someone will let me know.

I'm just, I'm going to walk through the law and organize my thoughts that way. I want to start with jurisdiction. There was a little bit of discussion on this at the TRO hearing, and the Court entered the TRO. I didn't -- there were arguments about what was property of the estate and that related to jurisdiction, but I'm not hearing a strong argument that this Court cannot enjoin arbitrations. I think it's very clear in the case law that it can, and I'm going to cite a few cases as we go on to that effect.

As Mr. Hall said, there's a four-part preliminary injunction standard. I won't lay that out again, but I will say I'm going to tailor my comments to that, because the cases that talk about the preliminary injunction standard in this context, which is *R & G Financial Corp,*, which is 441

B.R. 401, that what they say is basically the key is proving identity of interest such that allowing these arbitrations to continue is tantamount to violating the stay as if the Debtors were a party. And I fully understand the arguments around 362. I'm just, I'm not going to go there. Mr. Hall went there.

So going to irreparable injury, it's broad and undefined. I'm going to quote from the *R & G Financial* decision: The debtor would be the entity legally and financially responsible in providing not only all the legal costs of the broker-dealer's defense in the FINRA arbitration proceedings, but also its limited managerial resources would also be diverted in assisting towards the preparation for such proceedings, meaning that its automatic stay protections under 362(a)(1) would, in essence, be violated.

And there's similar language in the *SVB* decision out of New York a couple of years ago.

We have talked a lot about the injunction claims. They arise under the Managing Broker-Dealer Agreement, which is in evidence, and it's Paragraph 8 is the key paragraph there. And there's been plenty of evidence, including from Mr. Edwards' own complaint that we talked about, FINRA complaint. And even in the websites of the FINRA Plaintiffs, they're talking about this is a bankruptcy. It may relate to or it does relate to misconduct by the Debtors.

They're -- that misconduct that we're talking about, that was not disclosed to the public, certainly by the Debtors' current management until the petition date, but there's no evidence that it was disclosed to investors at any time prior to the petition date. And it stands to reason that it wasn't, because no reasonable investor would have invested in these companies had they known all the facts that have now been disclosed by the Debtors' current management.

We saw that evidence in the FINRA arbitrations, from the FINRA arbitrations, the Statements of Claim, the responses from the Broker-Dealers, the testimony of the FINRA Plaintiffs' counsel, they have -- the Broker-Dealers have denied any lack of due diligence. They have claimed that there were superseding causes. There are, in fact, many answers and affirmative defenses that specifically say that IHC was responsible, and some of those are in evidence before you from the Broker-Dealers and from the Nekvasil firm.

So I would encourage the Court to review the answers and affirmative defenses filed by both of those parties. They do specifically deny allegations, creating factual disputes that the Debtors' own property would be required to resolve in a discovery process.

There's been plenty of talk about the indemnities, and I want to make three points about it. First, there was a lot of discussion about, oh, maybe these claims aren't good

because there's a 14-day notice problem. Well, there's a few issues with 14-day notice.

First of all, if you read the Master Broker-Dealer Agreement, it says 14 days after an event that, in the party's opinion, justifies indemnification. Well, how would you form that opinion unless and until you become aware of the facts that justify indemnification? Again, the first-day declaration was filed on the petition date. That showed some facts to the public and to the Broker-Dealers that justify indemnification, but also at that point there's the automatic stay.

And we don't have a bar date as of today, or we do, it's weeks away, so there cannot be demands for indemnification at this point. There has certainly been notice that it's coming. There have been many communications with the Debtors, and that gets to my next point. Your Honor, --

MS. JONES: I'm sorry, Judge, I'm going to object to closing outside --

THE COURT: This is just argument.

MS. JONES: It's outside the record.

THE COURT: You can take that --

MS. JONES: Okay. All right. Thank you.

THE COURT: This is lawyer-speak. It's not evidence.

MS. JONES: Thank you.

THE COURT: And I will take it as such.

MS. JONES: Okay. Thank you.

THE COURT: So you may proceed.

MR. AXELROD: Your Honor, that gets to my next point. Your Honor had a question about, well, what's been happening in the last few months? Why haven't the Debtors been in the discovery process and devoting a lot of resources to it?

At the Debtors' Exhibit, I think it's 198, it's a letter to one of the FINRA Plaintiff counsel saying, we're going to pursue this injunction. Now, Your Honor, I can't introduce testimony about the settlement communications that have been occurring between the Debtors and the Broker-Dealers since February. I have certainly said on several occasions now they are happening, and we are trying to have a collaborative approach to this case that will result in successful confirmation and recoveries for creditors.

Well, Your Honor can use his imagination about what those conversations would have been over the last few months and why, as a result, there might not have been discovery in the arbitration proceedings and active adversarial stances between these parties.

However, we are also here because we know that can't continue. The costs are mounting, and if this injunction is denied, we also have evidence that trials are coming up in

these arbitrations. Evidence needs to be collected. Some of it goes to the personnel of the Debtors, what they said when. So it's going to result in quite a lot more activity if this injunction is not granted.

Finally, in some of the filings from the FINRA Plaintiffs, there's citations, especially I think in several documents in the transcript and in the hearing last time, about one case, and the suggestion that because it's only a contractual indemnification claim and not some sort of absolute indemnification right, that it's not strong enough for this Court to place an injunction on the arbitrations. I would just simply say there's no basis for that.

I'm going to cite three cases where there was an apparent contractual agreement justifying an arbitration. The first is *In re SVB*, 2023 Westlaw 2962212. That involved an injunction of FINRA arbitrations; *In re W.R. Grace*, 386 B.R. 17 from Delaware in 2008; and *In re Genesis Health* from this very district just in 2026, Westlaw 1194759. At the second page, it's describing a bankruptcy court holding, which it then overrules for unrelated reasons.

So against this, we have repeated citations to one case out of Louisiana called *Ferrandino & Son*. That was a case where the indemnification was sought by a general contractor who was not the debtor. It was a third-party defendant. Its clients hired it to build a building. It didn't build the

building. It claimed that its subcontractor had breached its contract. The subcontractor was in bankruptcy. But there was no privity between the Claimant, who had paid for a building and didn't get it, and the subcontractor. That Claimant did not have a claim in the bankruptcy. It had nothing to do with the bankruptcy.

And the most important point was, in that case, the debtor and the Subchapter V trustee came in and opposed the injunction. And they offered their own indications that they didn't need this injunction to have a successful confirmation. They were offering the exact evidence against what's been presented today.

And also, Your Honor, this is not a construction case. The major point that's been brought out in a lot of evidence from the FINRA Plaintiffs themselves is that what they are seeking -- first of all, they have claims in this proceeding. There are many of them. They have a huge impact on what's going on. And what they are seeking is recovery of the loss they suffered from the Debtors. They just want it from a different angle.

Likelihood of success, I think, was covered, and that, in a bankruptcy context, is basically the probability of a successful reorganization. We're here because we believe that it is probable and we want to work with the Debtors to do that. And you've heard the Debtors' own testimony that

they believe it's probable as well.

I just want to point out that -- well, as part of that, and this is to the point I just made, allowing the arbitrations to continue does raise barriers to reorganization, in our view. And again, it's because the Plaintiffs are seeking damages expressly for the value of their lost investments. All of the Statements of Claim that I have seen seek compensatory damages and rescission. What they basically say is we should get our money back; you should have to guarantee, as Broker-Dealers, the investment that we made in IHC.

They want the money that they gave to IHC back. That is exactly what they are seeking from IHC in this bankruptcy. And the indemnification and the resources that the Debtors will have to devote to these disputes are what gives you the identity of interests that connect these claims and make a resolution through the bankruptcy absolutely important.

There have been any number of statements saying that the allegations in the FINRA complaints have nothing to do with IHC and IHC is not a party. We also know that IHC is not subject to FINRA jurisdiction. Unless it agrees to be part of the arbitration, it can't become a party. And any assertion that the arbitrations don't concern the Broker-Dealer's conduct or concern the Broker-Dealer's conduct alone and not IHC is simply not credible. It's belied by

statements from the FINRA Plaintiffs, it's belied by statements from their websites, and it's belied by the nature of all of the defenses raised by the Respondents in those pleadings.

There has been plenty of discussion on insurance policies that I want to add to Mr. Hall's comments and to Your Honor's questions. First, I want to point out it's questionable, the value of the testimony we have around these policies. Only the carrier can say what it's going to cover, how much is exhausted. There are different policies held by different Broker-Dealers for different periods. Some of them do and don't relate to IHC.

We would not be here if we didn't have value to contribute in a settlement or a mediation and towards plan confirmation. We wouldn't say that if we thought there were other liabilities out there relating to some other investment that could eat up everything we could give to these Debtors. There would be no point to this. That's why there's a time limit on the proposed injunction, right? Because if it turns out there's no there there, why bother continuing?

Your Honor, on the balance of harms, the harms to be balanced, as I think everyone agrees, is that the Debtors incur these enormous costs and potential delays makes Chapter 11 confirmation harder. The harm to the Plaintiffs is the harm caused by any delay in the enforcement of their rights.

And I would point to the *SVB* and *R & G* decisions again, where the Court balanced these and found that the debtors' confirmation was more important.

I don't see -- well, I'll just make one point, Your Honor. There's been some discussion and evidence in the record that there are some aspects of some of the arbitrations that don't relate to IHC. There is nothing I'm aware of in FINRA procedure that prevents any party from amending their claim to sever the non-IHC elements, and my clients have no opposition to permitting any such amendment. And in fact, it would seem that with such amendment this injunction should not apply.

And all I can say around that in terms of the finances and so forth is there's no other IHCs out there. There are plenty of DST Investments that are performing, but our clients don't consider that there are any damages in any other investment and arbitration allegations that have been raised that would prevent them from participating in fruitful settlement mediation discussions in this case.

As to public interest, Your Honor, courts have routinely found that the public interest is served by a successful reorganization. We saw how certain witnesses are advertising for these claims. They are going out and telling the public there's a bankruptcy going on. One of the websites we saw even says it's going on and there's this alleged misconduct.

They are skirting many of the issues in this bankruptcy case and they're saying, come with us, we'll get you money from the Broker-Dealers, you'll get it faster that way.

But again, these are the same claims. They are created by conduct of the Debtors. The Debtors' conduct is intrinsic to them.

The Bankruptcy Code itself is the public policy. When a company fails, recoveries against that company should come from the bankruptcy, and when -- especially when the facts disclosed in the bankruptcy make very clear that there would be significant factual issues in the way of any securities regulatory recovery that might otherwise be available. That's especially when bankruptcy has to matter.

I will stop there, Your Honor, unless Your Honor has any further questions.

THE COURT: Thank you, sir.

MR. AXELROD: Thank you.

THE COURT: All right. Mr. Taylor?

CLOSING ARGUMENT ON BEHALF OF THE DST INVESTORS COMMITTEE

MR. TAYLOR: Thank you, Your Honor, and I'll be brief.

I got into this after the TRO hearing, so I was playing catch-up. And when I was reading through the various pleadings, the first thought that occurred to me was that the FINRA Plaintiffs were asking for a court-sanctioned version

of the *Hunger Games*.

As I thought about it more, I realized that's actually just the opposite, because the *Hunger Games* was about surviving the longest. What the FINRA Plaintiffs are looking for in this case is to get to the trough first and get as much as they can before that trough runs out.

And we realize that there are 150 of these that are being represented and have claims against the Broker-Dealers, but we have to balance that against the full pool of the 2,300 DST Investors that we represent.

So, in that context, I really liken it to the Sooners in the Oklahoma Land Rush. They want to get out there, they want to get ahead of the game, and they want to get what they can. Unfortunately, that works to the detriment of the body of the DST Investors.

Now, we can debate outside the bankruptcy context whether that's proper or not. But within bankruptcy, we know two things are true. One, there's a goal to maximize the recovery for all creditors; and, two, there is a requirement that the distributions be equal among similarly-situated creditors. If you're in the same class, you get treated the same. And the notion of getting to the front of the class and getting more is absolutely diametrically opposed to the goals of class preservation within the bankruptcy context.

To illustrate this point, the Court may recall, and maybe

this is an offhand comment, but in their opening Ms. Jones actually acknowledged the fact that they were running ahead of the game and they were front-running and basically said that's too bad, that we got here first. If we collect against the insurance first, that's because we got there first.

That's not what we're here about today, that's not why this bankruptcy is in place, and that's not the ultimate goal of the bankruptcy. Your Honor, what we're asking for, and we understand that if the other non-IHC arbitration plaintiffs move forward on their claims that could result in a diminution of the policy proceeds, either through the awards or through defense costs. But pausing this for 120 days, at least with respect to the IHC Claimants, Plaintiffs, FINRA Plaintiffs, gives us a chance to craft a solution that results in an equitable distribution to all similarly-situated DST Investors, which is really all we're asking for. We get to avoid the defense costs and awards related to them. Hopefully, we can avoid awards and defense costs related to other Claimants, and we avoid what we think will be a barrage of indemnity claims. No, it hasn't happened yet, but it doesn't take a rocket scientist to figure out what's going to happen in this case. It is a logical inference that the indemnity claims are coming and will be there at some point, and that's going to deplete the company's resources and its

insurance.

So, Your Honor, really, all we're asking for is a pause in these proceedings, and we're asking that the Court to keep the dinner bell from being rung and give us all a chance to get to the same process.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Taylor.

Mr. Kurzweil?

CLOSING ARGUMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

MR. KURZWEIL: Thank you, Your Honor. I'll try to be brief here and not cover what's been covered already.

Your Honor, this is the very reason the bankruptcy proceeding is going forward, and that is to maximize recovery and distribute the assets and the available resources in a fair version under the Bankruptcy Code.

I do agree with Mr. Hall that we believe bankruptcy trumps arbitration, especially in cases like this when you have a limited asset pool, as these policies are, and a vast number of claims against those assets.

And we could talk about the unsecured creditors, we could talk about the DST Investors. This is about all the investors. And it's about avoiding the rush to capitalize on those assets, which is very clear in the evidence here.

Not going through all of the four criteria that were

raised, the Court did have some questions about some of the things that were brought up. And one was the investigation. It's clear here that the overwhelming evidence and the only evidence in the record is that there's common identity of the interests here. And, Your Honor, and the documents are very telling in the advertising that was going on that are Exhibits 8 and 9 for the Ad Hoc Broker-Dealers. And it was clear in -- and I'm quoting from the particular advertisement of Document Number -- of Exhibit 10 of the Ad Hoc Committee.

THE COURT: 8 and 10.

MR. KURZWEIL: Yeah, 8 and 10, but I'm quoting from 10: You want to be represented by securities attorneys who are knowledgeable about this assisted-living developer and the IHC Funds and DSTs they were issuing.

It's clear that they are focusing on the IHC Investors as their clients in order to have a rush for those assets that are available. It's even more clear that they're tagging Inspired Healthcare Capital Loss Lawyers as a way of advertising and focusing directly on that. And a way to deal with that is a balancing of the equities, and that is a limited time period for the preliminary injunction. Limited in this case would be the 120 days, because, really, nothing can get done before that time, and then coming back to the Court on that and showing the progress that was made. And that is the Committees working with the Debtor, working with

the Ad Hoc Broker-Dealers in order to maximize this return and these available assets for the benefit of all creditors. And pointing out that this is an unusual situation that those creditors, on both sides, these are the creditors that the Unsecured Creditors represent, the creditors that the DST Committee represents, the ones where we're trying to avoid the race to the arbitration, the race to the courthouse, so these can be distributed for all creditors fairly under whatever is determined, negotiated, or ultimately decided by this Court.

There are limited resources here. These are wasting policies. There is no evidence to the contrary. The fact that there are the commonality of issues and interests means that an investigation has to be done. And as much as the Plaintiffs talk about, well, we're not interested in IHC, the truth is and common sense dictates and it's clear from the evidence that what happened matters. And the fact that they're saying the conduct of IHC doesn't matter, Your Honor, that's not credible in a situation like this, because, otherwise, why would they be focusing on the IHC victims in this case for their clients? Why else would they say having an expertise in this assisted-living developer matters? And we all know in bankruptcy cases and recovery what happened matters.

And this case should be about transparency, the theme

we'll keep going through. It should be about equitable distribution. There were a lot of people that were wronged in this case. We should find out what happened and make it right and distribute it to all creditors, all parties fairly, not just those who have the ability to rush to the courthouse and the first few to get there.

THE COURT: All right. Thank you, sir.

All right. Mr. Simon?

CLOSING ARGUMENT ON BEHALF OF CERTAIN FINRA ARBITRATION CLAIMANTS

MR. SIMON: Thank you, Your Honor.

Your Honor, we heard a lot of fine argument, but we also heard a lot of things that just frankly aren't true. And so I'd like to bring the Court back to what the actual legal standard is and to dispel some of the myths that we've heard for the last hour.

First, likelihood of success. Likelihood of success is not whether the Debtor will reorganize. Likelihood of success, what the Debtor has to prove is that it is likely to succeed in a full trial on proving an identity of interest between the Debtor and the Broker-Dealers. That's what they have to prove. That's what likelihood of success means. Because the legal standard is what do you have to prove in the Fifth Circuit, in order to get a temporary injunction? You have to prove to extend the automatic stay to a

nondebtor, you have to prove that there is an identity of interest.

Identity of interest. Not common interest, similar interest, gee, we're all rowing the boat in the same direction, wouldn't it be wonderful if we all got this relief? But identity of interest. That's what they have to prove, and they don't get there. And they don't get close.

And likelihood of success means they have to show you that if we had a full trial they're likely to get to that result. And they can't. And they won't. And we have a significant, serious failure of proof.

Now, in the Fifth Circuit, the standard for extension of the automatic stay is identity of interest. That means that a judgment against the party the Debtor is trying to protect -- here, the Broker-Dealers -- by extending the automatic stay would also establish the Debtors' liability on the same claim.

And there are a few special situations when that can be true, and that situation is when the debtor would be vicariously liable. And vicarious liability, typically partnership, *respondeat superior*. Contractual indemnity, maybe, depending upon what that indemnity is, how broad it is, what the exceptions are, what are all the other things that might create a defense to that contractual indemnity. And we'll talk more about that.

Fifth Circuit case law makes clear that the identity of interest must be actual identity of interest, not alleged or potential identity of interest. We cite several cases about that in our brief, but I'll cite one to the Court. The court in *In re Divine Ripe, LLC*, and that's 538 B.R. 300 at 312, from the bankruptcy court from the Southern District, explained that in order to extend the automatic stay to a nondebtor, "There must be an actual, as opposed to an alleged or potential identity of interest, such that a judgment against the non-bankrupt party would, in fact, be a judgment against the bankrupt party."

That's what they have to prove, and they don't get near that. In other words, why are all the reasons they don't get there? First, the Debtors are not parties to any of the FINRA arbitration proceedings. That is, they were not made parties by any of the FINRA Claimants, and they were not brought in as third-party responsible parties by any of the Respondents in the FINRA arbitration actions.

That is undisputed, and our clients all testified, Mr. Nekvasil, Sam testified, and certainly Mr. Jones, all gave that testimony, and the documents themselves all reflect that fact. In every one of the 105 or more FINRA arbitration actions and answers that were admitted into evidence, there is not a single one in which the Debtor is a party.

As a result of not being a party, the Debtor is not

subject to *res judicata* or issue preclusion or anything that happens in any of those FINRA arbitration actions.

Second, our clients, in their 11 FINRA arbitrations, and in fact, all of the other Claimants in the FINRA arbitration actions, do not assert any claims against the Debtor and they do not -- the claims do not require proof of any misconduct by the Debtor.

Now, in some of those Statements of Claim that we read, there is mention that the Debtors might have done something wrong, but those are not claims asserted against the Debtor. And the Debtor is not going to be bound by any fact findings that come out of those proceedings. Thus, a judgment against the Broker-Dealer is not a judgment against the Debtor.

And very specifically, the Court heard evidence that the Broker-Dealers have independent duties to their clients, and that the Debtor can lawfully sell risky securities. And nothing -- not necessarily anything wrong with that, as long as the proper disclosures are made. But the Broker-Dealers may not be able, permissibly, to recommend those securities to their clients, or -- well, first they have to -- they have to do due diligence to determine really what this investment is. They have to really understand the investment. And then they have to recommend the investment as being appropriate to their client.

And the Broker-Dealers can breach those duties, even if

the Debtor has done absolutely nothing wrong. The Debtor has issued a security that is lawful, proper in every way, but risky. The Debtor hasn't done anything wrong. But the Broker-Dealer may have done something wrong with respect to its client and incur liability.

Thus, the Broker-Dealers can easily incur liability to their clients under the Broker-Dealer Agreements without any finding of improper conduct by the Debtor, and the Debtor wouldn't be bound by it anyway, because the Debtor is not a party.

Third, the Broker-Dealers. The Respondents in those 11 FINRA arbitration claims do not assert any cross-claims against the Debtor or allege any specific misconduct by the Debtor. Now, we have heard testimony that, well, maybe they might do that in the future, but the Court cannot issue injunctions based upon what people may do in the future, because if the Court is trying to predict the future behavior of what people might do, that would be a potential identity of interest or an alleged identity of interest, not an actual identity of interest, which is the legal standard, and they don't get there.

Next, so nothing that happens in these FINRA arbitrations is a judgment against the Debtor and does not establish the Debtors' liability. And that really is the end of this discussion, but there's a lot more.

The FINRA arbitrations, the Debtor talked about the burdens that these FINRA arbitrations impose upon the Debtor. The Court heard the testimony of Mr. Jones, very candid testimony. Mr. Jones is a commendable witness for his candor. There is no real burden. The Debtor is proceeding with its reorganization. It is proceeding with its sale process. The Debtor is not responding to discovery requests. In fact, when discovery requests were sent to the Debtor, the Debtor said, nah, we're not going to respond, and the Debtor is not responding.

Thus, the Debtor is not incurring any costs or any expenses other than the cost of one letter from the Debtors' counsel saying back to a FINRA arbitration request, we're not going to answer. And he candidly said, no, we're not really incurring any costs because of that.

And the Debtor has the benefit of the automatic stay, which means that the Debtor is not going to be litigating indemnification claims that it might have to deal with outside of bankruptcy. But in bankruptcy, the Debtor doesn't have to do that.

The Debtors are bystanders to the FINRA arbitration claim -- the FINRA arbitration cases, and any incidental burdens they may bear are very slight, based upon the testimony, undisputed testimony of Mr. Jones, and do not justify enjoining the Claimants in 109 FINRA arbitration proceedings

from seeking recompense for their losses from the Broker-Dealers whom the Debtors allege caused those losses by breaching their duties to their clients.

The Debtors' next argument is that they may have indemnification obligations to the Broker-Dealers. Well, first thing to know is no indemnification claims have been asserted up to this point. Second, Mr. Jones admitted, quite candidly, that any future indemnification claims are potential only and thus not actual claims, which is what the Fifth Circuit would require.

Third, it is not at all clear that this indemnification would apply at all, at least not to most of the various arbitration proceedings. And here I will refer the Court to the indemnification provision, which is Section 8 of the Master Broker -- the Managing Broker-Dealer Agreement. I have it at Exhibit 11 for the counsel of the Ad Hoc Group of Broker-Dealers, but it's also our Exhibit 4. It's attached to the Debtors' Exhibit 1. So whenever the Court has a copy of that, then we'll go through it.

THE COURT: Oh, you want me to get that now?

MR. SIMON: Yeah. Yeah.

THE COURT: All right.

MR. SIMON: Our Exhibit 4.

THE COURT: I've got it right here.

MR. SIMON: Yeah.

THE COURT: Let me find your binder. All right. I'm there.

MR. SIMON: Sure. The important thing, Your Honor, before we go through this, the Debtor is not an insurer for the Broker-Dealers. It's not saying, no matter what happens, if you are held liable, we've got your back. It's saying: If we do these things that caused losses to you, then there's an indemnification claim.

So the first thing under -- and this would be Page 12, A at the top, it says, okay: Claims, damages, expenses that arise out of or are based upon. So in order for the Debtor to even potentially have liability, the Broker-Dealers' loss must be based upon -- must arise out of or be based upon one of these things.

And first, the Broker-Dealers can breach their agreements to their clients lots of different ways without the Debtor having done anything wrong.

Then, the Debtor says: These things, these things we might be liable for if it causes loss to you. Any untrue statement or alleged untrue statement of a material fact contained in the memorandum, authorized sale material, or in any application. We heard some discussions about the Debtor might have made some misrepresentations, but what the Court did not hear was the Debtor saying, oh, yeah, we made misrepresentations. We made misrepresentations to the

Brokers, and because of those misrepresentations these Broker-Dealers suffered losses. You did not hear that testimony.

And Mr. Jones testified at great length. He said, you know, we think Mr. -- the Debtors, we may have claims against Luke Lee, who may have misappropriated money. We think we may have claims against the Broker-Dealers for their own misconduct. But he didn't say, oh, yeah, we made untrue statements of material fact in the memorandum, authorized sales materials, or in an application. And therefore, by God, we'd be liable for this. You didn't hear that testimony.

The next is the failure of Inspired Healthcare to comply with any of the provisions of the Securities Act, the Exchange Act, the regulations thereunder. I won't read the whole thing. Same thing. You did not hear Mr. Jones say, oh, yeah, we breached the Securities Act. We breached the Exchange Act. Yeah, we're liable, we breached that. You didn't hear that testimony.

The next is any unauthorized verbal or written representation in connection with an offering made by Inspired Healthcare, its employees, affiliates, agents, in violation of the Securities Act. Same thing. Mr. Jones didn't say, oh, yeah, we did that. We didn't hear that testimony.

The same with #4, the same with #5. So, yeah, it's possible, it's possible that there could be an indemnification claim, maybe, but the Court didn't hear evidence that the Debtor is liable for any of those claims. So, again, we're back to there is no indemnification claim yet, and any indemnification claim is possible, potential, speculative, maybe it might happen. That's not identity of interest. That won't get you there. Not in the Fifth Circuit.

Then the Debtor says, at least in its pleadings, I didn't hear much argument about it, but in the pleadings and in the opening the Debtor talked about, well, there may be a principal-agent relationship. Well, there could be, potentially, except that Section 13 of the Managing Broker-Dealer Agreement says, no, this agreement does not create a partnership, it does not create a joint venture, it does not create a principal-agent relationship.

Yes, the company, the Managing Broker, was an agent in the sense that it was authorized to go sell the Debtors' securities, but it specifically disclaimed any fiduciary duty to the Debtor, any partnership arrangement with the Debtor, or any principal-agent relationship with the Debtor.

So does that establish an absolute agency whereby the Debtor would necessarily be liable for the actions of the Broker-Dealer? No. Not even close.

Is there an argument that might potentially be made? Sure. But, again, that's alleged, potential, not actual. Actual identity of interest is the standard. Again, we don't come close.

The Debtor's next argument is that the FINRA arbitration claims might implicate their insurance, I think, and they don't. None of the FINRA Arbitration Claimants have made any claims against the Debtors' insurance. And both of the two witnesses who testified, Sam and Mr. Nekvasil, both said, no, no, we don't -- we're not -- we make any claims against the Debtors' insurance and we're not aware of any claims against the Debtors' insurance.

Mr. Jones testified the Broker-Dealers are not named insureds under that policy, either. So the Debtors' insurance policies are not wasting because of any claims asserted by the Broker-Dealers, they're not claimants under that policy, just as the Arbitration Claimants are not Claimants under that policy.

The argument -- and it's really, frankly, a bizarre argument, Your Honor, when you put it into its proper context -- is you need to enjoin these lawsuits because these Broker-Dealers over there, they have insurance, and if these FINRA arbitration claims are allowed to go forward, then their insurance might be exhausted.

That's a really remarkable argument, because the argument

is that the insurance policies of the Broker-Dealers, who are not debtors, are property of the bankruptcy estate. And there is no legal -- there's no authority, no statutory authority for that, there's no case law authority for that. That is fanciful. That's simply the argument that I should be able to enjoin somebody from suing somebody else I have a claim against because that person may get all the money first. Yeah, that's true. That is absolutely true. That the other person -- you know, if John were suing Cal back there, yeah, John might win and get all the money before I do. Sure. But that's just ordinary common law. There's nothing, there's no legal principle that allows me to -- or would allow any court to enjoin John from suing Cal just so that Cal still has money to pay me when I finish suing Cal.

The Court is limited to protecting property of the bankruptcy estate, and the assets of the Broker-Dealers are not property of the bankruptcy estate and their insurance policies are not property of the bankruptcy estate. And the assertion that somehow the Court can impose an injunction to prevent anyone from going to get property because the Debtor might also have a claim against that person is an overreach. It's actually a stunning overreach. It's actually rather surprising that that argument has been made, but it has been. However, the Court should focus on what that argument is and how frankly absurd it is.

Now, there is another problem, and the Court identified this problem, which is other people have claims against those same insurance policies for the Broker-Dealers' alleged failures with respect to their claim, with respect to their clients and non-IHC securities. Of course. And if the Court were to enjoin the FINRA Claimants here from pursuing their Broker-Dealers and those insurance policies, then the other Claimants against those Broker-Dealers, suing the Broker-Dealers for non-IHC securities, would have first crack at those insurance policies and the assets of the Broker-Dealers. And they may get all of the assets of the Broker-Dealers and all of the insurance policies, and that would be really sad.

But there's nothing the Court can do about that. And enjoining these Claimants from pursuing the Broker-Dealers and their insurance policies simply because the Debtor might also have a claim against those people is absurd. And it specifically prejudices those people because they are losing -- those Claimants because they are losing out on the opportunity to go get insurance, which is supposed to protect them, before other Claimants get that money. And they've never had -- never had an answer to that.

I mean, the Court asked Mr. Hall the question, Mr. Hall tried to answer it, but there really isn't an answer. The Court is specifically disadvantaging one group of claimants

to the benefit of another group of claimants without any lawful basis. Well, would be disadvantaging one group of claimants against a nondebtor and a nondebtor's insurance policy to benefit another group of claimants against a nondebtor and a nondebtor insurance policy, with no lawful basis. The Court should resist, resist, the temptation to do so.

The Court also heard the rather remarkable statement that bankruptcy trumps arbitration. And I agree it would for claims against the Debtor. But bankruptcy does not trump arbitration for claims of a nondebtor against another nondebtor.

And I don't think the Supreme Court thinks that, either. The Supreme Court has been very clear that the Federal Arbitration Act means what it says and the Bankruptcy Codes are supposed to -- or the bankruptcy courts are supposed to respect it. The bankruptcy courts are not supposed to enjoin arbitrations unless it's a claim against the debtor. And a core claim against the debtor. And then it's part of the claims allowance process and the Court can, under those circumstances, say, you know, this is -- that's my job, to adjust claims against the debtor.

But when we're talking about claims of one nondebtor against another nondebtor that would be paid for out of property that does not belong to the Debtor or the Debtors'

estate in any way, I do not see how the Bankruptcy Code trumps the Federal Arbitration Act, and I don't think the Supreme Court would, either.

The Court also heard a very interesting argument that the 14-day rule, which is in Paragraph -- Section 8(d) of the Arbitration Agreement, this would be 8(d), that 14-day rule is unclear because it's not -- no one could figure out or wouldn't -- no one would necessarily know when that 14 days begins. It's because it says: After a claim is brought or asserted against Inspired Healthcare or the Managing Dealer, which, in the opinion of either, is subject to the indemnification provisions in Section 8.

Well, Your Honor, obviously, there's a degree of subjectivity to that, but getting sued in a FINRA arbitration would be notice to you that you might have an indemnification claim. And so that's the reasonable time from which the 14 days should run, when you, the Broker-Dealer, get sued in FINRA arbitration. Now you have -- based upon your sale of IHC securities. That would be your notice that, yeah, yeah, in my reasonable opinion, that would be the time to go assert an indemnification claim, if I had one.

And the testimony we've heard is hadn't happened. These arbitrations, at least in the case of our clients, their arbitrations were pending since, at least one of them, since June 2025.

And 14 days came and went. And all of -- in fact, I believe the testimony was all of my clients' arbitrations except one were filed before the Debtors' bankruptcy petition, and that 14 days came and went without any indemnification claims being filed.

And based upon that, the Court could reasonably infer, and should reasonably infer, that these indemnification claims are alleged, potential, possible, but not actual claims establishing identity of interest between the Debtor and the Broker-Dealers.

That's the standard they have to meet. They don't come close. The motion should be denied.

THE COURT: Thank you, sir.

Ms. Jones?

CLOSING ARGUMENT ON BEHALF OF CERTAIN FINRA CLAIMANTS

MS. JONES: Thank you, Your Honor. I'm going to try not to repeat argument as much as I can. I'm going to try to focus a little bit on a few specific things.

Okay. So, first, there's a new proposed order. Or I'll say it's a new proposed order. For the first time, we have seen a proposed order setting forth the relief and factual findings and everything that the Debtors are asking this Court to find today and then to conclude. And I know, Your Honor, I don't expect a ruling from the bench today, I don't think. I don't -- I might be guessing.

And you're going to look carefully over the record. You're going to consider what's been filed. And I would just caution the Court, there's so many findings in here that they're asking for that just -- there just wasn't even a discussion about today. And so I am a little concerned about that, but I don't want to go through every one, because I know you're going to do that.

So one of the things we heard today that -- or that we heard is that just the fact of these indemnity provisions is -- to some extent, we're hearing this is about identity of interest, but it's also being used on the side of harm, right? They're saying that the existence of these alleged -- you know, the indemnity provisions that they allege will result in claims against the estate will harm the estate because it will result in, you know, more claims against the estate. And that's if there's indemnity, right, and there's a big if.

We really didn't hear much about that today, really anything about that. In fact, I think what we heard Mr. Jones say was that he flipped through the Statements of Claim. But we didn't hear any real analysis about any specific claims, and kind of relative to the indemnity provisions, to say why there's a real concern about the fact that the claim would be valid against the Debtor.

And it's really from this place of there are these pieces

of paper that say the word indemnity and therefore we're at risk of harm. And from there we sort of slide down the slippery -- the slope that this is going to be catastrophic for the Debtors. Well, I don't really understand why. Because I think we understand that if -- even if there's indemnity, and like I said, it's a big if, these are going to be general unsecured claims.

There's no discussion from the Debtors about how they're going to object to those claims and ask to subordinate them under 510. It's an option. We didn't hear anything about any effort to try to mitigate this catastrophe that's going to happen to the Debtors if these claims are established.

We didn't hear -- we haven't seen a dec action for a determination that there is no indemnity obligation. It's just kind of like, we're just going to accept that it's out there, or maybe we just don't want to know right now.

Or, you know, what about the fact that, under 506(e), maybe those indemnity claims have to be disallowed. Shall. It says shall be disallowed if they're contingent at the time that they must be allowed. So we really don't hear anything about that.

We also don't hear anything about the claims. We don't hear any evidence today about what are the proofs of claim filed in this bankruptcy case. From federal claimants, if there are any. We don't have a single proof of claim in

evidence, we don't have a claims register, we don't have any testimony about it, we don't have anything in the record about the overall universe of the Debtors, the capital structure, how much they're going to owe, whether they're even going to get to general unsecured creditors under the plan. We have no idea.

And so this idea that the possibility that -- and we still have to get through the actual analysis of whether there's an indemnity obligation. But just the possibility or the fact that the word exists on a piece of paper is going to destroy the entirety of the bankruptcy case or the success of what they're calling a reorganization but -- you know, is just not really supported by the evidence actually here today. We don't know what it would do, because we don't even know what the claims would be. And by claims, I mean the proofs of claim, not the arbitration claims.

We -- there was -- and I kind of want to focus a little bit on harm, and I appreciate Mr. Simon's comments about property of the estate. There are findings in this proposed order that they're asking you to find that the continuation of the FINRA proceedings will or constitutes an exercise of control over estate property. That has not been proven today.

There is no evidence in the record that any of the Debtors' assets are at risk here relative to the FINRA

proceedings. In fact, we have evidence to the contrary, that they're not -- that the FINRA Claimants are not seeking, for the claims asserted in the FINRA proceedings, they are not seeking -- they are not looking to the Debtors' assets. So that's an issue on property of the estate.

But regarding harm, there was an argument that the Broker-Dealer's insurance would be exhausted and the Debtors would be left with no remedy. And I think it was Mr. Hall who said, you know, there was no evidence of wherewithal of the Broker-Dealers. And I agree, there was no evidence of wherewithal of the Broker-Dealers.

So the idea that that's a harm, I don't think there's any evidence in the record to establish that the Debtors would be harmed by the continuation of the FINRA proceedings in that regard. There's not -- not only is there not any evidence of their wherewithal, there's no evidence of their lack of wherewithal to satisfy the, you know, potentially, the Debtors' claims.

Oh. One of the arguments is that the Debtors want to -- they do want to reach an agreement with the Broker-Dealers, and they want to try to get their insurance to cough up the coverage under the policies, and they want to try to beat the FINRA Claimants to that money.

The problem with that is, if it's the Debtors' money, I mean, maybe they've got a shot at that argument. When it's

-- and they say, well, we don't want to affect anybody's rights. We just want to -- we just want to make sure we can get to it first. Well, that is definitely affecting their rights, because their rights exist against third parties and third-party assets that are not Debtor assets.

And to deprive those people of their right to proceed against nondebtors for non-estate property is not -- I don't -- something the Court could do. And it's not something 362 was intended to do.

So I thought that comment about the *Hunger Games* was interesting, because it's just -- I haven't even seen the *Hunger Games*, but I guess if we're all in the *Hunger Games*, you know, all of the FINRA Claimants are getting tied to the tree with no weapons or anything whatsoever so that the one person is guaranteed to win the *Hunger Games*. And so, as it stands right now, everybody's got a fair shot to get there at the same time.

There was -- there is evidence -- there was argument about that this will cause such an enormous burden on the Debtors to allow these FINRA arbitrations to proceed. I think Your Honor has picked up on Mr. Jones' testimony that he said, well, we really haven't had to spend any time on it. I think we heard the Broker-Dealers' attorney ask the Court to use its imagination. I would like you to look at the evidence. And I know you will, and it's no shade on your

imagination, which I'm sure is really good, but, you know, I don't think you can use your imagination at the end.

THE COURT: Well, you don't get if you don't ask.

MS. JONES: Right. So, you know, I think that we need to really look at what the actual harm is. And so there's this, well, the Debtors are not going to be able to confirm a plan of reorganization. One, I'm not even sure it is a plan of reorganization. I'm pretty sure I'm hearing it's a plan of liquidation, but called reorganization, but there's a sale of assets, and then there's going to be a channeling of money into a trust, and somebody's going to go pursue claims, whatever those are.

So there's -- there was zero evidence offered today about what's happening, really, in the plan process, or exactly how these FINRA claims are going to prevent the Debtor from being able to confirm a plan. The --

(WebEx interruption.)

THE COURT: Hold on, 949. We'll mute you as soon as we find you. There we go.

MS. JONES: I don't think we heard any evidence today either about this impeding the sales. In fact, what I think I heard testimony about was we're rocking along, you know, working on our plan, working on our sales. We're engaged in extensive discussions with the Ad Hoc Committees. We're sharing information with them. We're letting them talk

to insurers. We're giving them all that information, and that hasn't collapsed the case.

So, I mean, there is an investigation going on relating to these issues. It's just not one that the FINRA participants -- or the Claimants are being allowed to participate in.

And in fact, what we heard was we heard if you don't issue this extension of the stay or you don't issue a preliminary injunction, that the FINRA Claimants should not even be allowed to do any discovery whatsoever in the main bankruptcy case.

One has nothing to do with the other. People can take -- people can take -- they can get discovery under 2004 if they want to relating to their bankruptcy claim. That's a totally separate issue.

But getting the stuff from the FINRA proceeding, I mean, the testimony today was they're not asking for it. Nobody needs information from the Debtors to move forward with the FINRA proceedings.

So what I heard was: But if you don't do it, at least shut the FINRA Claimants up and don't let them ask for anything in this case. And those are completely separate baskets of rights and completely different procedures that are available to the FINRA Claimants.

So, yeah, I think this issue about distraction of

employees, I mean, the 14 people that are working there have managed to carry on a sale process, move towards a plan of reorganization, and engage in extensive discussions that we're not even allowed to use our imagination about because they're definitely not going to tell you anything about that today, you know, what the conversation is about.

They could have brought somebody in here today from on the Broker-Dealer side to say, we're definitely going to assert indemnity claims. Instead, they just want to stand up and argue that it doesn't take a rocket scientist to know that that is coming. Maybe, maybe not, but we don't know. There's no evidence of that. There is no evidence of claims, there is no evidence that there's going to be claims. There may be, but again, that's asking the Court to find harm based upon the occurrence of an event that just hasn't happened yet.

Asking for a temporary stay, Your Honor, is not going to -- I don't think is going to particularly help. In fact, I think what we heard today was Mr. Nekvasil testified that, under the FINRA Rules, they put elderly and ill people at the front of the line so that their cases can go to a final hearing, or I'm sorry, I don't know what it's called, before other people. So they prioritize those.

And so the temporary stay, the period of time that this is going to cover, this 120 days, is going to hurt the

weakest people in the bunch.

And the notion that bankruptcy trumps arbitration and the goals of arbitration and what public policy has dictated for FINRA arbitrations in terms of protecting the rights of these investors is simply just not the case. Although I think bankruptcy is great. I've been doing this for a long time. But so is arbitration. So, and I think we've heard that and there's statutes for both of them.

So, you know, and if you look at 362, it doesn't say we're going to -- 362 also -- I mean, Congress could have written something that says bankruptcy trumps arbitration and therefore we want 362 extend to any arbitration that could potentially touch upon or affect in any way the debtor. It doesn't say that.

So the idea that -- I just don't -- I didn't hear anything compelling about the Bankruptcy Codes and how it trumps the Federal Arbitration Act.

I think -- I do think there is a jurisdictional problem. I think there's a personal jurisdiction problem, at least with respect to entry of an order under Rule 65 or a preliminary injunction. I know there's an alternate pathway for relief, but at least as to a preliminary injunction, I don't -- I think there's an absolute failure of personal jurisdiction. And so I don't think the Court can grant relief under Rule 65.

The -- oh. There was kind of much ado about this Exhibit 198, this letter that says, you know, from Debtors to Mr. White, saying we're not going to give you any discovery and this idea that somehow having to give this discovery is going to eventually collapse this estate. We heard Broker-Dealer argue today or Committee of Broker-Dealers argue that they're not going to introduce 408 discussions. But counsel said, But I have said they are happening.

Well, there was no evidence introduced by any lawyers today, and they certainly didn't put themselves on the stand to talk about any of this. And so I'd ask the Court not to consider any of those things.

The statements from the websites that they say demonstrate some type of identity of interest. I think there was plenty of testimony today what those are about. Those are about making claims in FINRA proceedings, which are not claims against the Debtor. And so I think there was sort of a lot to-do.

I'm pretty sure I've never seen 362 treated as a gag order on being able to discuss a debtor. Otherwise, no reporter in the world would be able to ever write a story about a debtor, because then maybe people would find out they had claims.

And so this notion that there's some sort of nefarious intent behind providing information that touches upon the IHC

bankruptcies, there's nothing in the record that shows that that's attempting to solicit clients, even though I don't even know that there'd be anything wrong with it, but there's no evidence in the record to show that they're soliciting clients to file claims against the Debtor to go against the estate property or even file proofs of claim or anything in the case.

So I think there was kind of much ado made about that. And I don't think that that's something that really carries any weight here with respect to whether there's an identity of interest. And that's going to come down to whether there's actually an indemnity obligation.

There was a lot of talk about these policies and coverages and they're wasting. No evidence whatsoever about what the coverages were, how much has been spent, what's been wasting.

I think what we heard was at some point today some discussion that people are aware of it, but it's not something they're going to share with anybody today, but they do want to talk about it in argument. So we just don't have any evidence that there is any wasting or that any money's been spent from those policies or that there's any risk there. So that, they fail (inaudible) there as well.

I'm going fast, so it's good.

Oh. There has been a big discussion about equitably

distributing assets. I agree. That's a good goal of bankruptcy, and we aim for that. But that's equitably distributing the Debtors' assets, not other people's assets that they're going to sweep in and try to also distribute to the bankruptcy, and also have this Court decide claims ultimately because they want to channel it into -- these are claims that don't have anything to do with this bankruptcy.

Again, we weigh that against the harm that we heard about the existence of, I think it was 55-45, 55 percent of the -- these were estimates -- of the pending arbitration claims relate to IHC-sponsored investments and 45 percent of them do not. So I can't think of any reason why the Court should be staying those things.

I will say, in the proposed order that's at Docket 50, there is no carve-out. And I heard some discussion today about, hey, we're not trying to do that, we're not trying to stay these other non-IHC, and maybe there's a way to -- and I think Mr. Axelrod said, you know, we wouldn't oppose carving those out, moving forward with those if they could be severed. But this proposed order doesn't propose that solution to overcome that harm for the FINRA Claimants.

Then I am going to adopt the other arguments that Mr. Simon made so that I don't repeat the case law and arguments, but I do agree with them and adopt them wholeheartedly. Thank you.

THE COURT: Thank you, Ms. Jones.

All right. Mr. Hall. Last word?

MR. HALL: Your Honor, we engaged in our balancing of the equities over here and decided that the Court has been quite accommodating of us. And so we want to thank you and everyone for staying much, much later than I think any of us expected to.

We don't think there's anything that we're going to say that's going to materially move the needle at this point, so we would be happy to submit.

THE COURT: All right. Thank you very much. Ms. Jones, you were correct. Shock, shock, shock.

MS. JONES: I don't want to presume, but I didn't think.

THE COURT: Shock, shock. There's gambling going on in this establishment.

So I think the Court is obviously going to take this under advisement. A lot of evidence, and I do need to go through the evidence, because that's what's going to control the Court's decision on whether or not to extend the stay or to issue an injunction.

So, under Rule 65, so I wouldn't forget to do this since we're literally about two or three hours away from the expiration of --

MR. HALL: For cause?

THE COURT: -- the temporary restraining order, the Court does have the authority under Rule 65(a) -- (b) -- (b)(2), which states that unless before that time, which is the expiration of the 14 days, the Court, for good cause, extends it for a like period. And the reason for the extension is obviously for the Court to rule on the preliminary injunction.

So the Court is going to extend the current order for 14 days, just to be safe. But I intend to issue an oral ruling well within the time period.

MR. HALL: Can we submit sort of a supplemental order extending the --

THE COURT: I think a very short, just supplementing --

MR. HALL: Like, a paragraph.

THE COURT: -- supplementing the order, just to give the Court the opportunity to go through the evidence, which is very important for all the parties. And I'm looking at my calendar.

MR. HALL: I believe we're before Your Honor on the 22nd or 23rd of --

MR. SIMON: 22nd.

THE COURT: 22nd?

MR. HALL: 22nd.

THE COURT: All right. We do have --

MR. HALL: Not to try to impose any sort of time, but just --

THE COURT: No, that's okay.

MR. HALL: -- if you were checking your calendar, which I suspected you were.

THE COURT: Yes, and that's -- so I would probably schedule a -- I definitely want to rule no later than the 24th, which is the Friday, which is two days later. I would love to get it out on the 22nd at that time, since everyone's going to be here, or a lot of you people.

So let's go ahead and do this. I'm going to go ahead and target an oral ruling on July 22nd, 2026, at 1:30, which is when we have matters set in the underlying bankruptcy case. If it looks like that's going to be a little bit harder for the Court, I will let the parties know no later than early next week. But it won't be later than Friday. I've just got to get a ruling out. I should be able to do it by the 22nd. And we'll let the chips fall where they may thereafter, but I think just extending what the Court has already done for 14 days, which will take you through the 28th, pending whatever the Court does.

Yes, Mr. Simon?

MR. SIMON: Your Honor, that's obviously fine with us. That's the Court's prerogative. We would like to make sure that that order does not have any additional findings.

THE COURT: You mean the brief one?

MR. SIMON: The brief one extending the TRO for 14 days --

THE COURT: Yes. Mr. Hall is going to make sure --

MR. SIMON: -- does not have any findings --

THE COURT: Mr. Hall, before he uploads that, he's going to make sure that Mr. Simon and Ms. Jones approve it as to form only. Obviously, not as to content, since I know that you oppose the first one. And then if there is a dispute, you each upload one or the Court will have to craft its own again. But I will leave you to do that.

MR. HALL: I think I understand, Your Honor. It's like a one-paragraph?

THE COURT: Orally, the Court is extending it, and it's effective orally as of 8:00, whatever it is, 8:40 p.m. Dallas-Fort Worth time on July 14th. So it will be extended and will not terminate by midnight tonight. But it would be good to get an order on the docket for everyone to see.

MR. HALL: Absolutely.

THE COURT: But if you can get that uploaded, hopefully with agreement.

MR. SIMON: We'll respond quickly.

THE COURT: I understand. So, with that, again, thank you all very much for your patience. And as always, --

MS. JONES: Thank you.

THE COURT: -- a very excellent argument. And you've put a difficult decision in front of the Court. But thank you all very much. And with that, the Court is adjourned.

MR. SIMON: Your Honor, one unrelated?

THE COURT: Yes.

MR. SIMON: It's not related to this. It's just purely administrative. We have all these boxes here and it's more than we can carry.

THE COURT: You can pick them up. We'll leave them in like the back row and you can just have somebody come pick them up at your convenience.

MR. SIMON: Very good. Thank you, Your Honor.

THE COURT: All right. And then, of course, all of you who are traveling, safe travels. And we'll see you all of you hopefully on the 22nd.

MR. HALL: Thank you, Your Honor.

(Conclusion of proceedings at 8:41 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **08/03/2026**

_________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 5

OPENING STATEMENTS

- By Mr. Hall on behalf of the Debtors 60
- By Mr. Coleman on behalf of the DST Committee 70
- By Mr. Kurzweil on behalf of the Official Committee of Unsecured Creditors 73
- By Mr. Axelrod on behalf of the Ad Hoc Group of Broker-Dealers 76
- By Mr. Simon on behalf of Certain FINRA Arbitration Claimants 79
- By Ms. Jones on behalf of Certain FINRA Claimants 85

WITNESSES

Debtors' Witnesses

Ben Jones
- Direct Examination by Mr. Hall 93
- Cross-Examination by Mr. Simon 158
- Redirect Examination by Mr. Hall 189
- Recross-Examination by Mr. Axelrod 193

FINRA Arbitration Claimants' Witnesses

Kalju Nekvasil
- Direct Examination by Mr. Simon 209
- Cross-Examination by Mr. Kurzweil 225
- Cross-Examination by Mr. Hall 251
- Cross-Examination by Mr. Axelrod 255
- Cross-Examination by Mr. Taylor 266
- Redirect Examination by Mr. Simon 272

Certain FINRA Claimants' Witnesses

Samuel Benjamin Edwards
- Direct Examination by Ms. Jones 276
- Cross-Examination by Mr. Kurzweil 291
- Cross-Examination by Mr. Hall 304
- Cross-Examination by Mr. Axelrod 307
- Cross-Examination by Mr. Taylor 312
- Redirect Examination by Ms. Jones 316
- Recross-Examination by Mr. Simon 318

INDEX
Page 2

EXHIBITS


| | | |
|---|---|---|
| Debtors' Exhibit 1 | Admitted | 113 |
| Debtors' Exhibits 2 through 105 | Admitted | 130 |
| Debtors' Exhibit 110-021 through 110-112 | Admitted | 146 |
| Debtors' Exhibits 188 through 197 | Admitted | 101 |
| Debtors' Exhibit 198 | Admitted | 102 |
| GN Defendants' Exhibit 1 | Admitted | 170 |
| GN Defendants' Exhibit 2 | Admitted | 185 |
| GN Defendants' Exhibit 4 | Admitted | 186 |
| GN Defendants' Exhibits 9 through 35 | Admitted | 122 |
| GN Defendants' Exhibit 6 | Admitted | 147 |
| Ad Hoc Group of Broker-Dealers' Exhibit 3 | Admitted | 199 |
| Ad Hoc Group of Broker-Dealers' Exhibit 4 | Admitted | 199 |
| Ad Hoc Group of Broker-Dealers' Exhibit 5 | Admitted | 199 |
| Ad Hoc Group of Broker-Dealers' Exhibits 1-5 | Admitted | 201 |
| Ad Hoc Group of Broker-Dealers' Exhibit 6 | Denied | 201 |
| Ad Hoc Group of Broker-Dealers' Exhibit 7 | Denied | 202 |
| Ad Hoc Group of Broker-Dealers' Exhibit 8 | Admitted | 230 |
| Ad Hoc Group of Broker-Dealers' Exhibit 10 | Admitted | 294 |
| Ad Hoc Group of Broker-Dealers' Exhibit 11 | Admitted | 206 |
| Ad Hoc Group of Broker-Dealers' Exhibits 12-28 | Admitted | 206 |


CLOSING ARGUMENTS


- By Mr. Hall on behalf of the Debtors 320
- By Mr. Axelrod on behalf of the Ad Hoc Group of Broker-Dealers 344
- By Mr. Taylor on behalf of the DST Investors Committee 354
- By Mr. Kurzweil on behalf of the Official Committee of Unsecured Creditors 357
- By Mr. Simon on behalf of Certain FINRA Arbitration Claimants 360
- By Ms. Jones on behalf of Certain FINRA Claimants 375
- By Mr. Hall on behalf of the Debtors 388


RULINGS


Debtors' Oral Motions to Exclude 18

Motion to Exclude the Amended Witness List (48) 28

INDEX
Page 3

RULINGS, cont'd.

Debtors' Motion for Entry of Order (i) Authorizing the Debtors to File Redacted Version of Complaint Schedule 1 Under Seal and (ii) Granting Related Relief filed by Plaintiff Inspired Healthcare Capital Holdings, LLC (2) 54

Motion to File Document under Seal filed by Creditor Ad Hoc Group of Broker-Dealers of Inspired Healthcare Capital, LLC (45) 56

Emergency Motion for Injunctive Relief filed by Plaintiff Inspired Healthcare Capital Holdings, LLC (3) 388

END OF PROCEEDINGS 392

INDEX 393-395